UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANU UPADHYAY,                             :

                              :    Case No.:  10 Civ. 8462 (NRB)(FM)

                 Plaintiff,         :

                              :

     against                               :

                              :

NEERAJ SETHI, RONICA SETHI                :
SHIKHA SETHI, and GANESH RAJ.             :

                              :

                 Defendants.        :

                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................1

FACTS ......................................................................................................................................2

ARGUMENT ...........................................................................................................................9

I.      THE MAJORITY OF PLAINTIFF'S CLAIMS ARE OUTSIDE
        APPLICALE STATUTE OF LIMITATIONS PERIODS AND
        SHE CANNOT MEET THE EXCEEDINGLY NARROW
        DOCTRINE OF EQUITABLE TOLLING ................................................................9

        A.      Plaintiff Neither Acted With Reasonable Diligence Nor
                Can She Demonstrate the Existence of Extraordinary
                Circumstances .............................................................................................11

                1.      Plaintiff Was Aware of Her Rights Under The Law
                        But Nonetheless Failed To Timely Bring Suit. ..............................11

                2.      Alleged Failure to Post the Required Notices Is
                        Insufficient to Invoke Equitable Tolling. ......................................14

                3.      Plaintiffs Cannot Point to Any Evidence of Record
                        That Defendants Engaged in Conduct That Had the
                        Effect of Concealing From Plaintiffs the Existence of
                        Their Cause of Action.....................................................................18

II.     PLAINTIFF'S FLSA CLAIMS FOR OVERTIME FAIL AS A
        MATTER OF LAW BECAUSE SHE WAS AN EXEMPT
        DOMESTIC SERVICE EMPLOYEE......................................................................20

CONCLUSION......................................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adkins v. Mid-Am. Growers, Inc.*,
  831 F. Supp. 642 (N.D. Ill. 1993) ...................................................................22

*Antenor v. D & S Farms*,
  39 F. Supp. 2d 1372 (S.D. Fla.1999) ...............................................................14

*Archer v. Sullivan Cnty*,
  Nos. 95-5214/95-5215, 1997 U.S. App. LEXIS 33052
  (6th Cir. Nov. 14, 1997)....................................................................................14

*Asp v. Milardo Photography, Inc.*,
  573 F. Supp. 2d 677 (D. Conn. 2008) ..............................................................17

*Astudillo v. U.S. News & World Report*,
  No. 02 CIV. 7902 WHP, 2004 WL 2075179 (S.D.N.Y. Sep. 17, 2004) ................21

*Bowers on behalf of NYSA-ILA Pension Fund Trust v.*
  *Transportacion Maritima Mexicana, S.A.*,
  901 F.2d 258 (2d Cir. 1990)......................................................................10, 11

*Cerbone v. Int'l Ladies' Garment Workers' Union*,
  768 F.2d 45 (2d Cir. 1985)................................................................................18

*Doe v. Holy See (State of Vatican City)*,
  17 A.D.3d 793, 793 N.Y.S.2d 565 (3d Dep't 2005) ..................................10, 11

*Gustafson v. Bell Atl. Corp.*,
  171 F. Supp. 2d 311 (S.D.N.Y. 2001) ..............................................................18

*Hodgson v. Wittenburg*,
  464 F.2d 1219 (5th Cir. 1972) .........................................................................22

*Johnson v. Nyack Hosp.*,
  86 F.3d 8 (2d Cir. 1996)....................................................................................18

*Kotlyarsky v. N.Y. Post*,
  195 Misc. 2d 150, 757 N.Y.S.2d 703 (Sup. Ct. Kings County 2003)....................10

*Lanzetta v. Florio's Enters., Inc.*,
  No. 08 Civ. 6181 (DC), 2011 U.S. Dist. LEXIS 7048
  (S.D.N.Y. Jan. 25, 2011)...................................................................................15

*Marshall v. Intraworld Commodities Corp.*,
No. 79 C 918, 1980 WL 2097 (E.D.N.Y. June 9, 1980).........................................................21

*McCune v. Or. Senior Servs. Div.*,
894 F.2d 1107 (9th Cir. 1990) ...............................................................................................22

*Miccoli v. Ray Communications*,
No. 99-3825, 2000 U.S. Dist. LEXIS 10048
(E.D. Pa. July 20, 2000).........................................................................................................14

*Miller v. Int'l Tel. & Tel. Corp.*,
755 F.2d 20 (2d Cir. 1985).....................................................................................................18

*Patraker v. Council on Env't*,
No. 02 Civ. 7382 (LAK), 2003 U.S. Dist. LEXIS 20519
(S.D.N.Y. Nov. 17, 2003) .......................................................................................10, 15, 19

*Ramirez v. Rifkin*,
568 F. Supp. 2d 262 (E.D.N.Y. 2008) ..............................................................................15, 17

*Singletary v. Cont'l Ill. Nat'l Bank & Trust Co.*,
9 F.3d 1236 (7th Cir. 1993) ...................................................................................................10

*Skipper v. Superior Dairies, Inc.*,
512 F.2d 409 (5th Cir. 1975) ..................................................................................................22

*United States v. Sabhani*,
566 F. Supp. 2d 139 (E.D.N.Y. 2008) ....................................................................................17

*Veltri v. Bldg. Serv. 32b-J Pension Fund*,
393 F.3d 318 (2d Cir. 2004)....................................................................................10, 11, 18

*Yu G. Ke v. Saigon Grill, Inc.*,
595 F. Supp. 2d 240 (S.D.N.Y. 2008)................................................................................15, 17

### STATUTES AND OTHER AUTHORITIES

29 C.F.R. § 516.4 (2011) ..............................................................................................................14

29 C.F.R. § 552.3 (2011) ..............................................................................................................20

29 C.F.R. § 780.11 (2011) ............................................................................................................21

29 U.S.C.A. § 213(b)(21) (West 2011)..........................................................................................20

29 U.S.C.A. § 255(a) (West 2011).................................................................................................9

N.J. Stat. Ann. § 34:11-56a25.1 (2011) ........................................................................9

N.Y. Comp. Codes R. & Regs. Title 12, § 142-2.8 (2011)............................................14

N.Y. Lab. Law § 198(3) (McKinney 2011) ....................................................................9

N.Y. Lab. Law § 663(3) (McKinney 2011) ....................................................................9

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted by Defendants Neeraj Sethi, Ronica Sethi, Shikha Sethi, and Ganesh Raj in support of their Partial Motion to Dismiss Plaintiff's untimely and time-barred federal and state law wage/hour claims as well as Plaintiff's claims for overtime under the Fair Labor Standards Act.  This motion is brought pursuant to Fed. R. Civ. P. 12(b), or in the alternative, under Rule 56.

Plaintiff, Anu Upadhyay, was a former live-in domestic service worker for first Neeraj and Ronica Sethi (between December 1998 and approximately June 2003), and later for Shikha Sethi and Ganesh Raj (between June 2003 and July 2007).  Plaintiff's primary duties included cleaning, laundry, ironing, vacuuming, washing dishes, cooking, serving, general housekeeping, and child care.  Plaintiff has alleged a variety of federal and state law wage/hour claims for, *inter alia*, alleged minimum wage, overtime, and frequency of payment violations, as well as claims for breach of contract.

The vast majority of Plaintiff's claims – which date back as far as 1998 – are clearly time- barred and outside the applicable statutes of limitation periods, and Plaintiff cannot satisfy the elements needed for the court to apply the extraordinary and exceedingly narrow doctrine of equitable tolling.  In addition, Plaintiff's claim for overtime under the FLSA fails as a matter of law because Plaintiff was indisputably a live-in domestic service worker within the meaning of the law, and therefore exempt from overtime.  Accordingly, Defendants now move to dismiss all of Plaintiff's untimely claims, as well as her claims for overtime under the FLSA.

## FACTS

Defendants Neeraj Sethi ("Mr. Sethi") and Ronica Sethi ("Mrs. Sethi") (collectively the "Sethis" or "Defendants") first met Anu Upadhyay ("Ms. Upadhyay" or "Plaintiff") in the Fall of 1998 when they were looking for a housekeeper and nanny for their then soon-to-be born son. (Affidavit of Neeraj Sethi ("N. Sethi Aff.") at ¶ 2)  Ms. Upadhyay was recommended and introduced to the Sethis by Mr. Sethi's aunt, who had helped Ms. Upadhyay escape from an abusive employer who had severely mistreated her.  (*Id.*)  After meeting the Sethis, Ms. Upadhyay agreed to come live with and work for them in New York, subject to certain conditions:  she insisted that she be compensated at a rate approximately $100.00 more per month than she was earning at the time, and she wanted her wages to be sent to India upon her request to either her husband or her son.  (*Id.*)  Ms. Upadhyay provided the Sethis with all of the relevant bank information and routing details to effectuate these wire transfers to India.  (*Id.*; Ex. 1 to N. Sethi Aff.)

Between December 1998 and June 2003, Ms. Upadhyay lived with and worked for the Sethis in New York City as a live-in domestic service employee (Am. Compl. ¶ 10; N. Sethi Aff. at ¶ 2)  Between June 2003 and "the fall of 2003" Ms. Upadhyay lived with and worked for the Sethis in Princeton, New Jersey as a live-in domestic service employee.  (Am. Compl. ¶ 25) During both time periods, Ms. Upadhyay's duties included cleaning, laundry, ironing, vacuuming, washing dishes, cooking, serving, general housekeeping, and child care.  (Am. Compl. ¶¶ 11-12, 16-18, 20, 25)  In addition, Ms. Upadhyay alleges (although Defendants dispute) that she was also required to perform massage therapy on Mr. Sethi "several times each week" and also on relatives of the Sethis when they came to visit.  (Am. Compl. ¶¶ 13, 29)

During this entire time period, the Sethis treated Ms. Upadhyay as though she was a family member, and considered their home to be Ms. Upadhyay's home.  (Affidavit of Ronica Sethi ("R. Sethi Aff.") at ¶ 9)  Ms. Upadhyay had complete freedom to come and go as she pleased; she had a set of keys to the apartment, and because Ms. Sethi had stopped working and was primarily home with her children, Ms. Upadhyay would leave almost every evening to visit with friends and/or socialize.  (*Id.*)  When the Sethis went on vacation, they would always pay Ms. Upadhyay and she had free reign of the home, and she even had friends stay with her at times.  (*Id.*)  When the Sethis moved to Princeton, and after Ms. Upadhyay stopped living with and working for them, they allowed her to keep suitcases of clothes at their home, and Ms. Upadhyay was free to come visit or stay with them as she pleased.  (*Id.*)

At all times, Mr. Sethi was very familiar with the Fair Labor Standards Act ("FLSA"), New York Labor Law, and wage/hour laws in general, having worked for many years first as the Vice President of Finance and then as the Chief Financial Officer of Predictive Systems, a private and later publicly traded company.  (N. Sethi Aff. at ¶ 3)  Mr. Sethi was responsible for overseeing the accounting, finance, and human resources functions of the company, and was also responsible for ensuring that the relevant wage/hour notices were posted in each of the company's offices.  (*Id.*)  Not surprisingly, Mr. Sethi explained on numerous occasions the relevant wage/hour laws (including minimum wage and overtime) applicable to Ms. Upadhyay.  (*Id.* at ¶ 4)  In addition, it was clear that Ms. Upadhyay was well-familiar with the concept of a minimum wage and hourly wage, because she would frequently comment to Mr. Sethi about her "hourly rate," which she would calculate on her own and compare to some of her friends who were also nannies.  (*Id.* at ¶¶ 4, 5)

In 2001, following the passage of an amnesty law for foreign domestic workers, the Sethis began the process of applying for and sponsoring Ms. Upadhyay for lawful permanent resident status, which the Sethis paid for in full.  (*Id.* at ¶ 5)  The Sethis, together with Ms. Upadhyay, met with attorneys retained to help with the process.  (*Id.*)  Following these meetings, Mr. Sethi would explain to Ms. Upadhyay the various wage/hour, immigration, and other requirements for her application.  (*Id.*)  Ultimately, Plaintiff was approved for a green card and became a lawful permanent resident in or about 2006.  (*Id.*)  As a token of appreciation for the Sethis considerable efforts on her behalf, Plaintiff purchased and gave to Ms. Sethi a gold chain and earrings.  (*Id.*)  The Sethis also helped Ms. Upadhyay apply for a new passport, because her original passport had been confiscated by her prior abusive employer.  (*Id.*)

Significantly, as soon as the Sethis reported their wage payments made to Plaintiff, as well as reporting and paying required state and federal taxes and withholdings, including unemployment insurance and the employer's share of taxes, social security, and Medicare.  (*Id.*)  Copies of tax returns and statements filed on Ms. Upadhyay's behalf between 2002 and 2007 were previously provided to Plaintiff's counsel and to the Court.  (Alloy Decl. ¶ 5)

As a result, the Sethis began receiving copies of the relevant wage/hour posters, rules, and regulation.  (N. Sethi Aff. ¶ 5).  However, because Ms. Upadhyay was unable to read English, the Sethis did not post a copy of the wage/hour posters on the wall of their NYC apartment.  (*Id.*)  Rather, the Sethis maintained the posters, along with all other employment, payment, and tax records for Ms. Upadhyay, in a folder that they kept in the apartment.  (*Id.*)  Rather, Mr. Sethi sat down with Ms. Upadhyay, showed her the wage/hour poster, and carefully explained the poster's contents to Ms. Upadhyay in her native language, Hindi, which Mr. Sethi speaks fluently.  (*Id.*)  In addition, Mr. Sethi explained to Ms. Upadhyay the relevant minimum

4

wage and overtime requirements, Ms. Upadhyay's minimum wage, and how she was earning more than minimum wage once all allowances were accounted for.  (*Id.*)

In or about late 1999 or early 2000, Ms. Upadhyay was visited at the Sethis' apartment by two women of Indian descent whom Ms. Upadhyay had met in the park.  (Affidavit of Ronica Sethi ("R. Sethi Aff.") at ¶ 7)  One of the women, who was slightly older, was wearing a Sari, and the other woman was wearing an Indian suit called a Salwaar Cameez.  (*Id.*)  The two women informed Ms. Sethi, who had greeted the women at the door, that they were members of a workers' rights organization, and asked to speak with Ms. Upadhyay privately.  (*Id.*)  The Sethis went into their bedroom and left Ms. Upadhyay and her visitors to talk in privacy in the living room, which they did for approximately 45-60 minutes.  (*Id.*)  Following the visitors' departure, Ms. Upadhyay appeared very upset and irritated by the visit, and she told the Sethis that the women had told her to make sure she was receiving proper rest and meal breaks during the day, and being paid properly according to the law.  (*Id.*)  Ms. Upadhyay told the Sethis that she felt that the women were merely trying to stir up trouble and that she was treated extremely well.  (*Id.*)  Ms. Sethi explained to Ms. Upadhyay that although it may have seemed like the women were trying to stir up trouble, in fact they were doing an important job by trying to prevent abuse and help people.  (*Id.*)

In or about October 1999, the Sethis became friends with another couple, Vimy and Satish Chellaram (the "Chellarams"), who were looking for someone to help take care of their son and home.  (*Id.* at ¶ 2)  The Sethis asked Ms. Upadhyay, who in turn introduced the Chellarams to her friend, who went by the name "Shaku" but whose real name was Raziah Begum.  (*Id.*)  Ms. Upadhyay and Shaku met with the Chellarams, and Shaku was subsequently hired.  (*Id.*)  Over the years, Ms. Sethi came to spend a great deal of time with Shaku at her home

and at the Chellarams' home.  (*Id.*)  Ms. Sethi learned that Shaku had previously been abused and mistreated by her prior employer, from whom she managed to escape from with the help of Ms. Upadhyay.  (*Id.*)  Not surprisingly, over the years Ms. Sethi took and has kept numerous photographs of Ms. Upadhyay and Shaku.  (*Id; Id.* at ¶¶ 4-6, Exhibits 1-3)

Between 1999 and 2003, Ms. Upadhyay frequently socialized with other nannies and domestic workers who belonged to Andolan, a local organization supporting South Asian domestic workers' rights.  (*Id.* at ¶ 8; Alloy Decl. ¶ 4, Ex. 3)  Ms. Sethi was aware of this fact because Ms. Upadhyay frequently mentioned these nannies and/or Andolan to her, and they had multiple discussions about workers' rights and workers' rights organizations.  (R. Sethi Aff. ¶ 8) In fact, Shaku became a member of Andolan and is pictured on their website.  (Alloy Decl. ¶ 4, Ex. 3)  Moreover, in 2007, Shaku submitted a sworn declaration before the Inter-American Commission on Human Rights in which she asserted that when she first met Ms. Upadhyay (approximately two and a half years after she first came to the United States in June 1997), Ms. Upadhyay was a member of Andolan and encouraged her to escape her abusive situation.  (Alloy Decl. ¶ 3, Ex. 2)

Between "the fall of 2003" and June 2004, Ms. Upadhyay alleges that she began living with and working for Drs. Shikha Sethi ("Dr. Sethi") and Ganesh Raj ("Dr. Raj") (collectively, "Drs. Sethi and Raj") in North Carolina as a live-in domestic service employee, with largely the same duties and responsibilities.[1]  (Am. Compl. ¶¶ 31, 33-34)  From June 2004 through July 2007, Plaintiff lived with and worked for Drs. Sethi and Raj in New York City in the same role and with largely the same duties and responsibilities.  (Am. Compl. ¶¶ 42, 44-45)

---

[1] As repeatedly explained to Plaintiff's counsel, Ms. Upadhyay lived with and worked for Drs. Sethi and Raj in Charlottesville, Virginia (where Dr. Sethi was attending a Residency Program at the University of Virginia), and not in North Carolina.  *See, e.g.,* Dr. Sethi's CV, available publicly at http://www.metrocrest.com/doctors/sethi-cv.htm Defendants are confident that Plaintiff will voluntarily dismiss her claims under North Carolina law without requiring Defendants to expend any additional time and expense in disproving this patently false allegation.

After she began living with and working for Drs. Sethi and Raj, Ms. Upadhyay occasionally visited and called the Sethis (and their children).[2]  (N. Sethi Aff. ¶ 6)  On one such occasion, in or around late 2004/early 2005, Mr. Sethi learned from Ms. Upadhyay that Shaku had filed a wage/hour lawsuit against the Chellarams.  (*Id*. at ¶ 6)  Significantly, Mr. Sethi spoke on numerous occasions with Ms. Upadhyay about Shaku's lawsuit, and Ms. Upadhyay frequently shared her opinions of the lawsuit with Mr. Sethi.  (*Id.*)  In her Complaint, which she filed in the Southern District of New York, Shaku (going by Raziah Begum), alleged that she started working for the Chellarams in October 1999 after escaping from her previous employer, that she was introduced to the Chellarams by a friend "Jane Doe" employed by friends of the Chellarams, that she and "Jane Doe" met with the Chellarams at their home to discuss the position, and that "Jane Doe" provided salary and negotiating advice.  (Alloy Decl. ¶ 2, Ex. 1 at ¶ 5-9)

In or about June 2007, Ms. Upadhyay visited the Sethis and their children in Princeton. (N. Sethi Aff. ¶ 7)  During that visit, Ms. Upadhyay questioned whether all of the checks she had received from Drs. Sethi and Raj for her work for them since 2003 had been deposited into her bank account.  (*Id.*)  The Sethis undertook an extensive review and analysis of Ms. Upadhyay's bank records for her, as well as of the employment and payment records that Drs. Sethi and Raj had maintained since 2003.[3]  (*Id.*)  Subsequently, the Sethis explained to Ms. Upadhyay that all of the checks, wire transfers to India, and/or cash payments from Drs. Sethi and Raj were accounted for and had either been deposited directly into her bank account (since the checks

---

[2] The Sethis purchased Ms. Upadhyay a cell phone and T-Mobile service plan in December 2004, and transferred her to their Verizon "family plan" in January 2006, which they terminated in February 2009.  (N. Sethi Aff. ¶ 9)

[3] Ms. Upadhyay specifically asked the Sethis to open a joint account for her under their Chase account so that she would benefit from higher interest rates and so that Ms. Sethi could help her with her banking.  (*Id.* at fn. 1)  The Sethis frequently took Ms. Upadhyay to the bank and made deposits on her behalf whenever Ms. Upadhyay needed or asked.  (*Id.*)

were all made out directly to Anu), transferred at her request to India, or paid to her directly in cash at her request. (*Id.*)  The Sethis showed all of these records to Ms. Upadhyay, and also provided her with a copy of their analysis and records that showed that she in fact had been paid everything in full.  (*Id.*)  However, Ms. Upadhyay continued to claim that she was owed approximately $5,000 to $6,000 in wages.  (*Id.*)

Ms. Upadhyay visited the Sethis on only one weekend after June 2007 – from Thursday June 26, 2008 when she arrived at 6 p.m. until Saturday June 28, 2008, when she left at 5 p.m. (*Id.*)  Following that single weekend visit, Ms. Upadhyay made only one more visit to the Sethis, in early July 2008 (July 7-9, 2008), which was the last time the Sethis saw Ms. Upadhyay.[4]  (*Id.* at ¶ 8, 10)  The Sethis last spoke to Ms. Upadhyay in early 2009.  On November 9, 2010, Ms. Upadhyay filed the instant lawsuit alleging primarily that she is owed backpay for allegedly unpaid minimum wage and/or overtime pay dating back to 1998.

---

[4] Ms. Upadhyay alleges that between September 2007 and April 2009, she worked "one weekend per month" for the Sethis in their home in Princeton, New Jersey (Am. Compl. ¶ 57), that she would typically work from 10 a.m. Saturday until midnight, and Sunday from 7 a.m. until 5 p.m (Am. Compl. ¶ 58), and that she is entitled to damages under the FLSA and New Jersey law (Am. Compl. ¶ 64-65, 75-76.  However, the Verizon phone records that Defendants provided to Plaintiff's counsel and to the Court show every call made and received from Ms. Upadhyay's phone during this time period, including where Ms. Upadhyay was located when she made or received the call.  (N. Sethi Aff. ¶ 10, Ex. 2)  A simple analysis of these phone records establishes that Ms. Upadhyay's only weekend visit during this time period was June 26-28.  Defendants trust that once Plaintiff and her counsel have carefully reviewed the phone records, they will withdraw their minimum wage claims during this time period.

## ARGUMENT

**I.      THE MAJORITY OF PLAINTIFF'S CLAIMS ARE OUTSIDE THE APPLICABLE STATUTE OF LIMITATIONS PERIODS AND SHE CANNOT SATISFY THE ELEMENTS NEEDED FOR APPLICATION OF THE EXCEEDINGLY NARROW DOCTRINE OF EQUITABLE TOLLING**

The statute of limitations under the Fair Labor Standards Act ("FLSA") is two years (which a court may enlarge to three years in the event that a claim arises from a willful violation).  *See* 29 U.S.C.A. § 255(a) (West 2011).  Under New York law, the statute of limitations for bringing claims alleging violation of New York state minimum wage and overtime laws is six years.  *See* N.Y. Lab. Law §§ 198(3), 663(3) (McKinney 2011).  Under New Jersey law, the statute of limitations for bringing minimum wage and overtime claims is two years.  *See* N.J. Stat. Ann. § 34:11-56a25.1 (2011).  Accordingly, because Plaintiff first filed her Complaint on November 9, 2010, Plaintiff's FLSA claims arising before November 9, 2007 are time-barred and must be dismissed as a matter of law, along with Plaintiff's claims arising under New York Labor Law that pre-date November 9, 2004, and Plaintiff's claims under New Jersey law that pre-date November 9, 2008.

Plaintiff seeks to maintain all of her claims dating back to 1998 through application of the extraordinary doctrine of equitable tolling.  Specifically, Plaintiff has previously argued to the Court that equitable tolling is warranted because (i) Defendants allegedly failed to notify Plaintiff of her rights under the minimum wage and overtime compensation provisions of federal and state laws, and (ii) Defendants allegedly failed to post in their homes certain notices regarding an employee's entitlement to minimum wages, overtime compensation and/or promised wages.  *See* Am. Compl. ¶ 60  In light of the overwhelming evidence contradicting these statements of counsel and calling into question Plaintiff's credibility, and many of Plaintiff's other claims and allegations in this case which Defendants will address at the

appropriate stage, as well as the undisputable evidence that Plaintiff was well-aware of her rights under the law, Plaintiff's attempt to invoke equitable tolling to save her untimely claims is inappropriate and should be rejected as a matter of law and equity.

With respect to federal claims, the Second Circuit has observed that "[e]quitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32b-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004) (citation omitted); *see also Bowers on behalf of NYSA-ILA Pension Fund Trust v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir. 1990) (equitable tolling not satisfied in the absence of "affirmative action on the part of [plaintiff] to preserve its right"); *Patraker v. Council on Env't*, No. 02 Civ. 7382 (LAK), 2003 U.S. Dist. LEXIS 20519, at *2 (S.D.N.Y. Nov. 17, 2003); *Singletary v. Cont'l Ill. Nat'l Bank & Trust Co.*, 9 F.3d 1236, 1241 (7th Cir. 1993).  It is imperative that a plaintiff exercise reasonable care and diligence.  *See Patraker*, 2003 U.S. Dist. LEXIS 20519, at *2 (and cases cited therein)  Additionally, there is a clear consensus among courts within this district that equitable tolling is an "exceedingly narrow" doctrine.  *Id.*

To the extent the doctrine of equitable tolling (as opposed to equitable estoppel) exists under New York law, it requires that a plaintiff seeking to invoke the doctrine "demonstrate that the failure to timely commence the lawsuit is not attributable to a lack of diligence on his or her part." *Kotlyarsky v. N.Y. Post*, 195 Misc. 2d 150, 152, 757 N.Y.S.2d 703, 706 (Sup. Ct. Kings County 2003).  Accordingly, if a plaintiff cannot "articulate[] any acts by defendants that prevented [him] from timely commencing suit" then plaintiff has "failed to meet [his] burden of showing that [he was] wrongfully induced by defendants not to commence suit." *Doe v. Holy See (State of Vatican City)*, 17 A.D.3d 793, 796, 793 N.Y.S.2d 565, (3rd Dep't 2005) (citation

10

omitted).[5]  We have been unable to find any decisions by any New York or New Jersey state courts ever applying equitable tolling to wage/hour claims under applicable New York or New Jersey law.[6]

### A.   Plaintiff Neither Acted With Reasonable Diligence Nor Can She Demonstrate the Existence of Extraordinary Circumstances.

Plaintiff cannot demonstrate that she acted with reasonable diligence or that extraordinary circumstances existed to warrant tolling of the various statutes of limitations in this case.

1.   *Plaintiff Was Aware Of Her Rights Under The Law But Nonetheless Failed To Timely Bring Suit*.

Plaintiff was aware of the existence of her legal rights and potential causes of action since at least 1999, and she cannot be said to have acted with the appropriate level of diligence (or indeed, any diligence) required to trigger the extraordinary remedy of equitable tolling.

Equitable tolling is only appropriate where a plaintiff is prevented from bringing suit despite having acted with reasonable diligence in attempting to ascertain the existence of his cause of action.  *Veltri*, 393 F.3d at 323.  Indeed, where a plaintiff fails to take "affirmative action . . . to preserve its right", equitable tolling should not apply.  *Bowers*, 901 F.2d 258 at 264. Thus, "[d]ue diligence on the part of the plaintiff in bringing [an] action" is a mandatory prerequisite to obtaining this form of equitable relief. *Holy See*, 17 A.D.3d at 796.

---

[5] Plaintiff's request to have her breach of contract claims equitably tolled beyond the six-year statute of limitations period under New York law is analyzed and should be denied for similar reasons.  *See* N.Y. C.P.L.R. § 213(2) (McKinney 2011).; *Marvel Worldwide, Inc. v. Kirby*, No. 10 Civ. 141 (CM)(KNF), 2010 U.S. Dist LEXIS 123993, at *21-22 (S.D.N.Y. Nov. 19, 2010) (*citing Guido v. Merrill Lynch & Co. (In re Merrill Lynch Ltd. P'ships Litig.)*, 154 F.3d 56, 60 (2d Cir. 1998)).

[6] Under New Jersey law, "the doctrine of equitable tolling of limitations periods has been applied only in narrowly-defined circumstances" typically involving fraud or trickery.  *R.A.C. v. P.J.S., Jr.*, 927 A.2d 97, 107 (N.J. 2007) (citation omitted); *see also Price v. N.J. Mfrs. Ins. Co.*, 867 A.2d 1181, 1185-86 (N.J. 2005); *Freeman v. State*, 788 A.2d 867, 880 (N.J. Sup. Ct. App. Div.), *certif. denied*, 796 A.2d 895 (N.J. 2002).

Plaintiff cannot meet this steep burden.   As Defendants' submission makes clear, the overwhelming evidence is that Plaintiff was well-aware of her rights to minimum wage, overtime, and other wage/hour entitlements, and that Defendants took every reasonable measure to appropriately follow the law (including filing and withholding taxes).

Specifically:

- Plaintiff negotiated her salary with the Sethis (N. Sethi Aff. at ¶ 2);

- Mr. Sethi had numerous discussions with Plaintiff about her rights and about the relevant wage/hour laws (including minimum wage and overtime) applicable to her (*Id.*. at ¶¶ 4, 5);

- Plaintiff would frequently comment about her "hourly rate" which she would calculate on her own and compare to her friend's rates of pay (*Id.*);

- Plaintiff attended meetings with immigration attorneys and had follow-up discussions with Mr. Sethi about wage/hour laws and requirements in preparation for applying for lawful permanent resident status (*Id.* at ¶ 5);

- Mr. Sethi showed Plaintiff the wage/hour posters that he received, but because they were in English, he carefully explained the poster's contents to Plaintiff in her native language (*Id.*);

- Plaintiff met with women from a workers' rights organization, who personally informed her of her rights (R. Sethi Aff. at ¶ 7);

- Plaintiff regularly associated with other nannies and domestic workers who were members of Andolan, a workers' rights organization for South Asian domestic workers, and regularly discussed these nannies and Andolan with the Sethis (*Id.* at ¶ 8);

- Plaintiff helped her friend Shaku negotiate a starting salary with the Chellarams (Alloy Decl. ¶ 2, Ex. 1 at ¶ 5-9); and

- Plaintiff questioned and reviewed all of her employment records and payments from 2003-2007 with the Sethis (N. Sethi Aff. at ¶ 7);

Significantly, Plaintiff's closest friend – Raziah "Shaku" Begum – filed her own wage/hour lawsuit in December 2004 against the Chellarams (friends of the Sethis), which Plaintiff discussed repeatedly with the Sethis, and also shared her opinions about the lawsuit with

them.  (N. Sethi Aff. ¶ 6; Alloy Decl. ¶ 2, Ex. 1)  In addition, Shaku submitted a sworn Declaration before the Inter-American Commission on Human Rights in which she declares under penalty of perjury that Anu was a member of Andolan (as well as other facts that all match and confirm the Sethis' affidavits).[7]  (Alloy Decl. ¶ 3, Ex. 2)  Moreover, Plaintiff does not allege that she made any basic or reasonable (or even any) attempts to discover her rights at any time prior to filing this lawsuit in November 2010.

Under these circumstances it simply cannot be said that Plaintiff was unaware of her rights under federal and state wage/hour laws.  There can also be no question that Plaintiff did not act with the level of diligence in seeking to preserve her time-barred claims that is a mandatory precondition to the application of the doctrine of equitable tolling.  Rather, Plaintiff simply chose to wait until November 2010 to file her complaint; in other words, she exercised no diligence whatsoever.  Plaintiff waited to bring suit for approximately eleven years after first meeting privately with women from a workers' rights organization; at least ten years after discussing minimum wage and overtime requirements with Mr. Sethi and at least eight years after having the relevant wage/hour posters showed and explained to her; at least nine years after associating with other nannies involved in Andolan; approximately seven and a half years after stopping work for the Sethis; approximately six years after learning about and repeatedly discussing her friend Shaku's wage/hour lawsuit; approximately three and a half years after stopping work for Drs. Sethi and Raj; and approximately three and a half years after she first raised questions about her wages with the Sethis.

---

[7] During the April 28, 2011 court conference, Plaintiff's counsel suggested that perhaps Shaku's Declaration was referring to "another Anu" or that Anu was never aware of Shaku's lawsuit against the Chellarams.  These suggestions are neither credible nor conceivable in light of the specific and consistent facts laid out in both the Complaint and Declaration filed by Begum, which are verified by the sworn affidavits and pictures submitted by Defendants.

2.      _Alleged Failure to Post the Required Notices Is Insufficient to Invoke_
        _Equitable Tolling_.

We anticipate that Plaintiff will also rely on her allegation that Defendants failed to post

the required wage and hour notices in their home.  However, failure to post a notice does not

warrant application of equitable tolling, particularly where, as here, the case involves a private

apartment as opposed to a business establishment, Defendants have submitted significant

countervailing evidence that Plaintiff was well-aware of her rights, and where Plaintiff cannot

read English, rendering the posters useless.

The relevant regulation of the FLSA, 29 C.F.R. 516.4 (2011), provides, in relevant part,

that "[e]very employer employing any employees subject to the Act's minimum wage provisions

shall post and keep posted a notice explaining the Act, as prescribed by the Wage and Hour

Division, in conspicuous places in every establishment where such employees are employed so

as to permit them to observe readily a copy."  Similarly, N.Y. Comp. Codes R. & Regs. tit. 12 §

142-2.8,  provides, in relevant part, that "[e]very employer covered by this Part shall post in a

conspicuous place in his or her establishment a notice issued by the Department of Labor

summarizing minimum wage provisions."

Many courts have held that, as a matter of law, failure to post the relevant notices does

not permit equitable tolling.  _See, e.g., Antenor v. D & S Farms_, 39 F. Supp. 2d 1372, 1380 (S.D.

Fla.1999) (holding that because the FLSA poster required by  29 C.F.R. §  516.4 (2011) makes

no mention of the applicable two-year statute of limitations, failure to post it does not toll the

statute of limitations); _Archer v. Sullivan Cnty,_ Nos. 95-5214/95-5215, 1997 U.S. App. LEXIS

33052, at *13-14 (6th Cir. Nov. 14, 1997) (holding that employer's failure to provide required

Department of Labor notice of employee's rights under FLSA does not alone provide a basis for

equitable tolling); _Miccoli v. Ray Communications_, No. 99-3825, 2000 U.S. Dist. LEXIS 10048,

at *13 (E.D. Pa. July 20, 2000) (citation and internal quotations omitted) (refusing to toll statute of limitations based on naked allegation in complaint that defendant failed to post applicable posters).

In addition, it bears noting as well that the question of "[w]hether the failure to disclose or post a notice in and of itself is sufficient to warrant equitable tolling has not been addressed by the Second Circuit." *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 269 (E.D.N.Y. 2008). *See also Patraker*, 2003 U.S. Dist. LEXIS 20519, at *6 (observing that "the failure to post [the FLSA] notice [. . .] *might* result in equitable tolling") (emphasis added). In fact, courts have held that allegations alone are not sufficient to justify a tolling of the statute of limitations. *See, e.g.*, *CJS & Co.*, 2007 U.S. Dist. LEXIS 28901, at *3 (refusing to pronounce that the failure to post a notice, in and of itself, warrants equitable tolling); *Patraker*, 2003 U.S. Dist. LEXIS 20519, at *6 (refusing to equitably toll plaintiff's FLSA claim where plaintiff alleged that defendants failed to post required notices but never alleged, either in an amended complaint or declaration, any affirmative deception by the defendants).

Indeed, and of particular relevance in the instant matter, in *Lanzetta v. Florio's Enterprises, Inc.*, No. 08 Civ. 6181 (DC), 2011 U.S. Dist. LEXIS 7048, at *16 (S.D.N.Y. Jan. 25, 2011) (*quoting Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 259) (S.D.N.Y. 2008), in which the plaintiff argued that her entire four years of employment with defendant should be equitably tolled based on defendants' failure to provide her notice of her rights under the FLSA, the court held that "the failure to provide an employee the notice required by the FLSA '*may be* a sufficient basis for tolling,' [. . .] *but only if that failure contributed to the employee's unawareness of his rights*." (emphasis added).

15

Moreover, the cases cited by Plaintiff in her letter to the Court dated January 11, 2011 in support of equitable tolling are wholly inapposite.  First, these cases establish that the mere failure to post a required notice does not, as a matter of law, automatically entitle a party to have otherwise time-barred claims revived through equitable tolling.  Second, these cases establish that a Plaintiff must also be entirely unaware of her rights giving rise to her cause of action in order to warrant equitable tolling.  Third, a Plaintiff must do more than merely allege lack of knowledge.  He or she must undertake due diligence and take affirmative steps to discover the existence of his or her cause of action, and it must have been impossible for him or her to learn about them because of defendant's intentional (and often criminal) efforts to prevent such knowledge.

Here, on the other hand, as detailed above, Plaintiff was not ignorant of the existence of her causes of action and her legal rights.  Tellingly, Plaintiff nowhere alleges that she was ignorant of her rights (nor can she), nor does she allege that Defendants fraudulently or intentionally (or criminally) attempted to conceal her causes of action or legal rights from her; rather, she merely alleges that Defendants never informed her of her rights (which Defendants dispute). (Am. Compl. ¶ 60)  In addition, Plaintiff does not allege *any* affirmative steps that she took to learn about her cause of action, or allege that it would have been impossible to learn about her cause of action.

As noted above, Defendants have averred that they repeatedly apprised Plaintiff verbally of her rights and took painstaking steps to inform her of these rights in a meaningful manner (i.e., in her native language) (N. Sethi Aff. at ¶¶ 4, 5); Plaintiff was aware that a close friend and fellow domestic servant (Shaku) had sued the Chellarams under various theories of wage and hour violations, and Plaintiff discussed this lawsuit with Defendants (*Id*. at ¶ 6); Shaku later

declared under penalty of perjury that Plaintiff was a member of a workers' rights advocacy organization during the time-barred period (Alloy Decl. ¶ 3, Ex. 2); and, in 2007, Plaintiff contacted Defendants and accused them of having failed to pay her the entirety of the wages to which she alleged she was then entitled (N. Sethi Aff. at ¶ 7).  In addition, Plaintiff herself does not – and cannot – allege that she was unaware of her rights.  Therefore, not only was Plaintiff aware of her rights, but it cannot be said that the failure to post the required notices contributed in any way to Plaintiff's lack of awareness of the existence of her causes of action.

This is plainly insufficient to merit equitable tolling, and distinguishes this case from those extreme cases relied upon by Plaintiff in her January 11, 2011 letter.  *See*, *e.g.*, *United States v. Sabhani*, 566 F. Supp. 2d 139 (E.D.N.Y. 2008) (granting plaintiffs' request to have their claims equitable tolled on grounds that defendants – who had been criminally convicted – had failed to post required notices and that plaintiffs could not speak English, but emphasizing that plaintiffs "were completely unaware of the FLSA or any of its minimum wage or overtime provisions") (*id.* at 146); *Rifkin*, 568 F. Supp. 2d 262 (acknowledging that issue of "[w]hether the failure to disclose or post a notice in and of itself is sufficient to warrant equitable tolling has not been addressed by the Second Circuit," (*id.* at 269) need not be resolved because plaintiff had proffered additional facts and circumstances that the plaintiff contended reflected a *conscious attempt* to conceal from plaintiff the existence of her cause of action, including the fact that defendant failed to pay or report any taxes on behalf of plaintiff); *Asp v. Milardo Photography, Inc.*, 573 F. Supp. 2d 677, 698 (D. Conn. 2008) (granting plaintiff's request for equitable tolling on grounds that employer failed to post required notices and  "there [was] *no evidence* to show that the Plaintiffs had any knowledge, actual or constructive, of their rights regarding overtime compensation") (emphasis added); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 259

(S.D.N.Y. 2008) (applying equitable tolling where defendants – who were later criminally convicted – *intentionally* failed to post notice, *intentionally* "made no effort to provide any other form of notice to the plaintiffs about their rights," and took other extreme measures against plaintiffs) (emphasis added)

      3.     *Plaintiffs Cannot Point to Any Evidence of Record That Defendants Engaged in Conduct That Had the Effect of Concealing From Plaintiffs the Existence of Their Cause of Action.*

      The statute of limitations should not be tolled because the Defendants did not engage in any deception or any conduct to conceal from Plaintiff the existence of a potential claim.

      Courts have applied the doctrine of equitable tolling "as a matter of fairness" where a plaintiff has been "prevented in some extraordinary way from exercising his rights." *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985). Such "extraordinary" circumstances may be found where, for example, a plaintiff demonstrates that it would have been impossible for a reasonably prudent person to learn of the cause of action. *Id. See also Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996). Similarly, "extraordinary" circumstances may be found if the defendant, for example, concealed from the plaintiff the existence of the cause of action. *Veltri*, 393 F.3d at 322; *see also Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 323 (S.D.N.Y. 2001) (*citing Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985) (clarifying that the statutory clock begins to run when plaintiff either acquires actual knowledge of facts comprising his claim or should have acquired such knowledge through reasonable diligence). Accordingly, in order to have their time-barred claims equitably tolled, Plaintiff has the burden of proving that Defendants concealed from her the existence of her claims or that it was impossible for Plaintiff to learn of her causes of action.

In *Patraker*, 2003 U.S. Dist. LEXIS 20519, at *3-4, plaintiff alleged that the statute of limitations under the FLSA and New York Labor Law should be tolled because defendants failed to post the required notices and failed to tell plaintiff that he was entitled to overtime pay. However, the Southern District ruled that the statute of limitations should not be tolled because plaintiff failed to allege affirmative deception by defendants.  In addressing plaintiff's failure to aver affirmative misconduct, deception, or concealing behavior, the court observed that "to hold that a failure to disclose that an employee is entitled to overtime pay is sufficient to work an equitable toll would be tantamount to holding that the statute is tolled in all or substantially all cases seeking unpaid overtime." *Id*. at *6; *see also Amendola v. Bristol-Myers Squibb*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008).

Similar to the plaintiff in *Patraker*, Plaintiff here cannot demonstrate that Defendants concealed or engaged in any deceptive conduct as required under existing law for equitable tolling to apply.  To the contrary, Plaintiff merely claim that Defendants failed to post the required notices.  Moreover, even if Plaintiff were the victim of misrepresentation or deception – which she most certainly was not – she cannot allege that any of those circumstances prevented her from timely filing her complaint with respect to the claims she now seek to have tolled. Indeed, as noted above, Plaintiff was expressly put on notice of the existence of her rights by Defendants (N. Sethi Aff. at ¶¶ 4, 5); was aware of the pendency of wage and hour litigation initiated by her friend and fellow domestic servant and discussed one such lawsuit with Defendants (*Id*. at ¶ 6); there is reason to believe that Plaintiff was a member of an organization whose express mandate is to advocate for and protect workers' rights during the relevant period (Alloy Decl. ¶ 3, Ex. 2); and, finally, Plaintiff complained to Defendants of wages to which she was entitled and allegedly deprived as early as 2007 (N. Sethi Aff. at ¶ 7).  Accordingly, Plaintiff

was not prevented at any time by Defendants from filing a complaint with respect to her
otherwise time-barred claims she seeks to have revived.[8]

## II.   PLAINTIFF'S FLSA CLAIMS FOR OVERTIME FAIL AS A MATTER OF LAW BECAUSE SHE WAS AN EXEMPT DOMESTIC SERVICE EMPLOYEE.

Plaintiff's Fourth Cause of Action - for unpaid overtime under the FLSA between
December 1998 and July 2007 - fails as a matter of law because at all relevant times Plaintiff was
a "domestic service employee" who performed services of a household nature and resided in the
household in which she was employed, and therefore exempt from overtime under the FLSA.  29
U.S.C.A. § 213(b)(21) (West 2011); 29 C.F.R. § 552.3 (2011).

Nevertheless, Plaintiff has taken the position - in her counsel's January 11, 2011 letter to
the Court, and at the court conference held on April 28, 2011 - that the FLSA's overtime
exemption for live-in domestic service employees does not apply to Plaintiff because Plaintiff
was allegedly required to perform massage therapy "several times per week" on Neeraj Sethi
between December 1998 and Fall 2003.  Incredibly, Plaintiff apparently intends to argue that this
allegedly occasional massage work (which could not possibly have made up more than 4-5% of
her work, given her claims of working in excess of 70 hours per week), somehow destroys the
live-in domestic service employee exemption.[9]  Plaintiff has set forth two arguments, both of
which have no basis in the law: first, massage work is not work "of a household nature" and
second, where an employee performs both exempt and non-exempt duties in the same workweek,
all of the work is treated as non-exempt for the week.

---

[8] Plaintiff's breach of contract claims should not be equitably tolled for similar reasons.

[9] Because Plaintiff has not alleged that she performed any massage work on Shikha Sethi or Ganesh Raj while living
with and working for them between 2003 and 2007, there is no question that the FLSA's overtime exemption applies
to this time period.

First, the regulations defining domestic service employment refers to services of a general nature performed in or around the house.  The regulations further provide that this includes, but is not limited to, employees such as "cooks, waiters…maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers…"  There can be no serious question that Plaintiff was not employed as a "masseuse" but rather was employed, *as she alleges in her Complaint*, as a housekeeper and nanny.  The fact that Plaintiff allegedly gave massages a few days a week does not change the basic nature or function of her job or reason for her employment, and neither the regulations nor the statute provide any support for Plaintiff's tortured reading.

Second, the "principle" that Plaintiff is seeking to rely on to destroy the live-in domestic service employee exemption - i.e., that performing <u>any</u> non-exempt work in a workweek destroys all FLSA exemptions - is taken directly from a regulation applicable <u>only</u> to agricultural workers, 29 C.F.R. § 780.11 (2011) (Part 780 of the CFR is titled "EXEMPTIONS APPLICABLE TO AGRICULTURE, PROCESSING OF AGRICULTURAL COMMODITIES, AND RELATED SUBJECTS UNDER THE FAIR LABOR STANDARDS ACT").  Indeed, it is beyond dispute that almost all "exempt" employees perform <u>some</u> non-exempt work each week; to suggest that an attorney who makes a photocopy, a store manager who occasionally stocks the shelves, or a CEO who mails her own letters somehow lose their exemption because of this minimal non-exempt activity is ludicrous, and would destroy virtually every exemption.

Nevertheless, in her January 11, 2011, letter to the Court, Plaintiff has latched on to the fact that some courts have apparently misused this regulation and applied it (or its principle) outside of the agricultural context.  *See, e.g., Astudillo v. U.S. News & World Report*, No. 02 CIV. 7902 WHP, 2004 WL 2075179 (S.D.N.Y. Sep. 17, 2004); *Marshall v. Intraworld*

*Commodities Corp.*, No. 79 C 918, 1980 WL 2097 (E.D.N.Y. June 9, 1980). However, each decision in turn relies - mistakenly - on either decisions arising out of the agricultural context, *see Adkins v. Mid-Am. Growers, Inc.*, 831 F. Supp. 642 (N.D. Ill. 1993) (analyzing agricultural exemption) and *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409 (5th Cir. 1975) (same), or on decisions that themselves mistakenly relied on decisions arising out of the agricultural context. *See McCune v. Or. Senior Servs. Div.*, 894 F.2d 1107, 1113-14 (9th Cir. 1990) (dissent, relying mistakenly on cases arising out of agricultural context, including *Superior Dairies*, 512 F.2d 409 and *Hodgson v. Wittenburg*, 464 F.2d 1219 (5th Cir. 1972), also cited by Plaintiff in her letter).

In short, Plaintiff's attempt to escape the FLSA's overtime exemption for live-in domestic service employees is both unavailing and extremely disingenuous, and her claims should be dismissed as a matter of law. Moreover, because Plaintiff and her counsel have been on notice since at least January 2011 that Plaintiff's FLSA overtime claims fail as a matter of law, but have nevertheless refused to voluntarily dismiss those claims, Defendants respectfully request that all reasonable costs and fees, plus legal fees associated with seeking dismissal of these claims, be assessed against Plaintiff and her counsel.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Partial Motion to Dismiss Plaintiff's untimely claims and her claims for overtime under the FLSA should be granted and those claims dismissed with prejudice.   Defendants also seek reasonable costs, fees, and other equitable relief as the Court deems appropriate.

Dated: New York, New York
      June 15, 2011

                          Respectfully submitted,

                          PROSKAUER ROSE LLP

                          <u>/s/ Joshua F. Alloy</u>

                          Kathleen M. McKenna
                          Joshua F. Alloy
                          Eleven Times Square
                          New York, NY 10036-8299
                          Phone: (212) 969-3000
                          Fax: (212) 969-2900
                          kmckenna@proskauer.com
                          jalloy@proskauer.com
                          *Attorneys for Defendants*