C52FUPAH                      Hearing

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   ------------------------------x

3
   ANU UPADHYAY,

4
                  Plaintiff,

5
            v.                          1- CV 8462 (NRB)

6
   NEERAJ SETHI, et al,

7
                  Defendants.

8
   ------------------------------x

9                                       New York, N.Y.
                                        May 1, 2012

10                                      10:00 a.m.

11 Before:

12                 HON. NAOMI REICE BUCHWALD,

13                                      District Judge

14                            APPEARANCES

15 GLADSTEIN, REIF & MEGINNISS, LLP
        Attorneys for Plaintiff

16 AMELIA TUMINARO, ESQ.

17 PROSKAUR ROSE LLP
        Attorneys for Defendants

18 JOSHUA F. ALLOY, ESQ.
   KATHLEEN McKENNA, ESQ.

19

20

21

22

23

24

25

1          (Hearing resumed)

2          THE COURT:  Before we begin, can we just talk a little

3    scheduling?  So first Mr. Alloy, how much more do you have with

4    the plaintiff?

5          MR. ALLOY:  Your Honor, I would say approximately 30

6    minutes.

7          MS. TUMARINO:  In terms of redirect, I don't think I

8    have very much.  I have maybe a handful, maybe ten questions.

9    I don't know how long that will take.

10          THE COURT:  All right, so why don't we just finish up

11    with the plaintiff, then.

12          MS. TUMARINO:  Before we start, could I just raise a

13    few preliminary issues?  One is that the Court requested that I

14    copy the Defendant's Exhibits 23 and 24 yesterday, which I've

15    done and I have copies for the Court and I've provided them

16    already to defendant's counsel.

17          THE COURT:  Okay.

18          MS. TUMARINO:  If you'd like me to bring them up, I'm

19    happy to do that.

20          The other thing is that my -- the plaintiff's second

21    witness, Nahar Alam, is unavailable today she's possibly

22    available by video conference.  She thought that she would be

23    available that way.  I was unable to get in touch with her,

24    however, this morning about what her availability is in terms

25    of what time and whether she has the video conferencing at her

C52FUPAH                         Hearing

1    work.  So that's another issue in terms of finishing

2    plaintiff's case this morning.

3         THE COURT:  It sounds like we'll just have to take her

4    out of turn, but I'm not sure whether it just will be easier to

5    have her come in live on another day that works for everybody

6    instead of struggling to get video conferencing facilities up.

7    Because we're not automatically wired for that kind of stuff.

8         MS. TUMARINO:  I understand.  And one last thing, this

9    morning when plaintiff came to my office she brought a handful

10   of papers wrapped in a rubber band that she says have phone

11   numbers and addresses.  I have not had the opportunity to

12   review them at all.  I haven't had the opportunity to review

13   them with plaintiff, so certainly I don't know whether any of

14   those are responsive to any requests that have been made by

15   defendants.  This is the first I'm learning of their existence.

16   So I'm happy at some point to review them and provide them if

17   defendants so desire, but I wanted to bring that to the

18   attention of the Court.

19        THE COURT:  Let me go back just and ask a question.

20   Was there a discovery request from the defendants addressed to

21   the plaintiff seeking all information about her earnings over

22   the time period at issue in this case?

23        MR. ALLOY:  Yes, your Honor.  We had a request for

24   "all documents concerning your massage business, including but

25   not limited to advertisements and documents reflecting names,

C52FUPAH                          Hearing

1    addresses, phone numbers or other information of your massage

2    clients."

3          THE COURT:  Could you explain to me, Ms. Tumanaro, how

4    the diaries from yesterday and possibly the other pages were

5    not obtained by your firm from Ms. Upadhyay?

6          MS. TUMARINO:  Well, your Honor, we made an objection

7    to that request on the grounds of relevance and that it wasn't

8    reasonably calculated to lead to the discovery of admissible

9    evidence and it was overly broad and we produced the only

10   document that was given to us by plaintiff.

11         THE COURT:  Your job, particularly when you're dealing

12   with someone who you're asserting is uneducated and unfamiliar

13   with the court process, is to spend extra time explaining what

14   her obligations are under the Federal Rules.

15         MS. TUMARINO:  That's absolutely true, and we have

16   spent a tremendous amount of time with plaintiff, asking her

17   for all sorts of documents.  I don't think she understood that

18   these were -- I don't think she grasped that these were

19   documents or that they pertain to anything.  They're in her

20   view --

21         THE COURT:  I recall someplace in the materials I've

22   read on this case a reference to diaries and those diaries

23   contained, as I recall, phone numbers of massage clients.  So

24   if I recall that being in the papers how could it be that you

25   could not have had a discussion with her saying I need to see

C52FUPAH                          Hearing

1    all your diaries?

2              MS. TUMARINO:  I don't recall what you're referring

3    to, your Honor.

4              THE COURT:  I don't -- Andrew, am I imagining this?

5              THE DEPUTY CLERK:  I don't remember it.

6              THE COURT:  You don't remember it?

7              MS. TUMARINO:  I'm sorry.  This doesn't sound familiar

8    to me at all.

9              THE COURT:  Maybe I'm wrong.

10             MS. TUMARINO:  But notwithstanding that, these diaries

11   appear to be records, to the extent they're even records,

12   they're numbers, but kept after the time that she was employed

13   by defendant and aren't relevant to the times, to the question

14   of tolling.

15             MR. ALLOY:  I mean, your Honor, she testified she had

16   other diaries prior to this, many diaries.

17             THE COURT:  I thought I remembered something in the

18   papers.  Well, all I could say is you should review them.  You

19   should produce them if they're responsive and if we need to

20   we'll call Ms. Upadhyay back for additional testimony.

21             MS. TUMARINO:  Yes, your Honor.  Thank you.

22             THE COURT:  Okay.  Can you ask Ms. Upadhyay to come

23   back to the witness stand?

24    ANU UPADHYAY,

25        called as a witness by the Plaintiff,

1      having been previously duly sworn, testified as follows:

2              THE COURT:  Mr. Alloy.

3              MR. ALLOY:  Thank you.

4    CROSS-EXAMINATION

5    BY MR. ALLOY:

6    Q.  Good morning, Ms. Upadhyay.  You understand that you are

7    still under oath today with the same rules apply that we

8    discussed yesterday?

9    A.  Yes.

10   Q.  Thank you.  When you worked for Shikha and Ganesh in New

11   York after they returned from Virginia you were able to conduct

12   your massage business in New York City, correct?

13             MS. TUMARINO:  I'll object as to relevance.

14             THE COURT:  Overruled.

15   A.  Yes.

16   Q.  And you performed massages in the evening, correct?

17             MS. TUMARINO:  I object as to relevance.

18   A.  Yes.

19             THE COURT:  Overruled.

20   Q.  And you would leave every evening around 7:00 p.m. to do

21   your massage work, correct?

22             MS. TUMARINO:  Again, I reiterate the objection.

23   A.  Yes.

24   Q.  And you performed massages on weekends, correct?

25   A.  Yes.

C52FUPAH                          Upadhyay - cross

1    Q.  And you performed these massages in Manhattan?

2            MS. TUMARINO:  Maybe I could just have a --

3    Q.  And in Queens and in New Jersey, correct?

4            MS. TUMARINO:  If I could just have a standing

5    objection, your Honor?

6            THE COURT:  Okay.

7    A.  Anybody called me anywhere, I would go there.

8    Q.  And you also performed massages in the mornings when the

9    children were in school, correct?

10   A.  No.

11   Q.  And during the time when you worked for Shikha and Ganesh

12   you had your own cell phone, right?

13           MS. TUMARINO:  Objection as to relevance.

14           THE COURT:  Overruled.

15   A.  Yes.

16   Q.  Berry and Ronica gave you the cell phone, correct?

17   A.  Yes.

18   Q.  And they added your cell phone to their cell phone plan,

19   correct?

20   A.  I don't know about this.  I got a phone.  That is all.

21   Q.  And you used your phone to help set up your massage

22   appointments, correct?

23           MS. TUMARINO:  Again, a standing objection, relevance.

24   A.  Yes.

25   Q.  And you made phone calls from your cell phone, correct?

1    A.  Yes.

2    Q.  And you received phone calls on your cell phone, correct?

3    A.  Yes.

4    Q.  And on the weekends you didn't sleep at Shikha and Ganesh's

5    apartment in New York City, correct?

6    A.  No, I used to stay.

7    Q.  You stayed at a room in Queens also, correct?

8    A.  No.  I used to stay in their house only.

9    Q.  So you spent every single weekend in New York City at

10   Shikha and Ganesh's?

11   A.  Yes.  I used to come and sleep in the night.  In the

12   morning I used to go for a massage.

13   Q.  You recently had a hip operation, I believe you testified,

14   is that correct?

15            MS. TUMARINO:  Objection.  I'm not sure she testified

16   about that.  That was something that I mentioned in the context

17   of the -- when the affidavit was signed.

18            MR. ALLOY:  I'll rephrase.

19   Q.  You recently had a hip operation, correct?

20   A.  Yes.  It's been six months.

21   Q.  How do you know it's been six months since your hip

22   operation?

23   A.  Because it was told to me, the doctor told me that it's

24   been six months.

25   Q.  And you paid for your medical care through Medicaid,

1  correct?

2              MS. TUMARINO:  Objection as to relevance.

3              THE COURT:  I'll allow it.

4              MS. TUMARINO:  And I'd like to also object as to

5  foundation.

6              MR. ALLOY:  It's cross.

7              THE COURT:  Apparently there was a foundation, since

8  she said yes.

9              MR. ALLOY:  I will establish relevance very shortly.

10             THE INTERPRETER:  The response was yes.

11             MR. ALLOY:  Thank you.

12 Q.  And several years ago you were sick, you were diagnosed

13 with rheumatoid arthritis, correct?

14 A.  Yes.

15             MS. TUMARINO:  Standing objection to relevance.

16             THE COURT:  All right.

17 Q.  When you were diagnosed with rheumatoid arthritis you went

18 to see a doctor in Jackson Heights, correct?

19 A.  Yes.

20 Q.  Dr. Georgescu, correct?

21 A.  Yes.

22 Q.  And you found Dr. Georgescu on your own, correct?

23 A.  Shikha found him for me.

24 Q.  And when did Shikha find Dr. Georgescu for you?

25 A.  I don't remember when she found him.

C52FUPAH                          Upadhyay - cross

1    Q.  But you were living with Shikha in New York City, correct?

2    A.  Yes.

3    Q.  Why would she find you a doctor in Jackson Heights?

4    A.  I was ill, I had trouble.  She found him and then she went

5    with me.

6    Q.  But why didn't she find you a doctor in Manhattan?

7    A.  I don't know now.  They must know.  I don't know.  Because

8    she wanted a Hindi doctor, because of that.

9    Q.  Well, Dr. Georgescu is not Indian, correct?

10   A.  Yes, that is, Dr. Badlani is my doctor.  First we had went

11   to Dr. Badlani, that also Shikha had found and given.

12           THE COURT:  Could you answer the question, which was,

13   "Dr. Georgescu is not Indian, is he?"

14   A.  I don't know about this.

15   Q.  Well, he is white, correct?

16   A.  Yes.

17   Q.  So he's not Hindi, is he?  He's not Indian, sorry.

18   A.  Yes.

19           THE COURT:  Yes is not an answer to that.

20   Q.  Yes, he's not Indian?

21   A.  Yes.

22   Q.  And in fact, the reason you visited Dr. Georgescu in Queens

23   is because when you filled out your Medicaid application you

24   used an address in Queens, correct?

25   A.  I didn't give an address in Queens.  Why would I give an

C52FUPAH                          Upadhyay - cross

1   address in Queens?

2   Q.  So you did not write down on your Medicaid application that

3   you were living in an address in Queens?

4   A.  No.

5   Q.  And the reason you had to see a doctor in Queens was not

6   because Medicaid required you to visit a doctor in Queens

7   because that was where your home address was?

8   A.  Shikha found him.  I don't know about all this.  I don't

9   even remember.

10  Q.  Well, you remember when you filled out your Medicaid

11  application, you had to put down what your income was, correct?

12  A.  No.

13  Q.  And in fact, you wrote down that you only earned $100 a

14  week in order to qualify for Medicaid, correct?

15  A.  Yes.

16  Q.  And when Shikha saw a copy of your Medicaid application,

17  she was very upset with you, wasn't she?

18  A.  No.

19  Q.  Shikha told you when she saw your Medicaid application that

20  what you were doing was fraudulent, didn't she?

21  A.  No.

22  Q.  Do you remember showing your Medicaid application to

23  Shikha?

24  A.  Yes.

25  Q.  You testified yesterday about Shaku.  Shaku was a part of

1   Andolan, correct?

2   A.  Yes.

3   Q.  Shaku was very involved with Andolan, correct?

4   A.  She must have been doing it.  I don't know much about this.

5   Q.  In fact, Shaku tried to get you involved in Andolan,

6   correct?

7   A.  No.

8   Q.  Well, when you began living in the same apartment building

9   with Shaku, you were friendly with her, correct?

10  A.  Sometimes when I met her then we would talk.

11  Q.  And you would socialize with Shaku?

12  A.  If I met her then I would talk only.

13  Q.  And you complained to Shaku about your belief that you were

14  not paid all your wages, correct?

15  A.  I didn't speak to Shaku.

16          MS. McKENNA:  I didn't hear you.

17          MR. ALLOY:  I didn't speak to Shaku.

18  Q.  You knew that Shaku was involved in Andolan and you knew

19  that Shaku had filed a lawsuit against her former employer, but

20  you never spoke to her about your complaint?

21  A.  No.  I only spoke to her once.  That's all.

22          MR. N. SETHI:  There's one translation, not about the

23  case, it's about her wages.

24          THE INTERPRETER:  He said about the complaint.

25          MR. ALLOY:  Her complaint --

C52FUPAH                          Upadhyay – cross

 1          MS. McKENNA:  Let's rephrase it.  Let's reask it.

 2          MR. ALLOY:  Right.

 3   Q.  By complaint I did not mean the formal complaint, I meant

 4   her, Anu's complaint about her belief that she had not been

 5   paid wages, so I will rephrase the question.

 6          So you knew that Shaku was involved in Andolan and you

 7   knew that Shaku had filed a lawsuit against the Chellarams, but

 8   you never --

 9          MS. McKENNA:  One at a time.

10          THE COURT:  You have to break it up or you don't

11   get --

12   Q.  You knew that Shaku was involved in Andolan, correct?

13   A.  Yes.

14          THE COURT:  Okay, next clause.

15   Q.  And you knew that Shaku had filed a lawsuit against the

16   Chellarams, correct?

17   A.  Yes, I knew.

18   Q.  And you lived just one floor apart from Shaku, correct?

19   A.  Yes.

20   Q.  But you never discussed with Shaku your belief that you had

21   not been paid all of your wages?

22          MS. TUMARINO:  I'm going to object as to form.  Can we

23   have a time frame here?

24          THE COURT:  Never is the time frame.

25   A.  I didn't speak to Shaku.

C52FUPAH                    Upadhyay - cross

1   Q.  Instead, you complained to one of your massage clients, is

2   that right?

3   A.  Yes.

4   Q.  I'm sorry, the answer is yes?  So you want the Court to

5   believe that you told a massage client about your complaint

6   about the Sethis but not Shaku, is that right?

7   A.  I didn't speak to Shaku.

8           MS. McKENNA:  Move to strike, your Honor.  Not

9   responsive.

10          THE COURT:  A responsive answer would just have been

11  yes.

12          MS. McKENNA:  Right.

13          THE COURT:  But it's argument anyway.

14          MS. McKENNA:  Okay.

15  Q.  In one of the affidavits you submitted to this Court you

16  made a number of statements about the time that you were

17  working for Ronica and Berry and two women from a workers

18  rights organization visited you at their apartment, correct?

19  A.  Yes.

20  Q.  In your affidavit to the Court you did not identify either

21  of the two women, correct?

22  A.  No, I didn't know them.  I didn't have any knowledge.

23  Q.  Nahar Alam was not one of the two women who came to the

24  Sethis' apartment that day, correct?

25  A.  Nahar had come.  Nahar and one other lady, two people had

C52FUPAH                          Upadhyay - cross

1   come.

2   Q.  Well, when you signed your affidavit approximately one year

3   ago, you knew who Nahar Alam was, correct?

4   A.  Yes.

5   Q.  And her name and phone number are in your 2008 diary,

6   correct?

7   A.  Yes.

8   Q.  And she helped you get involved in the documentary film

9   that you appeared in, correct?

10  A.  What film?

11       THE COURT:  The film we were talking about yesterday.

12  A.  Yes.

13  Q.  And you attended a family gathering of Ms. Alam's many

14  years ago, correct?

15  A.  Yes.

16       MS. TUMARINO:  I'm going to object.  She hasn't

17  testified about any of this.  Foundation.

18       MS. McKENNA:  Cross-examination.

19       MR. ALLOY:  It's cross-examination.

20       THE COURT:  It's cross-examination.

21       MS. McKENNA:  Did we get an answer?

22       THE INTERPRETER:  Yes.  I said yes.

23       MS. McKENNA:  Thank you.

24  Q.  In your most recent affidavit that you submitted to the

25  Court just a few weeks ago, you stated that you bumped into

C52FUPAH                    Upadhyay - cross

1   Ms. Alam on the street in 2009, correct?

2   A.  Yes.

3   Q.  But in none of the affidavits you've submitted to the Court

4   today -- strike that.

5        You have not identified Ms. Alam as one of -- strike

6   that.

7        In your most recent affidavit in which you discuss

8   Ms. Alam, you still did not identify her as one of the two

9   women who visited the Sethis' apartment.

10  A.  Two people came.

11       MS. McKENNA:  Move to strike.

12       THE COURT:  I think that what you want to ask her is

13  at no time in any of your affidavits did you identify Ms. Alam

14  as one of the people who came to the Sethis' apartment.

15       MR. ALLOY:  Yes, thank you.

16       THE COURT:  Could you --

17  A.  Because I didn't know the names of people.

18  Q.  But you just testified that you know Ms. Alam.  Correct?

19  A.  Yes, we know each other.  It's now that we have done that.

20  Before we didn't used to meet.

21  Q.  Well, at the time you submitted or your counsel submitted

22  three different affidavits from you, you knew Ms. Alam's name,

23  correct?

24  A.  Yes.

25  Q.  So did you just forget that Ms. Alam was one of those two

1   women who visited the Sethis' apartment?

2   A.  Yes, I had forgotten.

3   Q.  And you only just remembered a few minutes ago; is that

4   your testimony?

5   A.  Remembered what?

6   Q.  Remembered that Ms. Alam was one of the two women who

7   visited the Sethis' apartment earlier in your employment for

8   them.

9   A.  Yes, two women had come.  They spoke and then they went

10  away.

11  Q.  That was not my question.  My question was, did you only

12  just remember five minutes ago that Ms. Alam was one of those

13  two women?

14  A.  At that time I didn't know by name, but now I know.

15  Q.  When you say at that time, you're talking about when she

16  visited, correct?

17  A.  Yes, she came.  Ronica called her and she came.

18  Q.  I'm asking you, two weeks ago when you submitted an

19  affidavit to the Court -- I'm sorry.  Two weeks ago when you

20  submitted an affidavit to the Court, did you not remember that

21  Ms. Alam was one of the women who visited you?

22  A.  At that time I didn't know.  The two women had come, that's

23  all.  They came.  Later I came to know.

24          THE INTERPRETER:  I missed something?

25          MS. S. SETHI:  It's not that you missed.  She keeps

C52FUPAH                    Upadhyay - cross

1  saying at that time.  That is not a specific phrase.  You're

2  not asking her specifically.  The question is not at that time

3  in 1999.

4              THE INTERPRETER:  I asked her (Hindi).

5              MR. N. SETHI:  She's not answering specifically to the

6  time line.

7              THE INTERPRETER:  Should I repeat that?

8              MS. S. SETHI:  Two weeks did she know.

9              THE WITNESS:  Yes.

10             THE COURT:  When this lawsuit was filed, at that time

11 did you know the name of at least one of the women that came to

12 the Sethis' apartment from Andolan?

13             THE INTERPRETER:  At that time when I went, then only

14 I knew, so I said at what time, she said when I went to ask for

15 help.

16             THE COURT:  Could you just listen to the question,

17 which is at the time you filed this lawsuit did you know the

18 name of one of the two women who came to the Sethis' apartment?

19             THE WITNESS:  Yes.

20             MS. McKENNA:  Hallelujah.

21 Q.  Before you started working for Shikha and Ganesh you spoke

22 to them on the phone and they agreed to pay you $1,400 per

23 month, correct?

24 A.  Yes.

25 Q.  And at some point they began paying you $1,600 per month,

C52FUPAH                        Upadhyay - cross

1   correct?

2   A.   When we went to North Carolina, at that time they had

3   spoken about 1400.  Then when we came to Manhattan, then they

4   spoke about 2,000 per month they would give me.

5   Q.   Okay, so your salary was raised by Shikha and Ganesh,

6   correct?

7   A.   Yes.

8   Q.   And in fact, you had conversations with Shikha and Ganesh

9   about your salary, correct?

10   A.   Yes.

11   Q.   In fact --

12   A.   On the phone.  On the phone.

13   Q.   Well, after you started working for Shikha and Ganesh, you

14   also had conversations with them about your salary, correct?

15   A.   No.

16   Q.   In fact, you asked for arrays, correct?

17   A.   No.  Because previously only they had told me that when we

18   come to Manhattan we'll give you 2,000.  Now we'll give you

19   1400 per month.

20   Q.   So it's your testimony that they raised your salary simply

21   out of generosity and not out of a discussion with you?

22   A.   I didn't speak about salary because they knew about it and

23   they had increased my salary.

24   Q.   Isn't it in fact true that they increased your salary in

25   part because you threatened to stop working for them?

C52FUPAH                      Upadhyay - cross

 1   A.  Aiyyo, no.

 2              THE COURT:  I'm sorry, "I don't know"?

 3              THE INTERPRETER:  "Aiyyo" is an expression of alarm.

 4              MS. McKENNA:  I'm sorry, what's the expression?

 5              THE INTERPRETER:  Aiyyo is an expression of alarm,

 6   a-i-y-y-o.

 7              MS. S. SETHI:  It's like, "Oh, no."

 8              MS. McKENNA:  Thank you.

 9              THE COURT:  Just to be clear, you never asked Shikha

10   and Ganesh or either of them to raise your salary?

11              THE WITNESS:  I never asked.

12              THE COURT:  So each time they raised your salary, they

13   just volunteered to do so?

14              THE WITNESS:  No.  It's because I was taking care of

15   two children on my own.  In the morning they would leave at

16   seven and in the evening they would come at seven, and I did

17   everything, I took care of the children, I did all the cooking

18   in that house and the taking care of the house and that's why

19   they increased my salary, not because their heart was big.

20              THE COURT:  But didn't they have two children when you

21   went to work for them?

22              THE WITNESS:  Yes, I used to take care of two

23   children.

24              THE COURT:  So all the time or within a few weeks of

25   the time you went to work for Shikha and Ganesh they had two

 1   children, correct?

 2             THE WITNESS:  Yes.

 3             THE COURT:  And from the beginning of the time that

 4   you went to work for them it was also your job to take care of

 5   the house, correct?

 6             THE WITNESS:  Yes.

 7             THE COURT:  And during the time that you worked for

 8   them all the time, it was your job to cook as well, isn't that

 9   correct?

10             THE WITNESS:  Yes.

11             THE COURT:  How many times did Shikha and Ganesh raise

12   your salary?

13             THE WITNESS:  I don't know about this.  In North

14   Carolina at that time before going there we had spoken, and

15   they had told me that now we'll give this much and then when we

16   go to Manhattan we'll increase it to 2,000, so I never spoke to

17   them about my salary because they knew that they were going to

18   raise it.

19             MS. TUMARINO:  I'm sorry, could you read the answer

20   back?

21             THE COURT:  So is your testimony that your salary was

22   either $1,400 or $2,000 a month throughout the time that you

23   worked for Shikha and Ganesh?

24             THE WITNESS:  I didn't see the money, salary.  I

25   didn't see the money.  They used to give a check and I used to

```
 1   go give it.  If I've never seen the money, then how will I
 2   know?
 3              THE COURT:  You saw the checks, did you not?
 4              THE WITNESS:  Yes, checks only I used to take it and
 5   go.
 6              MS. TUMARINO:  I'd like the record to reflect that the
 7   checks are from multiple months which don't necessarily
 8   correspond to either of the amounts that plaintiff has
 9   testified to.
10              MS. McKENNA:  And don't necessarily correspond to any
11   of the plaintiff's prior testimony I would also note.
12   BY MR. ALLOY:
13   Q.  You can read numbers, correct?
14   A.  No, I don't know.  I don't know how to look at checks.
15   Q.  But you know numbers, correct?
16   A.  What number?
17              THE COURT:  Any number.
18   A.  A, B, C, D numbers I know.
19   Q.  1, 2, 3 numbers you know.
20   A.  Yes.
21   Q.  And so when you receive a check and it has numbers on it,
22   you can read those numbers, correct?
23   A.  Before I didn't know any numbers.  Now I know numbers.
24   Q.  And when you sent money on your own to India, you had to
25   know how much money you were sending, correct?
```

1   A.  I used to take money -- I used to take money, I used to

2   take the money and I used to go to Western Union.  I used to

3   say I want to send one lakh rupees and he used to take one lakh

4   rupees and give the remainder back to me.  I didn't know how to

5   count.

6   Q.  Now you know there are numbers on money, is that right?

7   A.  Yes.  20, 10, yes, I know all this.  It's now that I know

8   all this.  Before I didn't know all this.  Shikha and Ronica

9   used to count it and give it to me my money.

10  Q.  So you operated a massage business in which you charged

11  clients different amounts of money, but you didn't know any of

12  the values of the bills you were receiving?

13  A.  They used to give it to me and I used to put it away.  I

14  didn't count and take it from them.

15          MS. McKENNA:  Objection.  Non-responsive.  Move to

16  strike.

17          THE COURT:  Granted.

18          MS. TUMARINO:  She answered the question.  He said --

19          MS. McKENNA:  It's not a responsive answer.

20          MS. TUMARINO:  She's explaining how it is that she got

21  money when she was paid.  He says but you didn't know how much

22  you were paid and she says they used to give it to me, I put it

23  away, but I didn't know how much it was.  It's totally

24  responsive to the question.

25          MR. ALLOY:  Can you read back the question, please?

C52FUPAH                    Upadhyay - cross

1          MS. McKENNA:  The Judge has already ruled on the

2    question.

3          MS. TUMARINO:  She ruled without hearing my argument.

4          THE COURT:  We'll let it stand.  It can stay.

5          MR. ALLOY:  Can you repeat the question, please?

6          THE COURT:  I'd try another question.

7    BY MR. ALLOY:

8    Q.  So you would charge massage clients, some of your massage

9    clients, $50, correct?

10   A.  Yes.

11   Q.  And those were the non-Indian massage clients, you charged

12   them $50, correct?

13   A.  Yes.

14   Q.  And the Indian massage clients you charged $35, correct?

15   A.  Yes, 35 or 40, like this.

16   Q.  So when a massage client paid you for your massage, how did

17   you know that they weren't just giving you one dollar?

18   A.  Those people, what money they would give, I would take it

19   and I would go.  I didn't used to count the money.  I didn't

20   know how to count the money.  Now I know how to count the

21   money.  At that time I did not know.

22          THE COURT:  So when you had a massage client and at

23   the end of the massage they paid you, it's your testimony that

24   you left without knowing whether they had paid you properly?

25   That's a yes or no question.

1          THE WITNESS:  Yes.  I used to think that they had

2   given it correctly.

3          THE COURT:  But you would travel all the way to Queens

4   to do a massage and leave the client without being certain that

5   they had paid you all the money you were owed.  Is that your

6   testimony?

7          THE WITNESS:  Yes.

8   Q.  And the purpose of all your massage business was so that

9   you could earn money to send it home to your family in India,

10  correct?

11  A.  Yes.

12  Q.  And you earned thousands of dollars through your massage

13  business, correct?

14  A.  Yes.

15  Q.  You were very successful at your massage business, correct?

16  A.  Yes.

17  Q.  It's true that you have signed your name with two N's

18  before, correct?

19  A.  I don't remember that.

20  Q.  Well, in fact, you signed your green card application with

21  two N's, correct?

22  A.  I don't remember.

23          MR. ALLOY:  What exhibit are we up to?

24          THE DEPUTY CLERK:  26.

25          MR. ALLOY:  I'd like to mark as Defendant's Exhibit 26

C52FUPAH                    Upadhyay - cross

1    four pages Bates stamped D000162, 163, 168, 170, which I will

2    represent are pages from, were produced by defendant and are

3    pages from plaintiff's green card application.  Here's a copy.

4    Q.  Ms. Upadhyay, the Sethis helped you apply for a green card,

5    correct?

6    A.  Yes.

7    Q.  And as part of that application, excuse me, as part of that

8    process you had to fill out some paperwork, correct?

9    A.  They would fill it.  I didn't fill anything.

10   Q.  You had to sign some paperwork, correct?

11   A.  Yes.

12   Q.  If you could look at the second page of Exhibit 26?  That's

13   your signature at the bottom of the page, correct?

14   A.  It is my signature but I did not write two N's.  I don't

15   remember.

16           THE COURT:  Well, if you didn't write two N's, who

17   wrote two N's, if this is your signature?

18           THE WITNESS:  I don't know anything about this,

19   because in the green card there's only one N.

20           THE COURT:  Look at this piece of paper.  Did you

21   write those letters on the second and third and fourth pages of

22   this Exhibit 26?

23           MS. S. SETHI:  Yes or no?  It was yes or no.

24           THE INTERPRETER:  She says I don't remember.  Should I

25   ask again that's a yes or no question?

1              MS. McKENNA:  Yes.  It's the judge's question, sorry.

2              THE COURT:  What don't you remember?

3              THE WITNESS:  These two N's, that sign that I have

4     done, I don't remember it.

5              THE COURT:  That's not the question.  The question is

6     did you write the letters on pages 2, 3 and 4 of this exhibit?

7              THE WITNESS:  What can I say?  I don't know about the

8     two N's.  I don't know about it, how am I going to say yes or

9     no?

10    BY MR. ALLOY:

11    Q.  Did someone else sign your green card application?

12    A.  No.  They took me and went.  I have done it.

13             THE COURT:  You remember signing a green card

14    application, correct?

15             THE WITNESS:  Yes.

16    Q.  So you wrote those letters on those pages of Exhibit 26,

17    correct?

18             THE INTERPRETER:  Sign.  She's asking about the sign.

19    A.  I don't know about the two N's.  How could I have written

20    it?  I don't know whether I should say yes or whether I should

21    say no.  I don't understand.

22             MS. TUMARINO:  Your Honor, I think it's pretty clear.

23    She's acknowledging she signed it --

24             THE COURT:  No, she's not.  That's what I'm trying to

25    get her to agree.

1         MS. TUMARINO:  She's saying she doesn't remember

2   specifically writing it this way.

3         MS. McKENNA:  No, she's saying she can't explain the

4   fact that her testimony is completely incredible.  That's very

5   plain, your Honor.

6         MS. TUMARINO:  Your Honor, she said she remembers

7   signing a green card application, she doesn't remember signing

8   it with two N's.  She says she did sign it, she just doesn't

9   remember.

10        MS. McKENNA:  That's not what she's saying.

11        THE COURT:  You could say in one sentence, "I signed

12  this although I don't remember writing two N's."  She has not

13  said that.

14        MS. TUMARINO:  That would assume a certain familiarity

15  with this forum.

16        MS. McKENNA:  No, it would assume a certain honesty is

17  actually what it would assume.

18        MS. TUMARINO:  Your Honor, she clearly --

19        THE COURT:  Look.  The bottom line is are you

20  challenging that she wrote these letters?  In other words, we

21  have it six times.

22        MS. TUMARINO:  Your Honor, I'm not challenging it.  If

23  you want to hear what I'd like to say.  She clearly used to

24  write her name with two N's.  She's confused because at some

25  point she stopped --

C52FUPAH                    Upadhyay - cross

1          THE COURT:  Yesterday she refused to acknowledge the

2     endorsement on the check with two N's.  That's the problem.

3     It's incredible.

4          MS. TUMARINO:  The endorsement on the check with two

5     N's looks different.  She also was unable --

6          MS. McKENNA:  That wasn't her explanation.

7          MS. TUMARINO:  Well, it wasn't her explanation because

8     she hadn't been shown this document.  She also was unable to

9     verify her own signature on a document which I've brought the

10    original of with me today which she signed, your Honor.  She's

11    an illiterate woman who is unfamiliar with writing letters.

12    She can write some letters but she's nervous, this is her first

13    experience with the court system.  This is a completely

14    different world for her.

15         THE COURT:  You know -- excuse me.  I have been a

16    judge for over 30 years.  In the course of that I have had many

17    uneducated people testify, particularly in the criminal

18    context.  Uneducated people can tell the truth when questions

19    are broken down for them that can answer them regardless of

20    their formal education.  The excuse that she is uneducated only

21    goes so far.  And it doesn't go as far as refusing to

22    acknowledge that on her very own personal green card

23    application she wrote her name six times with two N's because

24    there is no other possible explanation other than she wrote it,

25    because there's no reason for anyone else to have written this.

C52FUPAH                    Upadhyay - cross

1    There's no -- it defies the imagination to come up with another

2    explanation.  But yet she is reluctant to acknowledge it,

3    because she is not, maybe not formally educated, but that

4    doesn't make you unintelligent.  And perhaps she has put

5    together the questions from yesterday and the questions from

6    today.

7    BY MR. ALLOY:

8    Q.  Ms. Upadhyay, you've also signed your actual green card

9    with two N's, correct?

10   A.  I don't know.  I don't remember.

11   Q.  And you've signed your Social Security card with two N's,

12   correct?

13   A.  One N.

14        MR. ALLOY:  I only have one copy, but these I will

15   show you.  I will try to make copies.

16        MS. TUMARINO:  She has the more recent green card that

17   I think, I would be most comfortable checking before you do

18   that.  That one's expired.

19        MR. ALLOY:  Let me clarify.

20   Q.  You've had more than one green card, correct?

21   A.  I don't have old green cards, I just have the one.

22   Q.  You have your most recent green card but your green card

23   expires and you have to get a new one every few years, correct?

24   A.  I don't know about this.

25   Q.  Well, you had a green card in 2002 and 2003 that you signed

C52FUPAH                        Upadhyay – cross

1    with two N's, correct?

2            I apologize.  I have been referring to this as a green

3    card.  Let me -- this is the only copy I have, I apologize.

4            THE INTERPRETER:  Her response is I only have one

5    green card, it has just come recently.

6            MR. ALLOY:  I'm going to clarify.

7    Q.  You have also what's called a workers authorization card,

8    correct?

9    A.  With me I don't have any other card.

10   Q.  Not with you here.  Previously you have had what's called a

11   workers authorization card, correct?

12   A.  I don't know.

13           THE COURT:  Show it to her.  Does this refresh your

14   recollection.

15   Q.  Okay, let me refresh your recollection.  I'm going to show

16   you what's been marked as Defendant's Exhibit 27.  Do you

17   recognize that card?

18   A.  Yes.  I recognize it.

19   Q.  And that's your picture on the card, correct?

20   A.  Yes.

21   Q.  And this is an official document of the United States that

22   allows you to work in the United States, correct?

23   A.  Yes.

24   Q.  And that's your signature on the card, correct?

25   A.  Yes.  That is my signature.  How I could have written three

1   N's?  That's what I cannot remember.

2   Q.  I'm sorry, did you say three N's?

3              THE INTERPRETER:  She said three N's.

4              She says no, these two N's, I don't know.  I have put

5   it -- I don't remember.  I don't remember anything.

6              THE COURT:  Is there any question, any doubt in your

7   mind that you -- that that is your handwriting on the card?

8              THE WITNESS:  Because Ronica took me, and when she

9   took me and went to the office I only signed the document.  I

10  can remember this much.  Now I have to say yes only.  Yes.

11             THE COURT:  Yes -- let me be sure.  Yes, I wrote my

12  name on that card.

13             THE WITNESS:  Yes.  Yes, I had signed this card.

14  Ronica had taken me and gone and I had signed this.  Now, about

15  these two N's I don't know, but I'm going to say yes.

16             THE COURT:  We're going to do it one more time.  Try

17  to just answer my question.  Is there any doubt that you wrote

18  the handwriting on that card?  Answer my question yes or no.

19             THE WITNESS:  I have, I have doubt that it is, I have

20  doubt that it is not my signature.

21             THE COURT:  Okay, that's a double negative.

22             MS. McKENNA:  She's shrewd enough to know that, too.

23             THE INTERPRETER:  Could we just -- is it --

24             THE COURT:  I'll ask it another way.

25             MS. TUMARINO:  Why don't you just ask her if she

1    thinks it's her signature.

2              THE COURT:  Did you write the handwriting on that

3    card, yes or no?

4              THE WITNESS:  Because at that time I did not know how

5    to write so clearly.

6              THE COURT:  Let me understand.  You are saying you did

7    not write the handwriting on that card?

8              THE WITNESS:  I have not done this signature.

9              THE COURT:  Show her the next one.

10   BY MR. ALLOY:

11   Q.  I'm going to refresh your recollection with Defendant's

12   Exhibit 28.  Do you recognize that Social Security card?

13   A.  Yes.

14   Q.  That is your Social Security card, correct?

15   A.  Yes.

16   Q.  And the signature at the bottom of the Social Security

17   card, that is your signature, correct?

18   A.  This is not mine.  I remember with this Ronica had written

19   it.  Ronica had written it.  She had signed this.  I didn't

20   know how to do it.  Now looking at this I remember.

21   Q.  So it's your testimony that you did not sign your own

22   Social Security card?

23   A.  I didn't do it.  She filled the paper and she only did it.

24   Because at that time I did not know how to sign.

25              MS. McKENNA:  Your Honor, while my colleagues are

C52FUPAH                    Upadhyay - cross

1   conferring, I know we didn't have a jury trial so these

2   exhibits haven't been officially moved in, all the exhibits

3   from yesterday and today, but I assume they're in.

4          THE COURT:  You can move them in unless there's an

5   objection to any of the ones that have been referenced so far.

6          MS. TUMARINO:  I have to go through it.  I don't want

7   to concede their admissibility without looking at them since

8   they weren't moved.  I haven't made a specific list as to which

9   ones are pending, but I'm happy to do that on a break.

10          THE COURT:  Okay.  If I don't hear from you, I'm going

11   to assume that they're in evidence.

12          MS. McKENNA:  Thank you.

13          MS. TUMARINO:  Your Honor, yesterday, you had asked if

14   I had the original copy of the declaration and I've brought it

15   with me today.

16   BY MR. ALLOY:

17   Q.  Ms. Upadhyay, you remember -- you applied -- after you

18   arrived in the United States, several years after you were in

19   the United States, you applied for an Indian passport, correct?

20          MS. TUMARINO:  I object as to relevance.

21   A.  Yes.

22          THE COURT:  Overruled.

23   Q.  And you signed your passport with two N's, correct?

24   A.  Ronica put it on another piece of paper and then I was

25   doing it slowly and then she said don't do it so slowly and

1   then she did it.

2   Q.  So it's your testimony you did not sign your own passport?

3   A.  This much I don't have in my mind.  I don't remember.  I

4   only remember that she had written it on a piece of paper and I

5   didn't know at that time how to do it.  Now whether I've put it

6   or not put it, what happened or not happened I don't know.

7   Q.  And in fact, you've had more than one Indian passport,

8   correct?

9   A.  I have two.  There are two, sorry.

10  Q.  And your most recent Indian passport which you signed in

11  2005 also had two N's in your signature, correct?

12  A.  There must be.  I must have put it.  I don't remember this

13  much.  I don't remember about two N's, but even then, yes.

14          MR. ALLOY:  Defendant's Exhibit 9, I'm showing

15  Defendant's Exhibit 9 the last page Bates marked D000153 which

16  is a copy of Ms. Upadhyay's 2005 India passport.  I'm sorry,

17  the second to the last page.

18          THE INTERPRETER:  I have it.

19  Q.  Is that a copy of your passport, Ms. Upadhyay?

20  A.  Yes.

21  Q.  And I know it's hard to make out, but that's your signature

22  on the passport, correct?

23  A.  Yes.

24  Q.  And there are two N's in your signature on your passport,

25  correct?

C52FUPAH                    Upadhyay – cross

1  A.  I don't remember about two N's.  If they are there, they're

2  there.  I must have put it.

3          THE INTERPRETER:  Sorry, she's looking at the green

4  card, so I'm going to flip it.

5  Q.  You can see that there are two N's in your signature,

6  correct?

7  A.  Yes.

8  Q.  And that's your signature, correct?

9  A.  Yes.

10  Q.  So in fact, you do sign your name with two N's on occasion,

11  correct?

12  A.  I don't remember.  I only remember one.  I don't remember

13  two.

14  Q.  Ms. Upadhyay, after you received your green card you

15  planned your first trip back to India since you had come to the

16  United States, correct?

17  A.  Yes.

18  Q.  And I'm sure that was a very important trip for you,

19  correct?

20  A.  Yes.

21  Q.  You hadn't seen your children in a long time, correct?

22  A.  Yes.

23  Q.  And you also hadn't met some of your grandchildren or maybe

24  all of your grandchildren, correct?

25  A.  Yes.

1    Q.  And you brought a lot of gifts home for all of your family,

2    correct?

3    A.  Yes.

4    Q.  And you bought those gifts yourself, correct?

5    A.  Yes.

6    Q.  You bought a lot of gold jewelry for your family, correct?

7    A.  Two bangles for one girl, two bangles for one girl, for my

8    daughter in law two, for four people I bought two bangles each.

9    Q.  And you also bought a number of very expensive watches,

10   correct?

11          MS. TUMARINO:  Your Honor, I'm going to object as to

12   relevance.

13          THE COURT:  I'll let it go for a while.

14   A.  They were not expensive.  Ten, ten dollars, you get it in

15   the street.

16   Q.  In fact, weren't the watches Rado watches, Ms. Upadhyay?

17   A.  For one son I bought an expensive one, a Rado one.  For the

18   other son I bought a slightly less expensive one, for the

19   others --

20          MS. S. SETHI:  She also said her husband got a Rado.

21          THE INTERPRETER:  Official correction.  She bought one

22   Rado for her older son who goes in the office so for that, for

23   her younger son she bought a slightly less expensive one and

24   for the rest of the people to give them she bought the ones

25   that you get on the street.

C52FUPAH                    Upadhyay - cross

1  Q.  You also brought a lot of cash back to give out to your

2  family, correct?

3  A.  You can't take and go so much money, so I didn't take so

4  much money.  I took 5,000 and went.  Everybody told me that if

5  you take money like this you will get caught, so for everybody

6  I bought gifts.

7  Q.  Well, in fact the limit that you can bring is $10,000,

8  correct?

9          MS. TUMARINO:  Your Honor, I'm just going to object

10 again as to relevance.

11         MS. McKENNA:  Wait.  There was an answer.

12         THE INTERPRETER:  She responded.  She said I don't

13 know I took 5,000 and went.  Each time I take 5,000 and go.

14 Q.  In fact, the first time you went to India, Shikha and

15 Ganesh gave you $10,500 in cash, correct?

16         THE INTERPRETER:  In dollars?

17         MR. ALLOY:  Yes.

18 A.  No, they didn't give it.

19 Q.  In fact, the $10,500 they gave you included your last two

20 months of wages, correct?

21 A.  No.  Whatever I took in went, I took my massage money and

22 went.

23 Q.  Well, in fact, they also gave you part of that, part of the

24 $10,500 they gave you was $6,000 that came from your own bank

25 account, correct?

C52FUPAH                    Upadhyay - cross

1    A.  The 40,000 that they sent, is it that?

2    Q.  No.  Before you went to India for the first time.

3    A.  My bank money I never took out.

4    Q.  Well, in fact, you traveled to New Jersey shortly before

5    you went to India to visit with Berry and Ronica, correct?

6    A.  Yes, I went to meet them.

7    Q.  And you asked them to take money out of your bank account,

8    correct?

9    A.  No.

10   Q.  In fact, the bank was closed that day, correct?  So you

11   asked them to send money to Shikha and Ganesh?

12   A.  No.

13   Q.  So it's your testimony that Shikha and Ganesh did not give

14   you any money prior to your trip to India?  I'm sorry, shortly

15   before your trip to India?

16        THE INTERPRETER:  Your first trip to India.

17   A.  Money, nothing.  From my pay, my salary, nothing, nothing

18   at all.  When I went to India I had taken old clothes and gone.

19   They know that.

20        MR. ALLOY:  I have no further questions at this time,

21   your Honor.  I would like to reserve or to the extent that

22   additional documents are produced, I think you had referenced

23   previously that the witness could be made available again for

24   further cross-examination, but I have nothing further at this

25   time.

C52FUPAH                          Upadhyay - cross

```
 1              THE COURT:  Okay.  Why don't we take five minutes, all
 2    right?
 3              MS. TUMARINO:  I'm going to need a few more minutes
 4    than that.  And, your Honor, I have the original declaration
 5    which I brought in.  That's obviously the original.  You're
 6    welcome to keep it, but it's the only original I have.
 7              THE COURT:  You can keep it.  I wasn't questioning
 8    your bona fides.
 9              MS. TUMARINO:  You just asked yesterday if I had the
10    original and I wanted to bring it in so you can see it.
11              THE COURT:  Well, you've shown it to the other side.
12    I'm not going to keep it.
13              (Recess)
14              THE COURT:  Ms. Tumanaro.  Would you conduct redirect?
15              Is it part of the record when the plaintiff got the
16    green card?  Is that in the record?
17              MR. ALLOY:  I don't --
18              THE COURT:  Okay.  Don't worry about it.  If that was
19    something you knew off a the top of your head.
20              MR. ALLOY:  I can tell you, it was December of '06.
21              MS. TUMARINO:  I'm sorry?
22              MS. McKENNA:  December of 2006.
23              THE COURT:  Does that sound right to you?
24              MS. TUMARINO:  It does sound right.  What are you
25    getting that from?
```

1            MR. ALLOY:  We're not.

2            MS. McKENNA:  We have great memories.

3   DIRECT EXAMINATION

4   BY MS. TUMARINO:

5   Q.  Ms. Upadhyay, yesterday you testified about money in your

6   U.S. bank account being transferred to your Indian bank

7   account.  Do you recall that?

8   A.  Transfer that I had done, 40,000?

9   Q.  Yesterday, yes, you spoke about that 40,000 transferred

10  from your American bank account to the Indian bank account.  Do

11  you remember that?

12  A.  Yes.

13  Q.  Who arranged for that money to be transferred?

14  A.  Ronica.

15            THE COURT:  Are we talking, just for my clarification,

16  Chase to Citibank?

17            MS. TUMARINO:  Yes.  In April of 2008.

18            I'm going to have the witness look at Defendant's

19  Exhibit 24.  I'll bring a copy of the written pages up to the

20  court.  I think that it doesn't look like the cover of this

21  document was copied.

22            THE COURT:  Maybe we can help you out.

23            MS. TUMARINO:  And the cover of the other document it

24  looks like that wasn't copied also.  I assume you would want

25  that?

1           THE COURT:  Yes, it would be helpful.

2    Q.  I'm going to show the witness what's been marked as Exhibit

3    24?

4           MS. McKENNA:  You've given her the 2012?

5           MS. TUMARINO:  Yes.

6           MS. McKENNA:  It wasn't marked.  I just wanted to mark

7    them.

8           MS. TUMARINO:  We're missing a cover.  That's our

9    problem.

10          MS. McKENNA:  This is 24?

11          MS. TUMARINO:  Yes.

12          MS. McKENNA:  Thank you.

13          MS. TUMARINO:  And this is 23.  We'll get the Court a

14   cover.

15   Q.  This is the current diary that you use, correct?

16   A.  Yes.

17   Q.  When did you first get this diary?

18   A.  It's been one or two months.

19          MS. TUMARINO:  If the witness could be shown what's

20   been marked as Defendant's Exhibit 23.

21   Q.  Until you got the other diary that I just showed you, is

22   this the diary that you used?

23          MS. McKENNA:  Objection to form.

24          THE COURT:  I note the problem.  Let's see if we get a

25   coherent response.

1              MS. TUMARINO:  Maybe I can rephrase slightly.

2    Q.  You just stated that you've only had the diary I showed you

3    a moment ago for one or two months, correct?

4    A.  Two months, three months, like this it was.  I don't

5    remember when I took it and brought it.

6    Q.  But before you got that new diary, is the diary that is

7    being shown to you right now, Defendant's Exhibit 23, the diary

8    you used?

9    A.  Yes.

10   Q.  Do you remember when Nahar Alam wrote her number in your

11   diary?

12   A.  It's been at least 15 days when we met then she wrote it.

13             MS. McKENNA:  Could I hear the answer back, I'm sorry?

14             (Record read)

15             MS. McKENNA:  Thank you.

16             (Pause)

17             MS. McKENNA:  Are you looking for the date?

18             MS. TUMARINO:  Yes.

19             MS. McKENNA:  April 7th.

20   Q.  Ms. Upadhyay, you testified that you complained to massage

21   clients that the defendants had not paid you wages, correct?

22   A.  Yes.

23   Q.  And that massage client helped you, correct?

24             MS. McKENNA:  Objection.

25             MS. TUMARINO:  This is in her direct testimony.  It's

C52FUPAH                          Upadhyay - redirect

 1   in her affidavit.  We can go through it, if you like.

 2                THE COURT:  Go ahead.

 3                MS. McKENNA:  I withdraw it.

 4                THE INTERPRETER:  The response is yes.

 5   Q.  And the massage client gave you an address in Manhattan,

 6   correct?

 7   A.  Yes.

 8   Q.  And you went to that address, correct?

 9   A.  Yes.

10   Q.  And at that office in Manhattan what did they tell you?

11   A.  They said we don't do this work.  We only do divorce work.

12   Q.  And did they give you information to help you?

13   A.  They gave me Nahar's address.

14   Q.  And after that time you bumped into Nahar in the street,

15   correct?

16   A.  Yes.

17   Q.  And when you wrote Nahar's name in your diary -- when Nahar

18   wrote her number in your diary, was that after you bumped into

19   Nahar on the street?

20                MS. McKENNA:  Objection.  That's leading, your Honor.

21                THE COURT:  The last one was also.  You have to do it

22   when.

23   Q.  Nahar wrote her name in your diary, correct?

24   A.  Not at that time.  She just wrote it recently.  At that

25   time I didn't take her phone number.  She was ill.  I had gone

C52FUPAH                    Upadhyay - redirect

1    to see her and it was at that time that I had taken her phone

2    number.

3    Q.  And when you say you had taken the phone number, is that

4    the number that appears in your diary?

5              MS. McKENNA:  Object.

6              THE COURT:  Please.

7    Q.  Where did you take her phone number?

8              MS. McKENNA:  Objection.

9              THE COURT:  That makes no sense.  Sustained.

10   A.  In her house, I just took it.

11   Q.  Do you remember when Nahar was ill?

12   A.  Yes.

13   Q.  Was this before or after you bumped into her on the street?

14   A.  Recently it's been two months since she was ill.

15   Q.  And it's in that recent time that the number has appeared

16   in your diary?

17             MS. McKENNA:  Objection.

18             THE COURT:  Please.

19             MS. TUMARINO:  Does she still have Defendant's Exhibit

20   23 in front of her?

21             THE INTERPRETER:  Yes.

22   Q.  Ms. Upadhyay -- you can give it back to me.

23             Ms. Upadhyay, how many times did the Sethis ask you to

24   sign your taxes?

25   A.  One time.

1   Q.  Did you ever meet the Sethi's accountant in person?

2   A.  What is an accountant?

3   Q.  Did you ever meet the person the Sethi's hired to prepare

4   your taxes?

5   A.  I have never seen any -- I have never even seen any such

6   person.

7   Q.  On how many occasions did you discuss Shaku's lawsuit with

8   her?

9   A.  About the case only one time, that's all.  Why are they

10  keeping on asking the same question?

11  Q.  When you lived with Shikha Sethi and Ganesh Raj, you did

12  not see Shaku regularly, correct?

13          THE COURT:  She lived with them in Virginia?

14          MS. TUMARINO:  Manhattan.  Either.

15          MS. McKENNA:  It's also leading, your Honor.

16          THE COURT:  Yes, it also is leading.  How often.

17  Q.  How often did you see Shaku when you lived with Shikha

18  Sethi and Ganesh Raj in either Virginia or Manhattan?

19  A.  I used to work there, so when would I meet her?

20  Q.  And when you lived in New York City with Shikha Sethi and

21  Ganesh Raj, how often did you see Shaku?

22  A.  I didn't meet at that time.

23  Q.  Can you tell us from your memory what Shaku's telephone

24  number is?

25  A.  I don't remember this much.

1          THE COURT:  Do you have telephone numbers stored in

2    your telephone?

3          THE WITNESS:  No, there is no numbers.  I don't know

4    how to put it in, I don't know how to take it out.

5          THE COURT:  So how do you make calls to people?

6          THE WITNESS:  I look for the number and then I dial.

7    Sometimes it's the wrong number, then I dial again, then it's

8    the wrong number.  Like this, I keep twisting and turning and

9    that's how I do it.

10          THE COURT:  Where do you look to find the number that

11    you're going to call?

12          THE WITNESS:  I look in my book.  I search in my book

13    what this is, what that is.

14    Q.  When the film was made about you and Shaku -- do you recall

15    testifying yesterday about a film made about you and Shaku?

16    A.  Yes.

17    Q.  Do you recall when that was made?

18    A.  At the time that I was doing my case, when I had met Nahar

19    on the street, at that time she had sent me and it was at that

20    time that I had done it.

21    Q.  So it was after you saw Nahar on the street?

22    A.  Yes.  She sent me there.

23    Q.  Ms. Upadhyay, during the time that you had a cell phone

24    provided by Ronica Sethi and Berry Sethi, who paid the cell

25    phone bill?

C52FUPAH                    Upadhyay - redirect

1    A.  I used to pay it.

2    Q.  How did you pay it?

3    A.  I used to give them the money.

4    Q.  You testified this morning about your Medicaid application,

5    correct?

6    A.  Yes.

7    Q.  Who filled out the Medicaid application?

8    A.  They sit on the road, those people, to fill it out.  At

9    that time I had filled it out.

10   Q.  On what road?

11   A.  On, next to Patel's, the Patel's store on 74th, over there.

12   My friend had taken me and gone and she told me it's good to

13   take Medicaid it's helpful for medicines, so at that time we

14   had made the card, the card that had been shown.  It was at

15   that time.

16          MR. N. SETHI:  She said something about where it was

17   done on the side of the road.

18   A.  Like that, they sit on the road to make the Medicaid cards.

19   Q.  It was at that time that you applied for Medicaid?

20   A.  Yes.  My friend told me to make the Medicaid so I did it.

21   Q.  And who wrote on the Medicaid form?

22          MS. McKENNA:  Asked and answered.

23   A.  Them only, the people who gave it, the Medicaid people who

24   sit over there.  She only filled it out.

25   Q.  Ms. Upadhyay filled it out?

1    A.  Where do I know how to write?

2           MR. N. SETHI:  Keep translating as she speaks.  She

3    was saying the person who was sitting on the road who helped

4    her to fill out the form, the person on the road who told her,

5    she filled out the form.

6           THE COURT:  Is that correct?  Is that what she said?

7           THE INTERPRETER:  On the table, yes.

8           MS. McKENNA:  Excuse me, your Honor.

9           MS. S. SETHI:  Plaintiff referred to 74th Patel, she

10   said Queens, but Queens was not translated.  That was in

11   Queens.  She said 74th Patel Brothers, Queens.

12          THE INTERPRETER:  She said (Hindi).  I don't recall

13   her saying the word Queens.

14          MR. N. SETHI:  She said Queens.

15   Q.  Is it in Queens?

16   A.  Yes.

17   Q.  Before you went to work for Shikha Sethi and Ganesh Raj,

18   you testified you had a telephone conversation, correct?

19   A.  Yes.

20   Q.  And you testified that during that phone conversation they

21   told you what they would pay you, correct?

22   A.  Yes.

23   Q.  And they told you what they would pay you, you testified

24   that they told you what they would pay you in Virginia or North

25   Carolina, correct?

C52FUPAH                    Upadhyay - redirect

1   A.  Yes.

2   Q.  Did they say during that phone conversation -- did they say

3   anything about Manhattan in that phone conversation?

4           THE COURT:  Manhattan generally or, the borough, or

5   wages in Manhattan?

6           MS. TUMARINO:  Well, I could -- I'm trying not to

7   lead, your Honor.

8           THE COURT:  Why don't you just ask the question did

9   they say anything else about wages in any other location?

10  Q.  Did they say anything else about how much they would pay

11  you anywhere other than Virginia or North Carolina?

12  A.  We come to Manhattan we'll give 2,000, they had said this.

13  Q.  During that phone conversation while you were still in New

14  Jersey?

15  A.  Yes.

16          MS. TUMARINO:  I don't have any further redirect, your

17  Honor.

18          MR. ALLOY:  Nothing further, your Honor.

19          THE COURT:  All right.

20          MS. TUMARINO:  Your Honor, if we could address the

21  issue of exhibits, perhaps?

22          THE COURT:  Just one second.  Ms. Upadhyay, you're

23  excused.

24          (Witness excused)

25          THE COURT:  What about exhibits?

1          MS. TUMARINO:  The question of whether I'm objecting

2     to the admissibility of any of them.

3          THE COURT:  Okay.  Are you?

4          MS. TUMARINO:  I'm going to object to the

5     admissibility on relevance grounds on Defendant's Exhibits 23

6     and 24.

7          MS. McKENNA:  The diaries, your Honor.

8          THE COURT:  Overruled.

9          MS. TUMARINO:  We have no objection to -- Defendant's

10     Exhibit 8, only certain Bates documents within that exhibit

11     were referenced or were discussed in the testimony yesterday.

12     We have no objection to the exhibit provided it comes in with

13     all of those documents.

14          THE COURT:  I don't think there's a problem with that.

15          MS. McKENNA:  No, your Honor.

16          MS. TUMARINO:  I didn't think there would be.

17          We have an objection to Exhibit 20 on relevance

18     grounds.

19          THE COURT:  20 is the ---

20          MS. McKENNA:  Citibank records showing her address.

21          MR. ALLOY:  As well as that she opened her own

22     personal bank account.

23          THE COURT:  Overruled.  Is there anything else?

24          MS. TUMARINO:  We have an objection to Exhibit 9, the

25     Indian Citibank application.

C52FUPAH                     Upadhyay - redirect

1              MS. McKENNA:  That was used, your Honor, with respect

2       to the signature.

3              MS. TUMARINO:  Well, it has pages that were not

4       referenced in the examination.  It has --

5              THE COURT:  That may be, but if they only chose to

6       admit part of it, you would argue that they were being

7       incomplete.

8              MS. TUMARINO:  The discussion was about her Indian

9       passport.  There was no discussion or testimony about the

10      application for the Indian Citibank account.

11             THE COURT:  All right, but --

12             MS. McKENNA:  The passport was used for purposes, she

13      needed the passport for purposes of opening the account, your

14      Honor.  I'm not sure what the objection is, because as your

15      Honor had rightly observed, if we attempted to introduce part

16      of a document the argument could be made we were not admitting

17      the entire document.  I agree it's an appendage to the document

18      but that's how we got it.  And there was testimony, as your

19      Honor knows, about the opening of the bank account.

20             THE COURT:  I think it's also directly -- it's related

21      to the credibility issue about her general knowledge of

22      finances.  It is relevant to the issue which I believe is in

23      the defendant's affidavit about whether Ronica Sethi helped her

24      open this account by obtaining the good standing statement from

25      Chase.

C52FUPAH                              Upadhyay - redirect

1          MR. ALLOY:  Berry Sethi's affidavit, paragraph 15.

2          THE COURT:  I think it's also generally helpful in

3     setting time frames in the case.  I'll receive it.

4          Anything else?

5          MS. TUMARINO:  We have no objection to 27, Defendant's

6     27 and 28.

7          THE COURT:  Okay.  I just need, remember, everything

8     they've mentioned is in unless you object.  So.

9          MS. TUMARINO:  Your Honor, I'd like the opportunity to

10    ask the witness one question about Defendant's Exhibit 20.

11    Those may be famous last words with this particular witness,

12    but what I'd like to keep it to is really just a question of

13    establishing when the account was opened and who helped her

14    open it.

15         THE COURT:  You have Exhibit 9 is related, right?

16         MS. TUMARINO:  No.  It's a totally separate account.

17         THE COURT:  To 20?

18         MS. TUMARINO:  It's a totally separate account.

19         THE COURT:  I'm sorry.  I don't care.  You can ask

20    her.

21         MS. TUMARINO:  I will try and keep it as short as

22    possible.

23         THE COURT:  I thought it was one question.

24         MS. TUMARINO:  It may normally be one question.  Could

25    you call her back up?

1              (Witness recalled).

2     BY MS. TUMARINO:

3     Q.  Can you please show the witness Defendant's Exhibit 20?

4              THE INTERPRETER:  D000183?

5              MS. TUMARINO:  183, yes.

6     Q.  Ms. Upadhyay, you testified about the addresses on these

7     documents that are Citibank bank records yesterday, correct?

8     A.  Yes.

9     Q.  And they reflect your address in Queens, correct?

10    A.  Yes.

11    Q.  Do you know when this Citibank account in Queens was

12    opened?

13    A.  I don't remember.  When I took the new phone it was at that

14    time.

15             MS. McKENNA:  I can't hear you.

16             THE INTERPRETER:  When I took the new phone it was at

17    that time.

18    Q.  Were you still working for Shikha Sethi and Ganesh Raj?

19    A.  No.

20    Q.  Was this after you were working for them?

21    A.  It's been two or two and a half years.

22    Q.  That you have this account?

23    A.  That I opened this account.  It must have been at that

24    time.  I don't remember.

25    Q.  And who helped you open the Citibank account in Queens?

1              MS. McKENNA:  Objection.

2              THE COURT:  Who if anyone.

3    Q.  Who if anyone helped you open this Citibank account in

4    Queens?

5    A.  I went to Manhattan to do a massage, so her husband, I told

6    the woman.  Her husband came with me to open the account.

7    Q.  So, I'm sorry, are you saying it was the husband of a

8    massage client?

9    A.  Yes.

10             MS. TUMARINO:  I don't have anything further.

11             MR. ALLOY:  I have nothing.

12             (Witness excused)

13             THE COURT:  Okay.  So other than Ms. Alam, who is not

14   available today, I gather, the plaintiff has no other

15   witnesses.

16             MS. TUMARINO:  That's correct.  Subject to perhaps a

17   rebuttal witness.

18             THE COURT:  I'm not sure that we get to rebuttal

19   witnesses under this scheme, but why don't we, Mr. Alloy, do

20   you want to call your first witness?

21             MS. TUMARINO:  Your Honor, could we take a lunch break

22   at this time?  It's a little after 12:30.

23             THE COURT:  I personal would rather not.

24             MS. McKENNA:  At all?

25             THE COURT:  No, I just like to continue and then break

C52FUPAH                          Hearing

 1    after one, okay?

 2              MS. McKENNA:  Can we confer for one moment, then?

 3              THE COURT:  Sure.

 4              MS. McKENNA:  Thank you.

 5              (Pause)

 6              THE COURT:  Okay?  Mr. Alloy, would you call your

 7    first witness?

 8              MR. ALLOY:  Sure.  I'd like to call Dr. Shikha Sethi.

 9     SHIKHA SETHI,

10         called as a witness by the Defendant,

11         having been duly sworn, testified as follows:

12              MS. McKENNA:  Dr. Sethi, I'm going to ask you to keep

13    your voice up, okay?

14              THE WITNESS:  Yes.  Is that okay?

15              THE COURT:  Just don't get too close.

16    DIRECT EXAMINATION

17    BY MR. ALLOY:

18    Q.  Good afternoon, Dr. Sethi.  You previously have signed and

19    submitted an affidavit in this case?

20    A.  Yes, sir.

21    Q.  And I'd like to show you -- and that affidavit was

22    previously filed with the Court as part of a legal filing?

23    A.  Yes, sir.

24    Q.  I'd like to show you a copy of the affidavit of Dr. Shikha

25    Sethi dated July 29, 2011.

C52FUPAH                        S. Sethi - direct

1    A.  Yes, sir.

2    Q.  Do you recognize that document?

3    A.  I do.

4    Q.  And if you turn to the, I believe second to the last page,

5    is that your signature on the document?

6    A.  Yes, it is.  Page 9.

7    Q.  And do you remember reading this document before you signed

8    it?

9    A.  Yes.

10   Q.  And you remember signing this document?

11   A.  Yes.

12   Q.  And you signed it in the presence of a Notary Public, is

13   that correct?

14   A.  Yes.

15   Q.  And in fact, this document is your own words, correct?

16   A.  I wrote it.

17   Q.  Thank you, I'll take it.

18          MR. ALLOY:  Do you want us to enter -- the affidavits

19   were submitted separately as the direct testimony, not as

20   exhibits.  If you want them marked as exhibits we could offer

21   them.

22          THE COURT:  No, they don't have to be.

23          MS. McKENNA:  So they're just referred to as the

24   direct statement.

25          THE COURT:  The point is she is adopting this as her

1    direct testimony.

2              MS. McKENNA:  Thank you, your Honor.

3              MR. ALLOY:  I have nothing further for the witness,

4    thank you.

5              MS. TUMARINO:  Your Honor, at this time we have

6    various objections to the Shikha Sethi affidavit on the grounds

7    of improper argument, relevance and hearsay.  Would you like me

8    to identify those statements?

9              THE COURT:  Okay.

10             MS. TUMARINO:  The paragraph 2, move to strike the

11   second and third sentence as argument.

12             THE COURT:  Denied.  The defendant's counsel could

13   have asked on the witness stand what was your reaction to the

14   charges or the affidavit.  She could have answered that way.

15   There's nothing wrong with that.

16             MS. TUMARINO:  I'd like to move to strike it on the

17   grounds of relevance.

18             THE COURT:  Overruled.

19             MS. TUMARINO:  Paragraph 4A, we'd move to strike the

20   entire paragraph as irrelevant.  It doesn't have anything to do

21   with the issue of tolling, your Honor.

22             THE COURT:  But it does have to do with the issue of

23   credibility, which is exactly what this hearing is very much

24   focused on.

25             MS. TUMARINO:  We'd also like to object to paragraph

1   4B on relevance grounds as well and sentence 13, "I go through

2   this much detail" as improper argument.

3         THE COURT:  You know, you've already accepted the

4   relevance of this by answering it, so -- you've already put in

5   your client's version of these events.  So I understand and I

6   will not make a finding of exactly how many hours the plaintiff

7   worked as part of this hearing, but there are issues that

8   relate to the truthfulness of affidavits that are relevant.  I

9   have no idea whether this particular paragraph will enter into

10  any decision I make here, but I'm not prepared to strike it out

11  at this time.

12        MS. TUMARINO:  Okay.  Paragraph 7B.  There was the

13  sentence that says, "It's inconceivable that Anu cannot add,

14  subtract and multiply numbers," we'd like to strike as improper

15  argument.

16        THE COURT:  This is 7B?

17        MS. TUMARINO:  It's on page 5.

18        THE COURT:  Oh, I'm sorry.  I had the wrong paragraph.

19  As I understand the affidavit, the witness is testifying and

20  writing based on her observations having lived with the

21  plaintiff for almost four years.  I'm not striking it.

22        MS. TUMARINO:  Paragraph 7F.  We'd move to strike as

23  irrelevant, the first four paragraphs that go to the amount of

24  monies paid to her.

25        THE COURT:  It's directly responsive to her testimony

C52FUPAH                         S. Sethi - direct

 1   here in court that she wasn't paid.  It is that she was never

 2   paid in cash and really, as I say, I will not make a finding as

 3   to exactly what she was paid, but this is relevant to the

 4   credibility of the witnesses.

 5            MS. TUMARINO:  And the last sentence of paragraph F,

 6   beginning with "therefore, Anu's gravest lie."  I would

 7   reiterate the objection as to it being improper argument.

 8            MS. McKENNA:  Your Honor, we could have gotten the

 9   same testimony from the witness on direct.

10            THE COURT:  Yes.

11            MS. TUMARINO:  Okay.  And paragraph 8E, we'd move to

12   strike the sentence as hearsay, "They compared salaries, hours,

13   benefits, employers and jobs all the time."

14            MS. McKENNA:  I'm sorry, where are you?

15            MS. TUMARINO:  It is the fourth sentence.

16            MS. McKENNA:  The "she told me many times" sentence?

17            MS. TUMARINO:  Yes.

18            MS. McKENNA:  She's repeating what the plaintiff told

19   her in a conversation.

20            MS. TUMARINO:  And she's saying and they compared

21   salaries, hours, benefits, employers and jobs all the time.

22   I'm sorry, I'm thinking of the next sentence.  It's, "Most of

23   her friends were nannies and they compared salaries, hours,

24   benefits, employers and jobs all the time."

25            THE COURT:  It's a predicate to the next sentence.  "I

1    heard about positions and wages."

2            MS. McKENNA:  It's related to the sentence before and

3    the sentence after.

4            MS. TUMARINO:  And "Anu was held in high esteem among

5    her friends because she was paid so well."  That's also

6    hearsay.

7            THE COURT:  We'll take out "Anu was held in high

8    esteem among her friends because she was paid so well."  We can

9    strike the last sentence.

10           MS. McKENNA:  Well, I suppose, your Honor, we could

11   ask the witness, because if that's something she heard from the

12   plaintiff then that's quite relevant.

13           THE COURT:  Okay, we can follow through on that.

14           MS. TUMARINO:  Do you want to do that now?

15   BY MR. ALLOY:

16   Q.  Did you ever have any conversations with the plaintiff

17   about --

18           THE COURT:  Her reputation in the community?

19           MR. ALLOY:  Yes.

20   A.  I did.

21   Q.  And can you describe the conversations you had with the

22   plaintiff about her reputation in the Nanny community?

23   A.  Anu lived with other nannies on Friday and Saturday nights

24   when she wasn't staying at our place.  She referred to those

25   friends all the time.  We saw pictures, they went to parties,

1    she went to nanny parties and she was an active member of what

2    she referred to as the nanny society, which is how I referred

3    to Andolan because Anu referred to it as the nanny society

4    since 2005.  They thought she was very smart because she was

5    paid so much.  They also thought she was very smart because she

6    made so much money in her massage business.

7    Q.  Is that what you're referring to when you say in your

8    affidavit that Ann was held in high esteem by her friends?

9    A.  Yes, sir.  That's what I mean by high esteem.

10   CROSS-EXAMINATION

11   BY MS. TUMARINO:

12   Q.  Good afternoon, Ms. Sethi.  My name is Amelia Tumanaro.

13   I'm an attorney for Ms. Upadhyay.

14           MS. McKENNA:  Excuse me, in the interests of my

15   client, it's Dr. Sethi.

16           THE COURT:  Dr. Sethi.  She worked hard to get that in

17   front of her name.

18   Q.  Dr. Sethi, in your affidavit you state that you maintained

19   and have a spreadsheet of payments to Anu with checks and check

20   numbers listed for each months of Anu's employment, correct?

21   A.  Yes, ma'am.

22   Q.  And did you personally create that spreadsheet?

23   A.  My husband and I created it together.

24   Q.  Has that been produced to your attorneys?

25   A.  Yes, ma'am.

C52FUPAH                         S. Sethi - cross

1    Q.  Can you please turn to Exhibit 6 in defendant's exhibit

2    binder?

3    A.  Yes.

4    Q.  Is that the spreadsheet that you and your husband created?

5    A.  That is.

6    Q.  And when did you create this spreadsheet?

7    A.  We created this spreadsheet after we received the original

8    complaint.

9    Q.  In this particular lawsuit?

10   A.  Yes, ma'am.

11   Q.  So the lawsuit was filed in November of 2010.  You created

12   the spreadsheet after that time?

13   A.  When we received the original complaint we sat down to look

14   over Anu's pay records.  The lawsuit was filed in

15   November 2010.  It was within two weeks of us receiving the

16   original subpoena complaint that came to our workplaces and our

17   homes.

18   Q.  Is this an Excel document?

19   A.  I believe we made it an Excel, yes.  In fact, I know we

20   made it an Excel.

21   Q.  So given that this was created after you were served with

22   the lawsuit, it's fair to say that you never provided plaintiff

23   a copy of this spreadsheet, correct?

24   A.  No.  She had no copy of the spreadsheet.

25   Q.  Ms. Sethi, in the last column --

1           MS. McKENNA:  Dr.

2    Q.   -- where it says "reference," there's some notations next

3    to the information for each row.  Do you see that?

4    A.   Yes, ma'am.  In the column that says "reference"?

5    Q.   Yes.

6    A.   Or the column to the right of it?

7    Q.   The column that I believe is underneath "reference," it

8    looks like it's right justified?

9    A.   Yes, ma'am.  There are numbers there, like 2580, 2579.

10   Q.   And those notes are what you relied upon for, as a source

11   for the information in the rest of the spreadsheet, correct?

12   A.   Those are the check numbers of the checks that we

13   reference.  So, for example, when it says in October 2004, we

14   paid in November of 2004, in December of 2004, check number

15   152, was paid on December 10, 2004 for those three months

16   salary.

17   Q.   So that was the date of the check, correct?

18   A.   The date reflects the date that the check cleared, I

19   believe it's the date that either, I'll have to look, the date

20   that we wrote the check or the date that the check cleared our

21   account and the numbers that as you refer in the reference

22   column are to the check numbers.  And we did get those from our

23   Chase Bank account and Wachovia Bank account.

24   Q.   Do you still have access to your Wachovia Bank account?

25   A.   No, ma'am.  We closed it.  I cannot tell you when exactly,

C52FUPAH                    S. Sethi - cross

1    but sometime after we got to New York in 2004, I believe

2    sometime around then.  It could have been a couple of months

3    later we closed the Wachovia account.

4    Q.  So did you obtain check numbers 2580 and 2579 from your

5    Wachovia Bank account after this lawsuit was filed?

6    A.  My husband keeps records of cell phones, bank statements,

7    even in this digital age he still keeps the paper copies.  He

8    was able to bring up the copies from Wachovia and in order to

9    verify before we put them on the spreadsheet we confirmed them

10   with Neeraj that deposits had been made to Anu's bank account

11   in those exact dollar figures on those days.  So, yes, we did

12   have the paper copies of the check when we wrote the check

13   numbers.

14   Q.  If you look in the row that references July '04 and August

15   '04 and it reflects monthly wages of $1,400 in each of those

16   months and then it says the method of payment is a Wachovia

17   check, there's no date and there is no reference number,

18   correct?

19   A.  That is correct, we did not have the exact check at that

20   time but we were able to cross reference weapons with a deposit

21   made in Anu's account and our attorney confirmed that.  We

22   confirmed them ourselves, calling Berry on everything and our

23   attorney was able to cross reference that.  I did not have the

24   exact check number.

25   Q.  So if there were deposited there would be a $2,800 deposit

C52FUPAH                        S. Sethi - cross

1  into plaintiff's account on or about July 2004 or August 2004

2  or two separate $1,400 deposits, correct?

3  A.  I would assume so, yes.

4        May I add something?

5  Q.  Just one second.  Is it fair to say, Ms. Sethi --

6        MS. McKENNA:  Excuse me.

7  Q.  Dr. Sethi.

8        MS. McKENNA:  I don't think the witness finished her

9  answer.

10  Q.  I'm sorry.

11  A.  This particular copy of the spreadsheet was provided to the

12  attorneys when it was first presented to the Court and I

13  believe that some time has elapsed since then, so we have also

14  gone back as the case has proceeded and gone back and tried to

15  verify and reverify and get information where it wasn't as

16  clear to her.  So I do have in my mind and with me today paper

17  copies of even more updated information than what's available

18  here.  But this was provided to the Court, I believe it's been

19  more than several months since we provided it.

20  Q.  Do you recall when you provided these updated records to

21  your attorney?

22  A.  I didn't say I provided them to my attorney.  I said I have

23  them.

24  Q.  You have them with you today?

25  A.  Yes, we do have some updated records today.  That would,

C52FUPAH                         S. Sethi - cross

1     that certain lines of this spreadsheet will clarify things

2     further, because we have gone back and, like I said, verified

3     and verified.

4              MS. TUMARINO:  Your Honor, I'm going to ask for the

5     production of those -- before I continue with cross-examination

6     about the spreadsheet and the accuracy of certain information,

7     I'd like to ask that those records be produced since we're here

8     today and we have an opportunity to look at them before we

9     continue with cross here.  I don't want to waste the Court's

10    time.

11             MS. McKENNA:  This spreadsheet that your Honor will

12    recall, and I'll have Mr. Alloy supplement what I say because

13    I'm sure I'll forget something, was prepared initially at this

14    Court's request.  All of the records that related to the

15    transfers made and the checks written to the plaintiff were

16    provided.  What's now being requested is backup about documents

17    they know exist that go to the personal accounts of Dr. Sethi

18    and her husband.  If we get our confidentiality agreement,

19    we're happy to turn those documents over, but we have not -- I

20    saw them this morning.  We haven't turned them over.  If we get

21    a representation they're used only for this purpose we'll turn

22    them over.  But it certainly shouldn't hold up the continuation

23    of the cross-examination of the doctor.

24             MS. TUMARINO:  An agreement that the documents are

25    used solely for the purposes of this case?  Is that what you're

C52FUPAH                          S. Sethi - cross

1    looking for?

2            MS. McKENNA:  Yes.

3            MS. TUMARINO:  I have no problem with that.

4            MS. McKENNA:  We don't have to enter in a written one.

5    I'm comfortable doing this in this fashion, your Honor.

6            MS. TUMARINO:  I'm happy to --

7            THE COURT:  I'm very sorry, but I was actually looking

8    up some other information relevant to the case, but, and I

9    really wasn't following this exchange.  So what is it in your

10   stuff that goes beyond this?

11           MS. McKENNA:  I'm going to let Mr. Alloy speak to

12   that.

13           MR. ALLOY:  So, in efforts to rescour every, their old

14   bank account information, we have some bank statements dating

15   back to '05 that show cash withdrawals that correspond with the

16   cash item, the cash line items here.  We also have one

17   additional copy of a check that we had not seen before.  Hold

18   on, I'll tell you which -- from May of 2005.  Then I believe

19   there's some updated information about the last several months

20   of Ms. Upadhyay's wage payments, including bank statements that

21   show, and obviously the witness can better explain precisely

22   what happened or what the records show.

23           MS. McKENNA:  It is backup, your Honor.

24           THE COURT:  Does any document that you've just

25   described make something on this spreadsheet incorrect or does

1   it just -- in other words, I'm not saying it has to be the

2   same --

3           MR. ALLOY:  I think there's one correction to the

4   spreadsheet which we've been able to establish.  It's possible

5   that one of the check numbers is one digit off.  It may have

6   been a typo.  But the line that says September '06 where there

7   is a $6,000 transfer and then it says plus additional transfer,

8   I think the witness can clarify, I think that can be clarified.

9           I don't believe there's anything else on here that is

10  rendered incorrect by the further backup.

11          THE COURT:  So it's supplemental rather than

12  corrective.

13          MS. McKENNA:  Yes, your Honor.

14          THE COURT:  That's all I wanted to find out.

15          MS. TUMARINO:  Can I take a quick look at these

16  documents?

17          THE COURT:  Sure.

18          (Pause)

19          THE COURT:  Dr. Sethi, while they're doing that, could

20  you clarify for me what does the entry house cash refer to?

21          THE WITNESS:  Yes, ma'am.  House cash refers to money

22  we collected.  My kids would get some money from their

23  grandparents for a birthday, my mom would try to help us out

24  because we were both in training and not bringing a lot,

25  between Anu's wages and our apartment, so we didn't have much

C52FUPAH                    S. Sethi - cross

1    at that time.  So I had accumulated over that time some cash in

2    the home.  On one occasion in October 2005 when Anu asked for

3    her salary in cash rather than go to the bank and withdraw that

4    cash in the bank I gave her what I had accumulated.  I would

5    keep it in an envelope at home.  It was mostly birthday money,

6    a little bit from my mom.

7            THE COURT:  So you withdrew the cash from your house

8    rather than from a bank?

9            THE WITNESS:  Yes, ma'am.

10           THE COURT:  Okay.

11   BY MS. TUMARINO:

12   Q.  And you did that again in April of 2007?

13   A.  As the updated records will show, the April 2007, it was

14   paid in cash, but it was paid from a teller withdrawal and

15   that's reflected in the bank statements you just received.  The

16   last several months of Anu's wages she requested all in cash.

17   I can repeat what she said in Hindi to me if it's relevant, but

18   basically she was going to India and she wanted the money in

19   cash.

20   Q.  Do you recall, Ms. Upadhyay testified that you put her on a

21   plane to India.  Do you recall that testimony?

22   A.  I don't recall the testimony.  I recall the event.

23   Q.  And do you remember when that was that you put her on a

24   plane to India?

25   A.  You're talking about when she finished working for us and

1   went to -- I believe it is July 9, 2007.  We purchased the

2   ticket for her and we took her to the airport and I was able to

3   actually get her, to walk with her to the gate.  I introduced

4   her to another Hindi-speaking person who was going to be on the

5   flight and said goodbye.

6               THE COURT:  If you want we can break for lunch.

7               MS. TUMARINO:  I think that would make the most sense

8   if I could just have an opportunity --

9               THE COURT:  When it says AA round trip travel to

10  India, is that American Airlines?

11              THE WITNESS:  Yes, ma'am.

12              THE COURT:  Okay.  Let's get back together about five

13  after two.

14              MS. TUMARINO:  Your Honor, could I have a little extra

15  time?

16              THE COURT:  I just really, we need to finish and we

17  need to get her home and we need to get -- because really, this

18  is double the time at least that it should have been, so, 2:15.

19              MS. TUMARINO:  Thank you.

20              THE COURT:  Really.

21          (Luncheon recess)

22                              o0o

23                       AFTERNOON SESSION

24                         2:15 p.m.

25          (Witness resumed)

C52FUPAH                          S. Sethi - cross

1          THE COURT:  You may continue.

2     BY MS. TUMARINO:

3     Q.  Okay, so this morning you provided to us bank statements

4     dated March 24, 2007 through April 24, 2007, June 26, 2007

5     through July 25, 2007; July 27, 2005 through August 23rd, 2005,

6     in addition to a copy of a check made payable to Anu Upadhyay

7     for $3,000 dated May 31, 2005, check number 238 and in the

8     notation line it says April and May.  Does that sound like a

9     summary of the records you provided to your attorney recently?

10    A.  Yes, ma'am.

11    Q.  Ms. Upadhyay came to work for you in October of 2003,

12    correct?

13    A.  I don't have the exact date.  My daughter was born

14    September 19th.  I had six weeks of maternity leave.  My

15    mother-in-law was staying with me.  So it was the latest in

16    October.  I think she began working about the beginning of

17    November, because her November wages were paid prorated because

18    she hadn't been there the full month.

19    Q.  The reason I ask you is because you state in your affidavit

20    that she began working for you from October 2003 to July 2007.

21    A.  Yes, ma'am.  When I wrote that, it's six weeks from

22    September 19 would put her in our place right at the end

23    because I had six weeks of maternity leave.  When we went back

24    and looked at the records it had everything, November wages

25    were prorated so she started working after the first week of

C52FUPAH                          S. Sethi - cross

1    November.  So I would have to say based on the way we paid her,

2    because I do not remember paying her any cash at that time for

3    the first week, I would assume it was either the last week of

4    October or the first week of November.  There may be a two,

5    three or four-day period.  I cannot tell you exactly.  But when

6    I made reference to October, I did not mean October 1, I meant

7    the very end, because it was six weeks from September 19.

8    Q.  And so in November of 2003 and December of 2003 you paid

9    her by Wachovia checks and you have check numbers next to the

10   reference?

11   A.  Yes.

12          MS. McKENNA:  It's Exhibit 5, is that what you're

13   referring to?

14          MS. TUMARINO:  6.

15   Q.  But you weren't able to find copies of Wachovia check

16   numbers 2580 or 2579, correct?

17   A.  The Court does not have copies.  I know we must have found

18   a copy or a record of that check to have given you the exact

19   check reference number.  The Court does not have, I believe,

20   the face copy of the check, but I know that in order to get

21   those exact numbers we looked at a check or we have certainty

22   that those check numbers match those amounts paid to Anu

23   Upadhyay.

24   Q.  And how do you feel that certainty?

25   A.  Which certainty?

C52FUPAH                         S. Sethi – cross

1    Q.   That those were the check numbers?

2    A.   As I said, it was either from my husband's paper Wachovia

3    statement because he kept paper copies and still keeps paper

4    copies of everything, but I cannot assure you that we provided

5    that, in fact, I think we did not provide those exact paper

6    copies to the Court, but I feel certain that those were the

7    check numbers.

8    Q.   And then approximately eight months later in July 2004 and

9    August of 2004, according to your spreadsheet there were two

10   more Wachovia checks made payable, presumably to plaintiff in

11   the amount of $1,400 each or perhaps it was $2,800, correct?

12   A.   Yes, ma'am.

13   Q.   And there are no check numbers referenced there, correct?

14   A.   That is correct.

15   Q.   So you were unable to obtain the check numbers from your

16   records?

17   A.   At the time this was put together we were not able to

18   obtain the exact numbers, that is correct.

19   Q.   Do you have the check numbers now?

20   A.   I do not have the check numbers right at this moment.

21   Q.   Do you believe you provided them to counsel?

22   A.   I do not believe I provided those exact numbers to counsel.

23   Q.   But you do have them.

24   A.   I believe they are in my husband's possession, yes.  And we

25   feel confident that those were paid from a check from Wachovia

C52FUPAH                          S. Sethi - cross

1   Bank.

2   Q.  You said earlier you couldn't find the check numbers you

3   didn't have the check number at the time that you relied on

4   Neeraj's representation that there was a corresponding deposit

5   at that time?

6   A.  I believe we confirmed at the time this was made that there

7   was a deposit made at the same time of a corresponding amount.

8   And therefore we did not scour for the check numbers because it

9   was confirmed in the deposits.

10  Q.  Was confirmed by Neeraj Sethi?

11  A.  He and I had a verbal conversation and then Josh Alloy --

12        MR. ALLOY:  Don't reveal any conversations you had

13  with counsel.

14        THE WITNESS:  I apologize.  Neeraj and I spoke about

15  it.

16  Q.  You didn't inspect the bank records that the monies were

17  purportedly deposited into, correct.

18  A.  No.

19  Q.  Would you be surprised to learn that there's no

20  corresponding amount for that time period?

21        MS. McKENNA:  Objection.

22        MR. ALLOY:  Which time period are you referring to?

23        MS. TUMARINO:  To July 2004 and August 2004.

24  Q.  Would you be surprised to learn there is no corresponding

25  deposit at that time?

C52FUPAH                    S. Sethi - cross

1   A.  What I would do --

2   Q.  It's a yes or no Miss  -- Dr. Sethi.

3   A.  Yes.

4   Q.  There's also in September of 2004 it references a cash

5   teller withdrawal for $1,400 and in the reference line it says

6   bank statement.  Have you provided that bank statement to your

7   attorneys?

8   A.  I was not able to.

9   Q.  And why was it that you weren't able to provide that bank

10  statement?

11  A.  By the time I went back to look for it in 2010, I believe,

12  as you said earlier, I was not able to get the exact statement.

13  Q.  And so what's the basis of your information that this is

14  confirmed in your bank statement?  That this payment of $1,400

15  is confirmed by your bank statement?

16  A.  It is my memory at that time because I opened a new Chase

17  account at that time and we did not yet have our checks,

18  because it took several weeks to get a check.  I started my

19  residency.  They had a particular deal or special where

20  residents could open a bank account at Chase.  The Chase bank

21  account I opened is the one I currently have and provided

22  statements of this morning but we did not currently have checks

23  so it is my memory that we went to the bank at that time and

24  withdrew cash for that month.

25  Q.  Thank you.  On December 10, 2004, you wrote out a check,

C52FUPAH                         S. Sethi – cross

1    check number 152 for the wages for October 2004, November 2004

2    and December 2004, which would total $4,200, correct?

3    A.  Yes.

4           THE COURT:  Dr. Sethi, was there any requirement that

5    Ms. Upadhyay deposit any check you gave her in any particular

6    account?

7           THE WITNESS:  No, ma'am.

8    Q.  Dr. Sethi, you weren't able to find a copy of check number

9    152, is that correct?

10   A.  I wouldn't say it like that.  That is not correct.

11   Q.  Did you provide a copy of check 152 to your attorneys?

12   A.  I am not sure that we provided a copy of check 152.  I am

13   confident that we visualized check 152 and therefore put the

14   check number down.

15   Q.  Would you be surprised to learn that there's no deposit of

16   $4,200 in or about or anywhere approximate to the months of

17   December 2004, January 2005 or February 2005 of this check?

18   A.  I would have to be confident the check was deposited

19   because it cleared my account.

20   Q.  Are you confident the check was made into the amount of

21   $4,200?

22   A.  Because I do not have the check in front of me I cannot

23   tell you exactly, but since the check cleared my account and I

24   have a check number from a canceled check, I would be very

25   surprised that it hadn't been deposited somewhere.

1   Q.  And you have a bank record of the check clearing from your

2   account?

3   A.  Yes.  All the check numbers I refer to are not from a

4   ledger I kept.  These are the canceled checks in the bank

5   statement that the bank sends you at the end of the month.  So

6   if I have a reference to a check number it's because we have a

7   deposited check.  It's not because I thought I wrote the check.

8   It's from the statement.

9        I apologize.  The answer to your question is I'd be

10  very surprised because I know the check cleared a bank because

11  I had the canceled.  Not canceled, I had the cleared check.

12  Q.  Is it possible that the amount of the check is different

13  than --

14       THE COURT:  Anything is possible.

15  Q.  -- than $4,200, the sum of those three months?

16       MS. McKENNA:  Anything is possible, your Honor.  The

17  witness has said she doesn't have the check in front of her.

18       THE COURT:  But that she does have a bank statement

19  showing clearance.

20       MS. TUMARINO:  But not necessarily of that amount.

21  She shows that the check cleared but not, she can't recall that

22  the amount cleared.  I'm concerned here that there's no record

23  of $4,200 deposited into the plaintiff's bank account.

24       THE COURT:  Was there some requirement that she

25  deposit every check she received into some particular account?

C52FUPAH                      S. Sethi - cross

 1            MS. TUMARINO:  There was no requirement.

 2            THE COURT:  Of course not.

 3            MS. TUMARINO:  The plaintiff has testified she gave

 4   all these checks to the defendant and some of these are

 5   predicated by the recollection by Neeraj Sethi that all of

 6   these monies were deposited into the bank account.

 7            THE COURT:  I don't think that's a correct recounting

 8   of the check number 152.  That is not Neeraj remembering some

 9   check 152.  There is a bank record showing the clearance of

10   check 152.  From that one concludes it was deposited.

11   Q.  Dr. Sethi, in the reference column there is some certain

12   other notes, specifically in October 2006 -- sorry, in the row

13   corresponding to December 2006, it says in the reference column

14   plus $1,000 bonus.  Do you see that there?

15   A.  Yes, ma'am.

16   Q.  So this check, that reference corresponds to the amount of

17   the check payable to Kashi Prasad for $7,000, correct?

18   A.  Yes, ma'am.

19   Q.  And so is it fair to say that October 2006, November 2006,

20   December 2006 plus $1,000 were paid to Kashi Prasad on

21   January 26, 2007?

22   A.  Yes, ma'am.

23   Q.  Okay, so is it fair to say that it's this amount including

24   a $1,000 bonus?

25   A.  Yes, ma'am.

C52FUPAH                    S. Sethi – cross

1    Q.  And what was the $1,000 bonus for?

2    A.  Christmas bonus.

3    Q.  And then in June 2007 in this corresponding column it says

4    plus $1,000 bonus.  Is it fair to say that her wages were

5    $2,000 in June 2007 and then you paid her in addition a $1,000

6    bonus?

7    A.  She was paid an additional $1,000 bonus in that time frame.

8    We submitted the bank statements this morning and I can exactly

9    trace for you on which day she was paid the bonus if you like,

10   but, yes, there was an additional $1,000 above her wages paid

11   to her as a bonus.

12   Q.  I'm just trying to clarify because on certain lines it says

13   plus, which I think it means it's including and certain times

14   where it says plus where I think it really does mean plus.  I'd

15   just like the record to be clarified.

16           THE COURT:  Next time can we spend a little less time

17   on three times two plus one equals seven?

18   Q.  You state in your affidavit, Dr. Sethi, that in 2006 you

19   had a conversation with the plaintiff regarding Shaku's

20   lawsuit, correct?

21   A.  Yes, ma'am.

22   Q.  And you said that at that time she could recite all the

23   facts and calculations of Shaku's case.  What were the

24   calculations that she told you?

25   A.  She told me that Shaku had worked during the day and Shaku

1   had worked hours at night.  She told me that Shaku filed a case

2   because she had not been paid the minimum, and she used the

3   word "minimum."  She had not been paid the minimum.  And so she

4   worked too many hours for too little money.  I was surprised to

5   see an $800 figure in Anu's affidavit because I believe she

6   told me Shaku had been paid closer to $1,000, and that did not

7   cover Shaku for all the hours that she worked.

8           She mentioned the green card issue, but that was a

9   passing issue.  The main issue of that case, and it was very

10  detailed explained to me, was that Shaku had not been paid the

11  correct amount of wages for the number of hours she had been

12  worked and had not been paid the minimum.

13  Q.  Did she ever tell you that she hadn't been paid the minimum

14  wage?

15  A.  She used the word minimum.

16  Q.  Minimum.  But she didn't specifically use the word minimum

17  wage?

18  A.  Minimum daka.  Daka is wage in Hindi, so she used a

19  combination, as we did today of an English and Hindi phrase so,

20  yes, she did use the word minimum.  Minimum daka.

21  Q.  She used the word minimum in English?

22  A.  Yes.  That's also how we referred to the posters, it was

23  the minimum daka poster.

24  Q.  You state in your affidavit that there were wage hour

25  posters displayed in your apartment buildings in New York City

C52FUPAH                              S. Sethi - cross

1    during the period 2004 to 2007, is that right?

2    A.  Yes.

3    Q.  And you state that they were displayed in Payson House and

4    Sutton Terrace.

5    A.  Yes.

6    Q.  Where were they displayed in Payson House?

7    A.  Payson House they were displayed in at least two different

8    locations.  In the laundry room there was a bulletin board that

9    had -- I shouldn't say bulletin board.  There were postings

10   that referred to activities of the building and on that was

11   prominently displayed a wage hour, federal minimum wage poster

12   and then on the bulletin board going to the children's

13   playroom, it's a hallway about ten feet deep.  You get to the

14   end of the hallway, you make a left into a large children's

15   indoor playroom and there at the end of that ten-foot hallway

16   which you cannot help but see as you're walking towards the

17   playroom it's a bulletin board that displayed people looking

18   for nannies, that's where we put Anu's massage poster and there

19   too was displayed a minimum wage poster.

20          And in 2006 to seven there was one inside our

21   apartment, inside the linen closet door in the hallway.

22   Q.  And that would have been in Sutton Place?

23   A.  Yes, ma'am.

24   Q.  Sutton Terrace.

25          Now, at Payson House did you personally translate the

1    federal minimum wage poster located in either of the -- I'm

2    sorry.  Were they federal minimum wage posters located in both

3    locations?

4    A.  I would assume that they were federal minimum wage posters.

5    I cannot be a hundred percent sure.  They were definitely

6    minimum wage posters.  I would assume that they were federal

7    minimum wage posters.  They may have been New York State.  I

8    cannot tell you for sure.

9    Q.  Do you remember what the minimum wage was at the time?

10   A.  I know now what New York State and federal minimum wage

11   was.

12   Q.  Do you remember what the minimum wage was at the time you

13   were living in Payson House?

14   A.  I do know what minimum wage was.  It changed during those

15   years, as you know.  It changed in 2005, it changed in January

16   '06, it changed again in '07.  Not the federal --

17            THE COURT:  Not the federal.

18   A.  The federal has remained the same.  The federal has stayed

19   the same until recently.

20   Q.  Did you translate into Hindi these wage -- either federal

21   or state wage or hour posters that were posted in Payson House

22   to the plaintiff?

23   A.  I did.  In the context of our discussion about Shaku's

24   lawsuit, yes, I did, and again in 2006 when we moved into the

25   apartment and she saw the poster again the minimum daka poster.

1    There were really a few parts of that poster relevant to her,

2    because she doesn't fall under the child labor rules and those

3    parts of it.

4    Q.  So let's take the first location in Payson House.  Where

5    did this conversation, this translation take place?

6    A.  The translation took place in my living room in apartment,

7    27K.

8    Q.  And you had a copy of the notice with you?

9    A.  No.  But I referred Anu to it.  It was downstairs and she

10   was already familiar from having talked with Berry.  And again

11   it had a name, it was an item, it was a minimum daka poster.

12   She knew that.  She was already familiar.  It was not a new

13   concept.

14   Q.  Did you -- this first translation at Payson House, what

15   year would it have been?

16   A.  It was in connection in spring 2006 with the discussion of

17   Shaku's lawsuit.

18   Q.  Do you know when Shaku's lawsuit was filed?

19   A.  I cannot say for sure.

20   Q.  So you were living in Payson House in the spring 2006?

21   A.  Yes, ma'am.

22   Q.  And was that the only time that you translated the minimum

23   wage poster to her while you were living at Payson House.

24   A.  We discussed the content of the poster in terms of minimum

25   wage on the occasion when Anu asked for arrays when we moved to

C52FUPAH                    S. Sethi - cross

1  New York City in 2004, in the fall, when she negotiated her

2  salary up from 1400 to 1600 a month.  We discussed minimum wage

3  but in terms of the translation -- so we discussed the contents

4  of the poster in 2004 as well, but I did not refer her to the

5  exact poster at that time.  In 2006, she was referred to the

6  actual minimum daka poster, but the content, as I understood it

7  to be applicable to her, was all discussed in the fall of 2004.

8  Q.  Fall of 2004 you were living where?

9  A.  We had just moved back to New York and we had, Anu

10 initiated a conversation to increase her salary and in that

11 context of that conversation, which I remember extremely well,

12 the applicable contents of the poster were discussed with her

13 but I did not directly refer her to a physical poster in 2004.

14 Q.  What were the applicable contents of the poster?

15 A.  The concept of number of hours a week and the concept that

16 there was a minimum wage and she should make more than that.

17 Q.  And what was said about the concept of the number of hours

18 per week?

19 A.  That she should work 40 hours per week.  Her hours with us

20 were fixed because she left at the same time every day and was

21 not physically in our presence from Friday at 7:00 p.m. until

22 whatever time she came back on Sunday.  It was after we went to

23 sleep.  She physically was never in our apartment ever.

24        I think on one weekend when she was first diagnosed

25 with rheumatoid arthritis she was unable to leave the

1  apartment.  So when I say "ever" I should be careful.  There

2  may have been one weekend when she was not feeling well and

3  stayed back, not to work, but she was not feeling well.  Other

4  than that, she physically was not present on weekends.  And so

5  her hours were fixed.

6          So we discussed hours and we discussed the minimum

7  daka.

8  Q.  So you said to her she should not work more than 40 hours?

9  A.  I did not say exactly that.

10  Q.  What was it that you discussed about the hours?

11  A.  We said that a fair number of hours a week was most people

12  worked eight hours a day, five days a week.  I can tell you the

13  exact conversation we had, if you would like.

14  Q.  Not quite.  Thank you.

15          So you had a discussion, you discussed the concept of

16  the number of hours per week and this was in the fall of 2004.

17  A.  Yes.

18  Q.  And at that time you did not have the poster physically

19  with you?

20          MS. McKENNA:  Asked and answered.

21          THE COURT:  Also there's no 40-hour limit for live-in

22  help, is there?

23          MS. TUMARINO:  No.

24          THE COURT:  Okay.  So why don't we go on?

25  Q.  Did you advise her of her right to earn overtime pay after

C52FUPAH                         S. Sethi - cross

1    a certain number of hours per week?

2            THE COURT:  It's not applicable.

3            MS. TUMARINO:  In New York State law after 44 hours

4    you're entitled to overtime.

5            THE COURT:  And at the highest minimum wage during

6    this period, which did not start until January 1, 2007, someone

7    making $2,000 a month could have worked 280 hours per month and

8    still made minimum wage.

9            MS. TUMARINO:  Your Honor, you yourself has said we're

10   not litigating the number of hours --

11           THE COURT:  No, but that happens to be a fact.

12           MS. TUMARINO:  That may be a fact, but the question is

13   whether the plaintiff was aware of her rights and whether

14   defendants advised her of her rights, which is what the subject

15   matter of the hearing is.

16           THE COURT:  My only point is that your questions are

17   based on incorrect assumptions about the law.  They should not

18   continue to be misleading in this way.

19           MS. TUMARINO:  Your Honor, I'm asking the witness

20   about what the discussion was --

21           THE COURT:  The issue isn't whether the witness

22   understands the wage and hour laws.  The --

23           MS. TUMARINO:  She's stating she explained the

24   contents of the poster to her without referring to the poster

25   at the time and I'm trying to get a sense of what the subject,

1   what was discussed in that conversation.

2          MS. McKENNA:  Your Honor, the witness has offered now

3   on two occasions to give her full recounting of that

4   conversation and counsel, as she's entitled to, has declined

5   but she shouldn't then be allowed to argue with the witness

6   about the conversation if she doesn't want to hear the

7   conversation.

8          MS. TUMARINO:  I'm not arguing.  I'm just asking

9   questions about whether she advised her of her right to

10  overtime pay.  That's a yes or no question.

11         MS. McKENNA:  Well, that question you haven't asked

12  yet.

13  Q.  Did you advise plaintiff of her right to overtime pay after

14  working a certain number of hours per week?

15  A.  We specifically discussed that in the spring of 2006 in

16  connection with Shaku's lawsuit as it referenced the minimum

17  wage laws because that's what was discussed at that time.  In

18  2004 we discussed that Anu did not have any overtime because

19  her hours were fixed and that's what she wanted so she could do

20  her massage business.

21  Q.  And in spring of 2006 when you discussed the poster, the

22  minimum wage and hour poster, did you have a copy of the poster

23  with you?

24  A.  Yes, I did.  In spring of 2006 I referred Anu to it.  She

25  had been living in the building for two years.  She was --I

C52FUPAH                          S. Sethi – cross

1   should not say familiar.  I referred her to it and then it was

2   on the bulletin board and then as we were walking by a couple

3   of days later I pointed it out to her then.  She was already

4   familiar with the concept by the fall of 2006, very familiar.

5   It was not a new discussion.

6   Q.  Did you translate the poster for her word-for-word?

7   A.  Including the childhood section and the whole poster or

8   just the ones that applied to her?

9   Q.  The minimum wage portion.

10  A.  Yes, I translated it to her.

11  Q.  Did you translate the minimum wage section into Hindi?

12  A.  Yes, ma'am.

13  Q.  Did you translate any language to her regarding overtime to

14  her in Hindi?

15  A.  In 2006?

16  Q.  Yes.

17  A.  Yes, ma'am.

18  Q.  And you were located, you were standing in front of the

19  poster at the time?

20  A.  I referenced the poster in our conversation.  We discussed

21  minimum daka.  I translated it and as we were walking by

22  together, maybe a day or two later I physically represented the

23  poster to her again, the one in the bulletin board next to the

24  playroom.

25  Q.  You didn't translate the notice to her while you were

C52FUPAH                           S. Sethi - cross

1   physically standing in front of it word-for-word, is that

2   right?

3   A.  I saw the poster everywhere, because they're also posted in

4   our --

5   Q.  That's a yes or no question, Dr. Sethi.

6   A.  Can you repeat the question so I can answer yes or no?

7   Q.  You did not, while you were standing in front of the poster

8   in 2006 you did not translate word-for-word into Hindi for the

9   plaintiff the contents of the poster, did you?

10          THE COURT:  You did not, did you?

11  Q.  Did you translate word-for-word into Hindi for the

12  plaintiff in 2006 the contents of the wage hour poster?

13  A.  Yes, I did.

14  Q.  While you were standing in front of it?

15  A.  We were not standing in front of it at the moment I did the

16  translation, that's why I'm having trouble understanding the

17  question.  The applicable sentences are few.

18  Q.  How did you know the contents of the poster word-for-word

19  if you weren't standing in front of it?

20  A.  I did not translate the child labor parts of it, I did not

21  translate the parts that I believed didn't pertain to her.  The

22  minimum wage and the overtime were specifically translated by

23  me.  I saw that poster everywhere.

24  Q.  So you had the poster memorized?

25  A.  There are only two sentences.  I can tell you what they are

1    right now because there's only two sentences.

2    Q.  That's okay.  You also state in your affidavit that you had

3    a conversation with the plaintiff about Shaku's lawsuit and in

4    that context you told her that she had no case against you and

5    your husband, is that correct?  I'm just reading from your

6    affidavit.  That's not the question.

7    A.  I understand.  If you could read me exactly what I said.

8    Q.  "I told Anu truthfully that she had no case against Ganesh

9    and I since each month we had been paying her every dollar,

10   plus bonuses of her salary at her direction, had been paying

11   her way higher than minimum wage and had kept records of

12   everything."  Do you recall that?

13   A.  Yes.  I said that to her specifically.

14   Q.  Can you tell me what the records were that you kept?

15   A.  As you can see from our checks, I labeled most checks.

16   Q.  You labeled?  I'm sorry?

17   A.  I labeled most checks with the months of salary that were

18   being paid at the bottom at the memo line.  My father-in-law

19   kept the records of the bank transfers and since we had

20   maintained a single bank account aside from the Wachovia we

21   knew there were always records of the withdrawals.  And so we

22   felt very confident that we knew we had -- I knew I had paid

23   Anu every month and Anu acknowledged that to me.  She said no,

24   you have paid me every dollar that you owed me and I have no

25   case against you.

C52FUPAH                         S. Sethi - cross

1   Q.  What other records were you referring to?

2   A.  I was referring to the bank records.

3   Q.  Did you keep any other records of the plaintiff's

4   employment while she worked for you?

5   A.  Am I allowed to ask what kind of records you mean?

6   Q.  Any kind of records.  Like the checks, the bank records,

7   the wire transfers, any other records you kept pertaining to

8   her employment?

9   A.  We have the records of -- I'm going to say we have other

10  things that pertain to her employment.  I don't know if those

11  are the type of records that you're talking about.

12  Q.  Well, tell me what they are.

13  A.  We have the taxes that we paid for her, employer taxes, we

14  have records of those every quarter.  I assume that's a record

15  in connection with her employment.

16  Q.  Sure.  Anything else?

17  A.  No.  We asked Anu on two occasions to sign something.

18  "Sign" 'is a tough word as we have seen for her.  We asked Anu

19  on two occasions, especially when she started talking about

20  Shaku's lawsuit as well as in between, to sign something either

21  time and hour or that she was receiving money, and she

22  specifically turned around and said -- I can say in Hindi if

23  you like because I remember very clear what she said.

24  Q.  I don't understand Hindi.

25  A.  She said I'm going to sign anything you give me but later

1    on I'm just going to turn around and say I didn't know what it

2    was.  And when we were finished with her employment in 2007 she

3    said the same thing.  She said, yes, you have paid me

4    everything, you have treated me so well.  We said Anu will you

5    sign or give your thumbprint on something that says we owe you

6    no money?  She said I'll sign whatever you want, but I'm going

7    to turn around and say I didn't know what I was signing.

8    Q.  So you asked her to sign on two occasions specifically?

9    A.  Yes.

10   Q.  And both times she said I'll sign whatever you want but I'm

11   going to say I didn't know what I was signing?

12   A.  That's exactly what she said twice.

13   Q.  And the first time was when?

14   A.  We asked her to keep time and hour records of when she was

15   coming and going.

16   Q.  When was that?

17   A.  2006.

18   Q.  What month, do you remember?

19   A.  No.

20   Q.  You asked her to keep the records or to sign records?

21   A.  We asked her to sign them.  She wouldn't have been able to

22   keep them, but we asked her to sign them if we provided them

23   and explained to her what they were.  She essentially refused.

24   Q.  Did you draft those records?

25   A.  Did I present her with something to sign?

C52FUPAH                          S. Sethi - cross

1   Q.  Yes, did you present her with something to sign?

2   A.  I did not.  I had the conversation with her first and

3   that's what she said.  In my mind that was a refusal.  She

4   didn't refuse to sign, but she wasn't, it didn't seem to be

5   worth the effort.

6   Q.  And then the second occasion when you asked her to sign

7   something, did you present her with something to sign?

8   A.  I did not.

9   Q.  You did not.

10  A.  Did not.

11  Q.  You state in your affidavit, "In addition I personally

12  counseled Anu on too many occasions to count about her salary,

13  minimum wage, weekly wages and monthly wages."  Why was it that

14  you counseled her on so many occasions?

15  A.  Because she was always talking about how much she was

16  making, how much other nannies were making.  She talked

17  constantly about how much she made from her massage business.

18  She told -- which we found very embarrassing to ourselves --

19  Q.  I'm sorry, why did you counsel her on so many occasions?

20  A.  We counseled her that she was being paid well and was she

21  happy.

22  Q.  Why was it so many occasions?  That's the question.

23  A.  Because she talked constantly about how much she was

24  making, how much other nannies were making, how much she could

25  be making if all she did was her massage business, how she made

1    more in her massage business than what we were paying her even

2    though we paid her $2,000 a month.  She's had that conversation

3    with us when guests would come over when she would brag about

4    her massage business and talk about how much money she made.

5    So we went back to, you know, you feel a little threatened,

6    because we said, are you happy, are we paying you well?  And

7    you say, look, this is what we're supposed to pay and this is

8    what you are getting paid and she would tell us what other

9    nannies were making.  They were never making as much as her.

10   Q.  These occasions, would you say there were more than ten of

11   them?

12   A.  There were many more than ten occasions when we talked

13   about her wages.

14   Q.  About her wages?

15   A.  About her wages.

16   Q.  Her massage work?

17   A.  No, about her salary with us.  There were many more than

18   ten occasions when we discussed how much we were paying her.

19   Not that she was asking for more, but there was a conversation

20   about how much money she was earning, how much money she was

21   sending to India, how much money she should be sending to

22   India, how much money other people were making, how much she's

23   making from her massage.  I'm not saying that they were --

24   Q.  Were those --

25          MS. McKENNA:  Can she let her finish the answer?

1    Q.  Go ahead.

2    A.  There weren't that many occasions when we discussed minimum

3    wage, but I'm saying in terms of salary, weekly salary, monthly

4    salary, how much she was making, about her wages and

5    importantly how much should she be sending back to India.  She

6    cried on a lot of occasions.  We had all these conversations.

7    Those were too many to count.

8    Q.  When she came to work for you, you stated in your affidavit

9    that on the plaintiff's first day of work for you in Virginia

10   she negotiated her salary, correct?

11   A.  Yes, ma'am.

12   Q.  And you say that, "She told us what she was being paid by

13   my cousins Berry and Ronica on a weekly, hourly and monthly

14   basis," is that correct?

15   A.  Yes, ma'am.

16   Q.  What did she tell you she was being paid weekly?

17   A.  She was getting about $300 weekly.

18   Q.  And what did she tell you she was being paid -- so she told

19   you she was getting paid $300 weekly?

20   A.  Yes, ma'am.

21   Q.  What did she tell you she was being paid hourly?

22   A.  There were times when Anu used the hourly rate very

23   specifically and there are times when she used a ballpark,

24   because her calculations are done in round numbers.  That's why

25   she always sent a round number of dollars to India.  It

C52FUPAH                        S. Sethi - cross

1    wouldn't be 2200, it would be 2000 because she could round off

2    $2,000 in rupees.  She would always round off her numbers.  It

3    was roughly $7 an hour.  I think at that time in early 2000,

4    late 2003 it was like she heard that number somewhere and she

5    was kind of internally fixated on that number.

6         By the time we had gotten to fall 2004 she had gotten

7    very shrewd.

8    Q.  So late 2003 she told you --

9    A.  (Hindi) $7 an hour, but she was more fixated on the weekly

10   and monthly aspect at that time.  But she did make a mention of

11   $7 an hour.

12   Q.  How much was she earning monthly, did she tell you she was

13   earning monthly?

14   A.  $300 a week.  The week to month conversion becomes -- I

15   can't tell for sure that she told me in 2003 the monthly.  I

16   know it was $300 a week.  What she was earning with Berry and

17   Ronica.  With us she wanted to be paid monthly.

18   Q.  You didn't pay her monthly, though, correct?

19   A.  Every month at the end of the month I asked Anu how can I

20   pay you this month.  And every month that she worked for us she

21   toll me what to do with her salary.  To pay her in cash, to

22   send it, to write her a check or to wait until the next month

23   and then put the two of them together.  Every month she was

24   asked at the end of the month how shall I pay you for this

25   month.  We wanted to pay her by week or biweekly.  She did not

C52FUPAH                          S. Sethi - cross

1   want that.

2   Q.  If she said hang on to it, you wouldn't pay her, you would

3   wait until the next month, is that correct?

4   A.  If she said hang on to it, then when she requested that

5   month's payment, for example, in a check, we would pay both

6   months together.  But she was asked every month how do you want

7   to be paid.

8   Q.  When did you know you would be moving back to New York City

9   from Virginia?

10  A.  We didn't know until very late.  Very, very late.

11  Q.  Was it in your plans that you might move back to New York

12  when you were living in Virginia?

13  A.  We had no such concept.  The idea that we spoke to Anu on

14  the phone in 2003 and told her we were going back to New York

15  in eight months is not true.  The reason for that is once my

16  husband decided what he wanted to do, and he was still actively

17  interviewing for fellowships and job positions -- he was

18  interviewing for a private practice job in Charlottesville, he

19  was interviewing for jobs in Washington, D.C.  Once he decided

20  what to do, which was accept the fellowship at Memorial Sloan

21  Kettering, I had to negotiate a transfer in the middle of my

22  residency back up to New York.  This does not normally occur.

23  It's very rare and I was super lucky to be able to do that.  So

24  that did not come through until literally June of 2004.

25  Q.  When did your husband first start applying for residencies

C52FUPAH                         S. Sethi - cross

1   in New York?

2   A.  Fellowships in New York.

3   Q.  Fellowships, I'm sorry.

4   A.  I couldn't tell you.  They usually apply -- I don't know.

5   I don't know if it was the spring of 2004.  The interviews

6   were, I want to say like March-April.

7   Q.  So he wasn't applying in fall of 2003?

8   A.  I was furious at him because he kind of wasn't moving

9   along.  He was fixated on this job at the National Institutes

10  of Health and he thought that was going to work out and it

11  would be close to Charlottesville and I would stay in

12  Charlottesville and they led him along for a long time.  So we

13  really had absolutely no plans.  Once his plans were

14  determined, I had no way to get to New York.

15  Q.  Were you applying for any fellowships or residencies in New

16  York?

17  A.  Not at all.  I was smack dab in the middle of my residency.

18  I had no applications of any kind.

19  Q.  In your affidavit you state that you encouraged her in 2006

20  to contact a lawyer and understand her rights, is that correct?

21  And she was still working for you in 2006.

22  A.  Yes.

23  Q.  Around when in 2006 was this?

24  A.  This is going to be late of 2006, kind of in the fall.  It

25  also came up briefly in connection with Shaku's case.  Again we

1    had a very detailed conversation at that point till late in the

2    night.

3    Q.  When was this conversation?

4    A.  The conversation about Shaku's case was spring '06 so it

5    was briefly mentioned at that time that if she thought she had

6    any issues she should figure them out.  And then again in the

7    fall of '06, when she was actively complaining about lots of

8    things, I said if you think you have an issue -- she was free

9    to come and go every weekend.

10   Q.  You said she was actively complaining about lawsuit issues?

11   A.  No, not -- I didn't say lawsuit issues.  She was

12   complaining about wages and missing things in the fall of '06.

13   Q.  Missing things from you?

14   A.  She never said she missed anything from me.  And had she, I

15   offered to her, I said if you think I'm missing anything, you

16   tell me, I'll get my records, exactly what I wrote in my

17   affidavit.  I will go over them with you.  I said we have

18   simple bank accounts.  I had everything documented.  If you

19   feel like you have any issue with me with our time, you tell

20   me, and she said you have paid me everything, I have no quarrel

21   with you.

22   Q.  Can you turn to Exhibit 7, please?  You obtained, when you

23   were drafting the spreadsheet that's been marked as Defendant's

24   Exhibit 6 regarding your payment of wages to the plaintiff, you

25   obtained certain records from your father-in-law regarding

1    money transfers, correct?

2    A.  Yes.

3    Q.  And he provided you copies of correspondence sent, is that

4    right?

5    A.  Yes.

6    Q.  And it looks like there was in February of 2004 you sent or

7    your father-in-law sent a wire transfer in the amount of $2,100

8    to the plaintiff's relatives in India, correct?

9    A.  Yes.

10    Q.  And that was supposed to be, according to your spreadsheet,

11    wages for January 2004 and February 2004, correct?  I'm looking

12    at Defendant's Exhibit 6, I'm sorry.

13    A.  Yes, ma'am.  It was a partial payment for February.

14    Q.  And then --

15    A.  The other half of February went in the Western Union

16    transfer that Anu mentioned.

17    Q.  In March?

18    A.  Yes, ma'am, from Kroger on Highway 29.

19    Q.  In Defendant's Exhibit 7 are copies of the wire transfer

20    documents, is that right?

21    A.  Yes.

22    Q.  And D000124 is a copy of that wire transfer, correct?  It's

23    a signed copy from your father-in-law?  Is that right?

24    A.  At Anu's direct request my father-in-law --

25    Q.  I'm sorry --

C52FUPAH                        S. Sethi - cross

1   A.   That's a yes or no?

2   Q.   That's a yes or no question.

3   A.    That's not a copy of the transfer so I don't know how to

4   answer you.  The answer would be, no, it is not a copy of the

5   transfer.

6   Q.   This is correspondence directing the transfer, is that

7   right?

8   A.   Yes, ma'am.

9   Q.   And that's confirmed in his bank account records, is that

10  right?

11  A.   Yes, ma'am.

12  Q.   And that would be on D000122?

13  A.   Yes, ma'am.

14  Q.   And then later on that year there was another wire transfer

15  in July of 2004 for the wages of April 2004, May 2004 and

16  June 2004, correct?

17  A.   Yes, ma'am.

18  Q.   And Defendant's Exhibit 7, Bates number D000125 is

19  correspondence directing that transfer, correct?

20  A.   Yes, ma'am.

21  Q.   And then in 2006, according to your spreadsheet, the

22  plaintiff's wages for July 2006, August, 2006 and September,

23  2006 were sent by a wire transfer arranged by your

24  father-in-law on October 20, 2006, is that right?

25  A.   No.

1    Q.  Okay.

2    A.  No, pertaining to one part of that.

3    Q.  Okay.

4    A.  Can I explain?

5    Q.  Please.

6    A.  That is the instance that Anu described when there was a

7    discrepancy.  She described it several times in her testimony,

8    when there was a discrepancy between the bank account

9    information sent by her son via e-mail to us.  The e-mail is

10   provided within the same exhibit as well, Exhibit 7, and the

11   name on the account.  And so when you say October 20, I cannot

12   be sure that the money cleared on the 20th or that was the date

13   of the request, because, as she said, there was a back and

14   forth and the money wasn't actually received.  It was received,

15   but it was not received until a couple, I believe a couple of

16   weeks later.  We have the actual bank statement for when it was

17   taken out of the account.  There was a second letter sent

18   clarifying the name to whom it should go.

19          MS. McKENNA:  Your Honor, I believe that's in Exhibit

20   7, D123.

21   Q.  Yes.  So in Exhibit 7 the next page, there are three pages

22   that are additional, page 1 of 3, 2 of 3, 3 of 3 Bates numbered

23   D000131 through 000133.  Do you see those three documents

24   there?

25   A.  Yes, ma'am.

C52FUPAH                    S. Sethi - cross

1   Q.  And so all of this correspondence relates to the same --

2   does all of the correspondence relate to the October 20, 2006

3   transfer?

4   A.  Yes, ma'am, to the transfer, two lakh, yes.

5   Q.  In the reference column it says -- there's also, if I could

6   just ask one additional question.  D000129, and D000130 are

7   both dated 20 October, 2006, correct?

8   A.  They are both dated, yes.

9   Q.  And they're both unsigned, is that right?

10  A.  Yes.

11  Q.  And one of them asks to arrange payment for two lakh,

12  44,000 only, and that is D000129, correct?

13  A.  Yes, ma'am.

14  Q.  And then by letter of the same date also unsigned, the

15  defendant's Bates numbered D00130, it has the number written

16  out at two comma 43,000 and then in the parenthesis it says

17  rupees two lakh and 44,000 only.

18  A.  Yes, ma'am.

19  Q.  Do you know which of these were sent?

20  A.  I don't know which of those were sent.  I would refer to

21  the letters that come after that clarify.  I believe it's the

22  244 that is sent because the letter dated November 30 clarifies

23  that there was an error, the draft had reached ICIC branch at

24  Mumbai and it's the issue of 244.

25  Q.  Then on your spreadsheet Defendant's Exhibit 6 in the row

1    pertaining to September 2006 it says at the end of that 6,000

2    equals INR 243000 plus additional transfer to Upadhyay 2,000

3    44,000 equals U.S. 6,000 on 11/30/2006.

4    A.  Yes, ma'am, this was the typo that Josh Alloy was referring

5    to earlier.  That number should have been corrected when the

6    confusion was resolved to 244, that's correct.

7    Q.  So there was only one $6,000 payment sent at that time?

8    A.  Yes, ma'am.

9    Q.  Thank you.  Under May 2005 there's a row there that doesn't

10   have a corresponding date that says air fare, hotel, Disney

11   tickets, food, and then in the reference column, Disney

12   vacation value $800.  Do you see that?

13   A.  Yes, ma'am.

14   Q.  Was that paid to Ms. Upadhyay as wages?

15   A.  No, ma'am.  That was just a trip she came with us on.  She

16   went to Disney.  That is not calculated in her wages at all.

17   That is not regarded as a bonus either.

18   Q.  Okay.  Can you explain to me, the tally at the bottom says

19   total paid without bonuses equals 72,100.  Do you see that?

20   A.  Yes, ma'am.

21   Q.  And then the second row after that, which I presume is a

22   typo says total paid out bonuses 76,900?

23   A.  Yes, ma'am.

24   Q.  And the difference between those two numbers I'll represent

25   is $4,800?

1    A.  Yes, ma'am.

2    Q.  Could you tell me where the $4,800, where those bonuses

3    were paid?

4    A.  It seems like in this particular year we are including

5    $2,800 of cash bonus paid in December of '04, December of 2006

6    paid in June of 2007.  We should have -- and then it appears on

7    this particular sheet that that second number may include the

8    value of her air fare and the Disney vacation which would be an

9    additional money.  I believe that's probably how it's put

10   together, but we did not regard the value of the vacation or

11   the ticket in her calculation of wages.

12   Q.  Is that count considered to be bonuses?

13   A.  No.  This is a version -- as you said, there's a typo

14   there.  No.  The vacation and the ticket were given by us to

15   her as given.  We paid her plenty of bonuses.  Those were just

16   additional.

17   Q.  So the bonuses that are reflected on this sheet are the

18   $800 bonus in January 2005, the thousand dollar bonus in

19   January 2006, and a thousand dollar bonus in July of 2007, is

20   that right?

21        MR. ALLOY:  I'm just going to object as to relevance

22   grounds.

23        MS. TUMARINO:  Your Honor, it's admitted into the

24   record, Ms. Sethi's representation in her affidavit that she

25   paid plaintiff 76,000 -- let me read it.  $76,900 in paragraph

C52FUPAH                         S. Sethi - cross

1   7F and I'm just trying to get a sense of what the basis for

2   that number is.

3           THE COURT:  And I think we now all understand that

4   with more clarification, that the additional $2,000

5   representing the Disney vacation and the round trip air fare to

6   India should not be included in the wage amount.  Correct?

7           MS. McKENNA:  Yes, your Honor.

8           THE WITNESS:  Yes, ma'am.

9           MS. TUMARINO:  Okay.  I just have a couple of more

10  questions.

11  Q.  Ms. Upadhyay does not drive, correct?

12  A.  Not to my knowledge.

13  Q.  She didn't drive at any time when she was working for you?

14  A.  No, ma'am.

15  Q.  You stated that the plaintiff calculated -- before you

16  moved back to New York, you state that the plaintiff

17  calculated -- negotiated her salary again, then calculated her

18  desired hourly and weekly rate, taking into account that she

19  wanted to be paid monthly and included an up charge for the

20  extra weeks per year that did not fall into the four week per

21  month cycle, is that right?

22          What do you mean by upcharge, or what did she mean by

23  upcharge?

24  A.  May I explain or is it a yes or no?

25          That reference is a conversation I mentioned actually

C52FUPAH                         S. Sethi - cross

1    in the fall of 2004.  The paragraph does not specifically say

2    that that occurred in Virginia.  I realize that I am being a

3    little vague because I talked about her negotiating her hours

4    in the prior paragraph which we did have that conversation in

5    Charlottesville.  The wage conversation actually happened later

6    in 2004, once we were actually back in New York, and I believe

7    it was Anu's interaction back again with nannies in New York

8    and the resurgence of her massage business and she came to us

9    and said she wanted to talk about salary.

10           So that was the conversation I referenced earlier

11   about where we very specifically discussed, she discussed an

12   hourly wage, she specifically said this is a weekly rate, but

13   you're paying me monthly and so there should be more because --

14   she entered the conversation, it was negotiation.

15   Q.  I'm sorry when she entered the conversation --

16   A.  When she entered the conversation it was a negotiation

17   between myself, my husband and Anu all together, and her

18   starting point was a certain dollar per hour, a certain number

19   of dollars per week and we negotiated from there and ended up

20   with the $1,600 a month number because she still wanted to be

21   paid monthly and that salary actually did not take effect until

22   January.  That conversation did not happen in Virginia.  I

23   realize I was vague in that paragraph.  That actually occurred

24   in New York.

25           MS. TUMARINO:  I'd like to move to strike that answer

1    as non-responsive.  Can you read back my last question?

2            THE COURT:  What do you mean by upcharge or what did

3    she mean by upcharge?

4    A.  Anu was able to tell me that she should be getting paid

5    more because she was negotiating a weekly rate with us, but she

6    wanted to be paid monthly.  And she TOLD me that her monthly

7    salary then should not simply be equivalent to four weeks pay

8    because there were more weeks in a year than there were months.

9    That's what I meant by upcharge.

10   Q.  And did she tell you how much extra weeks in a year don't

11   fall into the four-month period?

12   A.  Yes.  There are (Hindi).

13   Q.  What did she say?

14   A.  Four weeks.  (Hindi) is four weeks.  There are four weeks a

15   year that I will not be paid.

16   Q.  So by upcharge she was referring to not receiving in effect

17   four weeks worth of wages in a year?

18   A.  No, that is not what she meant.

19   Q.  Please explain to it me.

20   A.  It's not that she never received anything.  This is a

21   negotiation.  Her -- may I explain?

22   Q.  I'm sorry.  It's not that she didn't receive, I'm just

23   trying to get a sense of her understanding of upcharge was to

24   include the additional four weeks per year?

25           THE COURT:  Compensate for the fact that if you only

C52FUPAH                        S. Sethi - cross

1   think of each month as having four weeks you're missing some

2   days every month.

3   Q.  So she asked you --

4          THE COURT:  Except February and not in a leap year.

5   Q.  So she asked to be paid for an additional four weeks per

6   year?

7   A.  She did not specifically say I want an additional payment

8   per year.  That's not correct.

9   Q.  How is it that she calculated the upcharge?

10  A.  She said I should be paid more than the 400 I'm asking for

11  because when you move the 400 to 1600 a month it doesn't add up

12  in the year.  And she was able to say that she would be four

13  weeks short in payment.  It was a negotiation.  This was not a,

14  she didn't receive anything.  This was in the context of a

15  negotiation on salary, the conversation I've referred to in

16  2004.  She did not, she was not saying she hadn't received

17  salary.  We were talking about how much she should be paid.

18  Q.  So up until -- this conversation was in the fall of 2004,

19  is that correct?

20  A.  If my memory is correct it's September, end of

21  September-ish, October.  And that's why her increased salary

22  went into effect in January.

23  Q.  You've described, you state in your affidavit -- I'll

24  withdraw that.

25          By the time Ms. Upadhyay had come to live and work for

1  you in Virginia, you had already earned a bachelors degree with

2  high honors from Harvard University, correct?

3  A.  Yes.

4  Q.  And you were on the dean's list at Harvard, correct?

5  A.  I believe I made dean's list.

6  Q.  You were also Harvard University national scholar, meaning

7  you were recognized as one of the top 50 students in the class

8  of 1993, correct?

9  A.  Mm-hmm.

10 Q.  And you had also earned a medical degree from SUNY

11 Downstate by then, correct?

12 A.  That is all correct.

13 Q.  And you received numerous academic awards and were in an

14 honor society there as well, correct?

15 A.  That's correct.

16 Q.  And in addition, by the time Ms. Upadhyay had come to work

17 for you, you had already completed a residency in dermatology

18 at Duke University, correct?

19 A.  I had not completed it.

20 Q.  Had you started?

21 A.  I had started one.

22 Q.  And had you also had an internship at St. Vincent's

23 Hospital in New York?

24 A.  You are correct.

25 Q.  By 1996 you had also successfully led and sold a startup

1    company, is that correct?

2            MS. McKENNA:  This is leading.

3            MS. TUMARINO:  It's a very impressive resume.

4            THE COURT:  Yes.  I think I should just leave the

5    bench.

6    Q.  Yet you say that Mrs. Upadhyay had the clear upper hand

7    when she came to work for you in November of 2003?

8    A.  No question.

9            MS. TUMARINO:  Okay.  I don't have anything further.

10           MR. ALLOY:  I just have a few questions.

11           I'd like to mark four exhibits which I believe are

12   documents that I believe are already --

13           MS. TUMARINO:  I have additional copies here.

14           MR. ALLOY:  Oh, you do?  Thank you.  Let's start with

15   July '05 and then March '07 and June '07 for the bank records.

16           MS. TUMARINO:  Which one is which?

17           THE DEPUTY CLERK:  July '05 is 29, March '07 is 30.

18   REDIRECT EXAMINATION

19   BY MR. ALLOY:

20   Q.  I show you Defendant's Exhibit 29.  I believe you've

21   already discussed this exhibit.  Do you recognize that

22   document?

23   A.  Yes, sir.

24   Q.  That's a copy of your bank statements from July 27 through

25   August 23, 2005?

C52FUPAH                        S. Sethi - redirect

1   A.  Yes, sir.

2   Q.  And that would be a bank statement that you'd refer to to

3   confirm there had been a corresponding cash withdrawal to the

4   analysis in Exhibit 27?

5   A.  Yes, sir.

6   Q.  I'm going to show you what's been marked as Defendant's

7   Exhibit 30.  Do you recognize that document?

8   A.  Yes, I do.

9   Q.  That's a copy of your bank statements from March 24, 2007

10  through April 24, 2007?

11  A.  Yes, sir.

12  Q.  And this document was also used to confirm a corresponding

13  cash withdrawal from Exhibit 7, correct?

14  A.  Yes, sir.

15  Q.  I'm going to show you what's been marked as Defendant's

16  Exhibit 31.  Do you recognize that document?

17  A.  I do.

18  Q.  And that's also your bank statement from June 26, 2007

19  through July 25, 2007?

20  A.  Yes, it is.

21  Q.  And that was also used by you to confirm a cash withdrawal

22  corresponding to Exhibit 7?

23  A.  Yes.

24  Q.  And I'm also going to show you what's been marked as

25  Defendant's Exhibit 32.  Do you recognize that document?

C52FUPAH                         S. Sethi - redirect

1   A.  Yes, I do.

2   Q.  And what is that document?

3   A.  That document is a check made out in the name of Anu

4   Upadhyay for the amount of $3,000 reflecting payment for April

5   and May salary.

6   Q.  And there's also a corresponding line for this payment in

7   Exhibit 7?

8   A.  Yes, sir.

9   Q.  Okay, thank you.

10          If you could turn briefly to Exhibit -- I'm sorry,

11   I've been referring to Exhibit 7, but it's actually Exhibit 6.

12   A.  Yes, sir.

13   Q.  If the record could reflect my previous references to

14   Exhibit 7 are all Exhibit 6.  If you could look at Exhibit 6

15   quickly, please?

16   A.  Yes, sir.

17   Q.  The first two line items on Exhibit 6, November

18   '03-December '03 they total $2,300 and the reference is a

19   Wachovia check dated 12/28/03?

20   A.  Yes, sir.

21   Q.  If you could turn to Exhibit 3 of the binder.  And the

22   third page of Exhibit 3, Bates stamped D000003, do you see

23   that?

24   A.  Yes, sir.

25   Q.  And there is a deposit on 12/29 in the amount of $2,300.

1   Do you see that?

2   A.  Yes, sir.

3   Q.  What if anything do you believe that deposit refers to?

4   A.  I believe that deposit refers to the total of the two

5   checks that were referenced in the first two lines of the

6   spreadsheet.

7   Q.  Thank you.  If you could turn back to Exhibit 6, please.

8   Can you explain or clarify the last several payments of wages

9   that were made to Ms. Upadhyay?

10  A.  The last several months in 2007?

11  Q.  Yes.  And in particular, I'd like to draw your attention to

12  Exhibit 31, which is your bank statement from June 26, '07 to

13  July 25, 2007.

14  A.  Yes, sir.  May I explain?

15  Q.  Yes, please.

16  A.  Anu knew by December of 2006 that she had received her

17  green card and she was then free to leave the country, because

18  she had gotten her green card.  She was not able to leave

19  before then.  So she knew in December 2006 that she wanted to

20  go back to India.  We had a conversation with her and said do

21  you want to go immediately, we know you're dying to see your

22  family.  We would have made arrangements and taken care of the

23  children.  I was grateful to her that she said she would stay

24  until my time in New York was done which was known six more

25  months and she began planning for her return trip.

1              From that point forward, she took all of her salary in

2       cash.  She took two months salary in cash with a check written

3       out to cash in March 2, 2007.  I made a teller withdrawal for

4       cash on April 20 reflecting her March salary, referencing the

5       bank statements that you have referenced as Defendant's Exhibit

6       31, a $3,000 withdrawal was made on July 5, which actually paid

7       for her thousand dollar bonus and her April salary and she told

8       me to hold on to May and June and she would take that for us

9       when she left.  May salary of $2,000 plus June salary of $2,000

10      plus $6,000 that she withdrew from her bank account with Berry

11      and Ronica and I'll explain how that got to us in a second,

12      $10,000 plus the $500 for her first week's salary in July,

13      because we paid that as well.  I was very clear to pay her

14      until the last day she worked were withdrawn on July 9 in a

15      $10,500 withdrawal and given to Anu.  That was the day she was

16      leaving for India.

17             The $6,000 that I mentioned from her own account, she

18      went to New Jersey on June 10.  I believe it was referenced

19      earlier.  She made a withdrawal.  Berry and Ronica, we didn't

20      have as you can see by the numbers, we didn't have extra money

21      staying around, Berry and Ronica sent us a check for that in

22      that instance minus two months employer insurance, and we

23      deposited the check and were able to give her the cash because

24      they couldn't give her the cash on that day.  So the $10,500

25      withdrawal on July 9, I believe that's the exact day she went

C52FUPAH                          S. Sethi - redirect

1  to the airport, was May's salary of 2000, June's salary of

2  2000, $6,000 from her own bank account and $500 for the first

3  week in July that she had worked.

4  Q.  Thank you.

5        If you could turn to Exhibit 15 in the binder, please.

6  Do you recognize any of the people in that picture?

7  A.  I am able to recognize the lady in the white, blue and

8  black striped sweater as Shaku.

9  Q.  You're referring specifically to the woman who is standing

10  second from the right?

11  A.  Yes, sir.

12  Q.  And how were you able to recognize that person as Shaku?

13  A.  I met Shaku on at least two occasions in my own apartment.

14  Anu associated with Shaku very often.  Anu called Shaku and

15  spoke of Shaku so often that my son, he joked to my

16  mother-in-law and to me, my son used to call Shaku chaku, which

17  means knife in India, because he heard the word so much.  She

18  was friends with Anu at the time.  I met Shaku twice; once in

19  our Payson apartment, once in the Sutton Terrace apartment.  I

20  remember her face clearly.  From her lawsuit that I learned

21  only through Anu and nobody else, and since I saw her twice in

22  association with Anu, I was able to recognize her from this

23  photo.

24  Q.  If you could turn to Exhibit 5, please.  Bates stamped

25  D000117 and D000118.

1   A.  Yes, sir.

2   Q.  Do you recognize this document?

3   A.  Anu brought to me bank account statements and spreadsheets

4   given to her by Neeraj Sethi in the spring of 2007.  She asked

5   me to look through them and see if I could find anything wrong

6   with them.

7   Q.  Was Exhibit 5 one of the documents that Anu brought and

8   showed to you in the spring of 2007?

9   A.  I am pretty sure that this document is one of what she

10  brought.  I very clearly remember her bank statements and I'm

11  pretty sure, we certainly discussed verbally the spreadsheet

12  analysis Neeraj had done for her, and I'm pretty sure I can say

13  that this is one of the things that I looked at to make sure

14  that, she wanted me to make sure that all of the numbers added

15  up, and she wanted me to go through her bank statements and

16  make sure that there was no money missing.

17  Q.  And if you could turn to Exhibit 4, the series of, we don't

18  need to go through them all, these are a series of Chase Bank

19  statements.  Were any of these Chase Bank statements the

20  documents that you were just referring to that Anu brought and

21  showed to you in or around the spring of 2007?

22  A.  Yes, sir and I remember, because when she handed me the

23  pile it was a very thick pile and I thought it was going to

24  take a very long time.  It ended up that there had been very

25  little activity in the account especially in the way of

1  withdrawals so it really didn't take very long at all.  It was

2  pretty straightforward.

3  Q.  If you could take a look at Exhibit 3, showing you a series

4  of Sovereign Bank statements.  Do you recognize any of these

5  documents in Exhibit 3?

6  A.  Yes, sir.  She brought me the whole stack.

7  Q.  Have you ever seen an application by Anu for Medicaid?

8  A.  Yes.  What I saw specifically was a piece of paper about

9  this big, bigger than a check, about this big.  It had Anu's

10  name, what I believe to be the address of the room that she

11  rented for her Friday night and Saturday night, because she

12  never slept with us on those nights.  The room that she rented

13  there, I assumed that was that address, and it was an

14  application for Medicaid and it showed a weekly salary of $100.

15  Q.  And when did she show you this?

16  A.  She showed me this when we were still living in Payson

17  House.  My education has been referenced.  I have a very visual

18  memory, so I can remember where we had conversations because I

19  remember standing looking at it in the hallway in that

20  apartment.

21  Q.  And what if anything did you say to Ms. Upadhyay after she

22  showed you the application?

23  A.  I was shocked because even though I had never had a

24  conversation with her about income taxes and I had never had a

25  conversation with Berry about income taxes, I asked her, I said

1  how can you report a salary of $100 a week?  I am paying you so

2  much more.  And I was a little mad because ultimately it's

3  taxpayer money, and I said don't you think somebody is going to

4  cross reference this with your income taxes at some level some

5  day somehow?  And she said no.  And the reason she got the

6  Medicaid was because she was getting sick and she was starting

7  to feel ill and she went out and applied for it.  Completely on

8  her own.  I had nothing to do with the application process or

9  the application or anything.  I saw this after the fact.

10  Q.  Did you help her find a doctor for her rheumatoid

11  arthritis?

12  A.  Absolutely not.  Anu mentioned the Dr. Badlani.  I never

13  met Dr. Badlani.  I believe he came to her through some of her

14  friends.  She had to find a rheumatologist in Queens.  She knew

15  that because she filed her application in Queens, with that

16  Queens address from Friday and Saturday nights.  I believe.  I

17  should not say exactly because I don't know.  I did not find

18  Dr. Georgescu for her.  It was a two-hour commute to get there

19  and I went on a couple of occasions with my children to get

20  there, waiting in the waiting room to translate.  I would have

21  much rather she had gone to Bellevue because it was closer.

22  She was not able to do that because she applied in Queens with

23  a Queens physical address.

24  Q.  Did you ever write checks made out payable to Berry, Sethi

25  or Ronica Sethi for Ms. Upadhyay's wages?

C52FUPAH                     S. Sethi - redirect

1   A.  I have never written a check to Neeraj or Ronica Sethi for

2   Anu's wages, never.

3          MR. ALLOY:  No further questions.

4          MS. TUMARINO:  I just have a couple.

5   RECROSS EXAMINATION

6   BY MS. TUMARINO:

7   Q.  Have you ever written a check to Neeraj or Ronica Sethi for

8   Anu's taxes?

9   A.  Absolutely.

10  Q.  You have.  And those were made payable to Neeraj and/or

11  Ronica?

12  A.  Yes.  May I explain?

13  Q.  No, I don't need an explanation.  That was the question.

14  A.  Never Ronica, always Neeraj.

15  Q.  Always Neeraj?

16  A.  Never wrote a check to Ronica.  Always Neeraj.

17  Q.  You said you saw the Medicaid application when you were

18  living in Payson House, correct?

19  A.  Yes, ma'am.

20  Q.  And it reflected an address in Queens?

21  A.  Yes, ma'am.

22  Q.  And you said you believe it to be the address of a room she

23  rented, is that right?

24  A.  I believe it to be the address of the place she stayed on

25  Friday and Saturday nights because she did not sleep at our

1   home on Friday and Saturday nights.

2   Q.  Did you ask her where the address was?

3   A.  At that moment?

4   Q.  At any point.

5          THE COURT:  I'm sorry, if the address said some street

6   in Woodside, why would you ask someone where's Woodside?  Is

7   that what you want to know?

8          MS. TUMARINO:  It's in Queens.  No, she said she

9   believes it to be the place she stayed.  I'm trying to get a

10  sense of where that belief is derived from, whether she had a

11  conversation with the plaintiff about whether that was --

12         THE COURT:  Okay, I didn't understand that was the

13  question.

14  A.  The plaintiff told me on many occasions about the room she

15  rented, about the other nannies that stayed in that apartment,

16  about how she actually took pots and pans from our home to use

17  in her apartment.

18  Q.  I'm sorry.  The question was --

19  A.  I'm sorry.

20         MS. TUMARINO:  Could you read my question back?

21         (Record read)

22  Q.  Did you ask her whether the address on her Medicaid

23  application was a place where she stayed, according to you, on

24  the weekend?

25  A.  I did not at that very moment ask her that question

1    standing in the hallway.

2    Q.  Did you ask her didn't whether the address on the Medicaid

3    application was the place where she stayed on the weekend?

4    A.  Absolutely the answer is yes.

5    Q.  And when was that?

6    A.  Because all of her mail addressed to her from Medicaid,

7    including letters from Dr. Georgescu that she asked me to read,

8    and appointment letters and medical records, information came

9    addressed to that address in Queens and she brought those to me

10   with I assume the same Queens address on it because that's

11   where they were mailed and asked me to interpret them and in

12   those occasions I asked her where is this, and this is the room

13   that she was renting.

14   Q.  And that was the same address that was on the Medicaid?

15   A.  I believe it to be so.

16   Q.  You had to read those letters for her?

17   A.  The letters from her physician, yes.

18   Q.  And the letters from Medicaid?

19   A.  Yes, she brought me her Medicaid mail which was not mailed

20   to us directly because it was mailed to a Queens address and

21   she brought them to me.

22   Q.  You understand she can't read?

23   A.  She cannot read fluent in English.  I don't believe she can

24   read a full sentence in English.  However, she can read an

25   address written in her diary, she knows how to go back to that

1    place.

2              MS. TUMARINO:  Move to strike as nonresponsive.

3    A.  I do not believe she can read full sentences, but she can

4    read names, proper nouns, street names, places.

5              THE COURT:  Ms. Tumanaro, are you done?  I have to

6    just leave for like ten minutes.  We have a swearing in

7    downstairs if you're done.

8              MS. TUMARINO:  I just have one quick thing.

9    Q.  If you could turn to Plaintiff's Exhibit 2.

10             THE COURT:  Okay.  Sorry, we're going to take a break.

11   You get one question when I get back.  It should not be longer

12   than 15 minutes.

13             (Recess)

14   BY MS. TUMARINO:

15   Q.  Please refer to Plaintiff's Exhibit 2.  You testified I

16   believe that plaintiff handed you her bank statements sometime

17   in the spring of 2007, is that right?

18   A.  Yes, I did.

19   Q.  And these were bank statements she had obtained -- do you

20   know where she had obtained the bank statements from?

21   A.  I definitely did.  She obtained them from Neeraj Sethi.

22   Q.  Looking at Plaintiff's Exhibit 2, are these the statements

23   she showed to you?  Starts with P0001, I believe?

24   A.  I'm looking at the dates to see how far back these go.

25             THE COURT:  I'm looking at statements --

1              MS. TUMARINO:  Do they start with P00001, your Honor?

2              THE COURT:  Which are in the name of Ronica Sethi and

3      then later Neeraj Sethi or Ronica Sethi?  These are not -- am I

4      mistaken?  Are these the plaintiff's statements?

5              MS. TUMARINO:  These are the statements, these are,

6      plaintiff's bank account was in these bank statements.  The

7      defendants -- well, let me just ask, if I could just ask the

8      witness the question.

9              THE COURT:  Okay.

10     Q.  Are these the bank statements that the plaintiff showed to

11     you?  Do you recall?

12     A.  I can recall if I look at them, but these stretch over a

13     two-year period.  The address changes during those two years,

14     so I would need to look and see whether these are exactly the

15     same statements that I just referenced in the defendant's --

16             MS. McKENNA:  Could you keep your voice up?  I can't

17     hear you.

18     A.  I would have to look and see, I'm happy to do that, if

19     these are exactly the same statements.

20     Q.  Maybe you could compare them to Defendant's Exhibit 4.

21             THE COURT:  The plaintiff had the full bank records of

22     Neeraj and Ronica, is that correct?

23             MS. TUMARINO:  We don't know, your Honor.  I'm just

24     asking the witness what she saw.  The full records of these

25     bank statements -- well, if we could just ask the witness.

 1          MS. McKENNA:  Well, if the question is supposed to

 2   establish what these records are, I suspect that question is

 3   more properly put to Ronica Sethi.  If the question is are

 4   these the documents that plaintiff showed to you --

 5          MS. TUMARINO:  That's the question.

 6          MS. McKENNA:    -- when she had the conversation, I

 7   believe the witness said she needs to look at them to ascertain

 8   the answer to that question.

 9          MR. ALLOY:  I also want to make sure, these documents

10   are subject to the same confidentiality that we've previously

11   discussed.

12          MS. TUMARINO:  Only for the purposes of this case.  I

13   have no problem with that.

14          MS. McKENNA:  Thank you.  They will be used only for

15   the purposes of this case.

16          MS. TUMARINO:  That's correct.

17   A.  So we referenced two exhibits.

18   Q.  I'd like you to compare Plaintiff's Exhibit 2, which is

19   what you're looking at, right, which starts at P00001?

20   A.  Correct.

21   Q.  And Defendant's Exhibit 4.

22          THE COURT:  Excuse me, that wasn't the question.

23   Q.  You can tell us whether the bank statements -- she said she

24   needed to look at the bank statements to see whether they were

25   the ones that were shown to her.

```
 1              THE COURT:  Isn't there a more direct way of asking
 2    the question to learn the answer?
 3              MS. TUMARINO:  One way to be --
 4    Q.  Did the plaintiff show you Defendant's Exhibit 4 or
 5    Plaintiff's Exhibit 2?
 6              MS. McKENNA:  That suggests they are two different
 7    things.  A plain looking, for example, at the first page of
 8    Defendant's Exhibit 4 and the first page of Plaintiff's Exhibit
 9    2, to my eyes they appear to be the same document.
10              THE COURT:  Look, just to cut through this.  Did the
11    plaintiff show you bank records which contained pages such as
12    33?
13              MS. TUMARINO:  P33, your Honor?
14              THE COURT:  Right.
15              THE WITNESS:  Yes.  I believe so.
16    Q.  Did the record -- were you going to say something?
17    A.  I'm going to say that what I testified to earlier was what
18    Anu brought to me was very straightforward, easy to look
19    through, because there weren't a lot of transactions.  And the
20    documents that are in Defendant's Exhibit 3 and 4 are very much
21    the same.  And that's why it did not take me a very long time
22    because there wasn't a lot of activity.
23              Specifically, P33 references a whole lot of activity
24    and I do not, I am not confident that that page is in
25    Defendant's Exhibit 3 and 4.
```

1    Q.   Okay.  So the documents that she brought to you, the bank

2    statements, had very little activity at all?

3    A.   They did not have much activity.  They did not -- she asked

4    me to identify any missing money, any money that was withdrawn

5    was her specific concern and I did not see any of that in the

6    statements she brought to me.  She had asked me to identify

7    things that would have gone wrong or missing or that were

8    deducted somehow.

9    Q.   Okay, thank you.

10             THE COURT:  Okay, I think that's your question.

11             MS. TUMARINO:  I think that's it.

12             THE COURT:  Anything further Mr. Alloy?

13             MR. ALLOY:  No.

14             THE COURT:  Thank you.  You can go back to Texas.

15             (Witness excused)

16             MS. TUMARINO:  We have no objection to Exhibit 3, but

17    since Exhibit 4 is not the complete record we object on that

18    basis and proffer Exhibit 2.

19             MR. ALLOY:  I object.  If I could briefly address

20    this, because I've had this discussion with plaintiff's counsel

21    before and this is very troubling to both me and to my clients,

22    which is that what we have produced as Exhibit 4 are the

23    complete records from Chase of the account in which

24    Ms. Upadhyay was, Ms. Upadhyay's accounts.  What plaintiffs

25    have put forward as Exhibit 2 which we object to on a number of

C52FUPAH                          Hearing

 1   grounds are the complete banking records of the Sethis during

 2   this time period, and my understanding is that they were

 3   obtained improperly.  I'm not suggesting that plaintiff's

 4   counsel did anything improperly, but they were obtained

 5   improperly when plaintiff's counsel attempted to obtain

 6   Ms. Upadhyay's records from Chase.  Chase mistakenly provided

 7   them with all of the Sethis records because Ms. Upadhyay's

 8   account was part of an umbrella account of the Sethis.

 9           And so we certainly object on a number of grounds,

10   including relevance as well as confidentiality to any of the

11   Sethis' personal banking records, which really are not at issue

12   in this case.

13           MS. TUMARINO:  Your Honor, we could resolve this with

14   a simple stipulation, which was that the plaintiff's bank

15   account statements were commingled with defendant's bank

16   account statements.  They did not come separately or appear

17   separately, and the relevance of the financial information

18   pertaining to to the Sethis is not at issue.  If defendants

19   will stipulate to us, stipulate that plaintiff's bank account

20   statements were part of a larger statement of defendants, then

21   we should have no problem.  The substance of -- with one

22   additional fact which has been testified to by Dr. Sethi, that

23   there was a transfer or a withdrawal of monies from plaintiff's

24   account by defendant Ronica Sethi in order to give her those

25   monies.  As long as those -- because that's not clear from

C52FUPAH                    Hearing

1    defendant's own records of plaintiff's account.

2            MS. McKENNA:  Your Honor, with respect to the latter

3    issue raised by counsel, the testimony is quite clear with

4    respect to what withdrawals were made and why.  I feel no need

5    to stipulate anything with respect to that.

6            Second, with respect to the Chase Manhattan Bank

7    accounts, the testimony is clear and Defendant's Exhibit 4

8    makes clear that the plaintiff had an account with Ronica

9    Sethi, first in Ms. Sethi's name and then in their names

10   together, joint holders of that account.  To use the expression

11   commingled with other accounts, the Sethis had an incorrect

12   statement.

13           The banking records of the Sethis that have nothing to

14   do with the plaintiff are not at issue here.  What is at issue

15   is the way plaintiff was paid into an account in the name of

16   Ronica Sethi and then in the name of Ronica Sethi and herself

17   and that is that single account which is Defendant's Exhibit 4.

18           THE COURT:  Ms. Tumanaro, there's no suggestion, I

19   gather, that there are portions of Exhibit 2 which relate to

20   the plaintiff that are not included in Exhibit 4.

21           MS. TUMARINO:  The only thing that is not included --

22   well, there are portions of Exhibit 2 that are not included in

23   the sense that Exhibit 4, Exhibit 4 doesn't reflect the fact

24   that Ms. Upadhyay's bank statements came in a statement of all

25   the Sethis.

1          THE COURT:  That's not what I'm saying.

2          MS. TUMARINO:  The one --

3          THE COURT:  Are they cheating when they say the

4    Exhibit 4 reflects the transactions that are relevant to the

5    plaintiff?

6          MS. TUMARINO:  No.  There is only one way in which

7    Exhibit 4 doesn't reflect -- there's a $6,000 transfer to

8    another account of the Sethis that there's been some testimony

9    about.  In June of 2007, and it doesn't -- because it's not

10   Plaintiff's 2, you don't see that those monies go into

11   defendant's account.  But other than that, since that doesn't

12   appear to be at issue, the main issue here is that plaintiff's

13   bank account statements came as part of a summary statement of

14   all accounts under the Sethis' name.  It was not an individual

15   bank statement, one that would be easy, for example, to pass

16   along to plaintiff.

17         MS. McKENNA:  Obviously it would be easy to pass along

18   to plaintiff because Defendant's Exhibit 4 is exactly that.

19   She had an account.  These are the pages of that account.  I

20   don't know what the relevance is to the other issue that

21   counsel is raising.

22         MS. TUMARINO:  Defendants have redacted information

23   from the pages so it is just plaintiff's -- the joint account

24   in plaintiff's and Ms. Sethi's name, but other than that, it is

25   not an accurate reflection of what the statements look like.

C52FUPAH                    Hearing

1              MS. McKENNA:  Your Honor, if I could know what we're

2       trying to establish, I would try to help.

3              THE COURT:  There's no testimony by the plaintiff that

4       she ever asked the Sethis to see her bank account statements

5       and the Sethis refused to show them to her, right?

6              MS. TUMARINO:  Nor is there testimony --

7              THE COURT:  Her testimony is I don't know about bank

8       account statements, therefore it doesn't really matter --

9              MS. TUMARINO:  Your Honor --

10             THE COURT:  Whether they were more complex or simpler,

11      because she is asserting that she has no concept of a bank

12      account.

13             MS. TUMARINO:  She's not asserting that, your Honor.

14      She's asserting that she never got bank account statements from

15      the defendant.

16             THE COURT:  But she isn't stating that she ever asked

17      for them.

18             MS. TUMARINO:  Exactly.  She didn't say she asked for

19      them.  She also didn't state that she received them.

20             THE COURT:  Okay.  So what's the issue?  If she didn't

21      ask for them, the form that they're in is not important.

22             MS. TUMARINO:  Plaintiff's Exhibit 2 makes it look

23      unlikely that defendants would have just turned over statements

24      to her every month.

25             THE COURT:  And I don't believe that the defendants in

1    their affidavit said that they gave her bank statements

2    monthly.

3           MS. TUMARINO:  They haven't said that, your Honor, but

4    Dr. Sethi just testified that plaintiff came to her with a pile

5    of bank statements.

6           THE COURT:  Okay.  She said that she came to her with

7    something approaching Exhibit 4, not something approaching

8    Exhibit 2.

9           MS. McKENNA:  And I would note, your Honor, that

10   counsel could have had the opportunity to explore with the

11   witness on cross-examination why that was so and why that came

12   up, and chose not to do it.

13          THE COURT:  The whole point, I think the bottom line

14   is at some point the plaintiff asked to see bank statements and

15   the plaintiff was given bank statements and the plaintiff at

16   that time, at least, I think felt sufficiently comfortable with

17   Dr. Sethi to ask her to verify whether there was any wrongdoing

18   with respect to the bank statements.  I think that's where we

19   are.

20          MS. McKENNA:  Should we call our next witness?

21          THE COURT:  Yes, please.

22          MR. ALLOY:  Plaintiff calls Neeraj Sethi, please.

23    NEERAJ SETHI,

24        called as a witness by the Defendant,

25        having been duly sworn, testified as follows:

C52FUPAH                          Hearing

1    DIRECT EXAMINATION

2    BY MR. ALLOY:

3    Q.  You previously submitted an affidavit in this case dated

4    June 15, 2011, correct?

5    A.  Correct.

6    Q.  I'd like to show you -- and you've also submitted what I

7    will call an updated affidavit recently dated April 16, 2012,

8    correct?

9    A.  Correct.

10   Q.  Let me show you both of your affidavits.  If you could look

11   at your 2011 affidavit first.  Do you recognize that document?

12   A.  I do.

13   Q.  And approximately on page 5, is that your signature?

14   A.  It is.

15   Q.  Did you sign that document in the presence of a Notary

16   Public?

17   A.  I did.

18   Q.  And when you signed that document you understood that you

19   were attesting that the statements contained in your affidavit

20   were true?

21   A.  Yes.

22   Q.  And if you could take a look at -- oh, I'm sorry.  Who

23   wrote that document, your 2011 affidavit?

24   A.  I did.

25   Q.  Those are your words?

C52FUPAH                        N. Sethi - direct

1   A.  Those are my words.

2   Q.  If you could take a look at the most recent 2012 affidavit.

3   Do you recognize that document?

4   A.  I do.

5   Q.  And is that your signature at the back of the document?

6   A.  It is.

7   Q.  And was that also signed in the presence of a Notary

8   Public?

9   A.  It is.

10  Q.  When you signed that you also understood that you were

11  attesting to the truth of the matters within your affidavit?

12  A.  Yes.

13  Q.  And this most recent affidavit incorporates your prior

14  affidavit and adds some additional statements?

15  A.  That is correct.

16  Q.  And those additional statements, are they also your words?

17  Excuse me.  Did you also write this most recent updated

18  affidavit?

19  A.  I absolutely did.

20  Q.  Thank you.

21       MR. ALLOY:  No further questions.

22  CROSS-EXAMINATION

23  BY MS. TUMARINO:

24  Q.  Good afternoon, Mr. Sethi, my name is Amelia Tumanaro.  I'm

25  attorney for the plaintiff.

C52FUPAH                         N. Sethi - cross

1   A.  Good afternoon.

2   Q.  Ms. Upadhyay started working for you in December 1998,

3   correct?

4   A.  Correct.

5   Q.  At that time she didn't have a bank account, correct?

6   A.  Not to my knowledge.

7   Q.  And because she was new to this country, you and your wife

8   assisted in getting her work authorization, correct?

9   A.  When you say new to the country, she was in the country for

10  three years already.

11  Q.  So she had been here for three years, you were helping her

12  to get work authorization when she came to you, correct?

13  A.  That is not correct.

14  Q.  Can you explain?

15  A.  Yes.  We started applying for a work authorization when

16  there was a newspaper article that came out Chellaram's wife

17  Vimi gave it to my wife.  We still have the article.  I think

18  was New York Times, it was February 2001.  There was an amnesty

19  ruling and that's when we decided to file for Anu's green card

20  under that amnesty program.

21  Q.  And you did this without deducting any of the costs of this

22  from Anu's pay, correct?

23  A.  That is correct, and I think she testified to that as well.

24  Q.  And during the time Ms. Upadhyay worked for you, she

25  couldn't read or write in English or in Hindi, correct?

C52FUPAH                    N. Sethi - cross

1   A.  Selectively, she could absolutely read.  She could

2   absolutely read her name.  She could absolutely spell her name

3   and I think today when Josh showed her her Social Security card

4   how did she know it was hers?  Because she could read her name.

5   Q.  So she could read her name?

6   A.  And she could speak selective words.  She could definitely

7   have a communication.  She could go to the grocery store, buy

8   groceries.  And even drop off my dry cleaning.

9   Q.  Because plaintiff didn't have a bank account, she asked you

10  to keep money for her and send it to India upon her request,

11  correct?

12  A.  That is correct.  I offered to pay her every 15 days.  She

13  said, "What am I going to do with it?  Where am I going to keep

14  it?  If you can keep it for me and every time I ask it if you

15  send it to my children or my husband," and she gave me a piece

16  of paper which I presented earlier on which had her husband's

17  name and bank account information and her son Ashok Upadhyay's

18  name and bank information and that's how I transferred the

19  money.  I would send it by check in the initial days and

20  typically it was always a round number, 3,000 or so, sometimes

21  4,000 that I would send a check.

22          Later on there was some issues with one of the checks,

23  it took a long time to clear.  I remember very clearly because

24  her son called and said, "What happened?  Why is this money not

25  come?"  And I said hey the bank's deducted it from me.  It's

C52FUPAH                          N. Sethi - cross

1   the issue of the Indian bank having to convert it into rupees

2   and back, then it would take a really long time to do.  I think

3   you can talk to any banking people would tell you the same

4   thing.  It was a long time for international check to clear in

5   India especially.  Because back then in India, all the banking

6   laws was in what you call a ledger format.  It was not

7   computerized.

8   Q.  And how often did Ms. Upadhyay ask you to send money to

9   India?

10  A.  Every three months or so.  I remember sending thousands,

11  tens of thousands of dollars over the four and a half, five

12  years she worked for us.

13          MS. TUMARINO:  Your Honor, I'm going to move to strike

14  the last portion of that answer.

15          THE COURT:  Okay.  Granted.

16  Q.  At the time Ms. Upadhyay worked for you and Ronica Sethi

17  you kept a ledger, correct?

18  A.  That is correct.

19  Q.  And in that ledger you kept track of what you referred to

20  as Anu's balance, is that right?

21  A.  That is correct.

22  Q.  And the balance was an accounting of her calls to India,

23  checks to India, wire transfers to India and cash paid to her,

24  is that right?

25  A.  In the early days I told her very carefully that --

1    Q.  I'm sorry, that's a yes or no question.

2    A.  I'm sorry, could you repeat the question again?

3    Q.  The balance was an accounting of her calls to India, cash

4    given to her, checks given to her and wires sent to India,

5    correct?

6    A.  That is correct.

7    Q.  And presumably it also contained dates corresponding to

8    those transactions, correct?

9    A.  That is correct.

10   Q.  And the ledger would have also included amounts of those

11   checks and wire transfers and cash payment, correct?

12   A.  That is correct.

13   Q.  Besides these items, the cash, the checks and the wire

14   transfers and the calls to India, were there any other

15   notations in the ledger pertaining to Anu's employment?

16   A.  No.

17   Q.  And did you deduct the cost of the calls to India from her

18   pay?

19   A.  No.

20   Q.  And when did you start making this ledger?

21   A.  From the day she started.  I believe it is December 1,

22   1998.

23   Q.  And did anyone else make entries in the ledger?

24   A.  No.

25   Q.  Did you stop making entries in the ledger when she went to

1    work for Shikha and Ganesh?

2    A.  Yes.

3    Q.  I'm sorry, I should have asked you, did you continue making

4    entries in the ledger for the duration of Ms. Upadhyay's

5    employment for you and Ronica Sethi?

6    A.  I only made those entries in the ledger until she worked

7    for us in 2003.  Once she went to work for Shikha and Ganesh I

8    did not make any more entries in the ledger.

9    Q.  When in 2003 did she stop working for you?

10   A.  I think it was about October '03.

11   Q.  And was the ledger an actual book?

12   A.  It was actually the back of a checkbook.  And it went on to

13   multiple pages because I ran through that pretty quickly and

14   then I had to carry on.

15   Q.  You had to carry on, you said?

16   A.  Yes.  I had to.  Sometimes when I ran out of my checkbook

17   for the back, it would start at the back.  If you look at the

18   back of a checkbook, it has the date what check you wrote.  You

19   have a memo, a debit and a credit field.  So when I ran through

20   the page I used the next page, but that's more for writing a

21   check.  So I would take another checkbook and then I started

22   doing that and I kept that checkbook specifically for all the

23   accounting for Anu.

24   Q.  So were there two ledger books?

25   A.  There was one ledger book that continued on to the other

1    and I stapled it to the other one.  So this continues.

2    Q.  And just to be completely clear, the checks sent to India

3    for Anu, those were to her wages, correct?

4    A.  Absolutely.

5    Q.  And the same question for the wires, those were also

6    payment of her wages?

7    A.  Absolutely.

8    Q.  How long did you keep the ledger book after you stopped

9    making entries?

10   A.  I don't know.  I don't remember throwing it away.  It's

11   somewhere, somewhere, it's just somewhere in the house

12   somewhere.  We moved from the house in '03 to New Jersey.  I

13   remember still having it, and then after she stopped working

14   for us, I mean, it wasn't material, not for me to keep on

15   keeping it because I paid her everything and all the money in

16   the later years, once she had a Social Security number, she

17   could open a bank account, we opened the bank account for her

18   all her money was in the bank account that was remaining.

19   Q.  So about how long after she moved to work for Shikha and

20   Ganesh did you keep the ledger?

21   A.  I have no idea.  Let me ask you a question.  How long do

22   you keep stuff from five years ago?

23   Q.  You don't get to ask questions, Mr. Sethi.

24   A.  I'm sorry.

25            THE COURT:  You've got to go to law school first.

C52FUPAH                    N. Sethi - cross

1    Q.  So you said you have no idea how long you kept it.  Did you
2    still have the ledger after Anu stopped working with Shikha and
3    Ganesh?
4    A.  I don't know.
5    Q.  Did Ms. Upadhyay ever give you cash to deposit in the bank
6    from her massage work?
7    A.  Not even once.
8    Q.  Were you present when your wife opened an account, a joint
9    account for her and Ms. Upadhyay?
10   A.  No.
11   Q.  On either occasion?
12   A.  No.
13   Q.  Have you ever endorsed checks for Anu within the bank?
14   A.  No.
15   Q.  Could you turn to Defendant's Exhibit 8?  The second page
16   of that, which is D000135.
17   A.  135?
18   Q.  D000135.
19   A.  Yes.
20   Q.  Do you recognize that handwriting?
21   A.  No.
22   Q.  We'll turn to D000138.  Do you recognize that handwriting?
23   A.  It's the same handwriting on the passbook.
24   Q.  My question was do you recognize the handwriting?
25   A.  I said I do recognize the same writing as Anu's writing on

1    the passbook.

2    Q.  So this is Anu's handwriting?

3    A.  Exactly.

4    Q.  Could you turn to D000140?  Do you recognize the

5    handwriting on the back of that check?

6    A.  Yes, I do.

7    Q.  Whose handwriting is that?

8    A.  That's my wife.

9    Q.  And where it says Anu, is that your wife's handwriting?

10   A.  I don't know about that.  I know my wife's signature at the

11   bottom.

12   Q.  Can you turn to D000142?  Do you recognize who wrote the

13   word Anu there?

14   A.  I don't know who wrote the word Anu, but I know my wife's

15   handwriting because she writes her name.

16   Q.  And D000144?  Do you recognize who wrote Anu there?

17   A.  No.

18   Q.  Did you make deposits for Anu into the bank account of

19   checks paid by Shikha Sethi and Ganesh Raj?

20   A.  No.

21   Q.  Did Anu ever give you cash from her massage work to wire to

22   India?

23   A.  Never.

24   Q.  After Ms. Upadhyay got her Social Security number you

25   started reporting and paying the required state and federal

C52FUPAH                          N. Sethi - cross

1   taxes on your payments to her, is that correct?

2   A.  Actually, I was going through my records and I, first time

3   I declared paying as an employer paying for her taxes and

4   paying the employer taxes was in the year 2000.

5   Q.  And --

6   A.  I'm not sure when she got her Social Security card.  But

7   that's the first year I filed on my tax return, I remember

8   there's a special schedule H to be exact, if I remember

9   correctly, that had for employment, employer taxes or household

10  taxes.

11  Q.  In paragraph 7 of your affidavit you say, "When Anu first

12  received a Social Security number we immediately began

13  reporting our payments to Anu and reported and paid state and

14  federal taxes."  Would that have been 2000?

15  A.  No.

16  Q.  So you don't remember when Anu received her Social Security

17  number?

18  A.  I don't.  I thought we started doing it when she got her

19  Social Security number but the other day I came across a piece

20  of paper from the IRS that said, they asked a question that we

21  filed a schedule H and this paper was dated October 2001, and

22  it said that here is your EIN number for your taxes that you

23  should reference, next time you pay employer taxes you should

24  reference that EIN number on it.

25  Q.  So you didn't apply for an EIN number?

1    A.  We got it through, like I said, I filed my 2000 tax

2    returns.  It had a schedule H and in October of 2001 I got the

3    letter.  I'm sure my accountants applied for it on my behalf,

4    but that's the letter I got from the IRS and I still have that

5    letter.

6    Q.  And you also say in your affidavit that after you started

7    reporting your wage payments you started receiving copies of

8    wage hour posters rules and regulations, correct?

9    A.  That is correct.

10   Q.  And so that would have been in what year?

11   A.  I don't remember exactly what year.  My guess is late 2001,

12   probably 2002.  It had to be after I got the EIN because that's

13   something that would normally trigger something like that.

14   Q.  And who sent you the relevant wage hour posters?

15   A.  I don't remember exactly how I got them, if I ordered them

16   or if they came.  But I do remember them coming in the mail and

17   I do remember discussing it with Anu because the key thing I

18   remember is telling her, see what they do in this country.

19   They actually send every business a poster that you got to put

20   up that shows the minimum wage for every employee.  So every

21   employee is aware of their rights and what their minimum wage

22   is.

23        And also I remember that and I remember discussing

24   very clearly with her.  I never put it up because I didn't know

25   we had to put that up in my house.  I only thought businesses

1   had to put it up.  But the fact remains that Anu, there's no

2   way she could have read or understood if I put it up what that

3   poster meant.

4   Q.  Why is that?

5   A.  She can't read English that fluently.  She's very selective

6   in her reading.  There's some words she can understand and some

7   words she can read because she definitely can find her way

8   around town.

9   Q.  Did you have a conversation with your wife about whether or

10  not to post the notice?

11  A.  I don't think so.  I don't remember.

12  Q.  Can you describe the poster that was sent to you?

13  A.  Absolutely.  There were two different types of posters.  I

14  remember the Fed poster is a much bigger poster if I remember

15  correctly.  The key thing in the poster was the minimum wage.

16  The Fed poster, I remember it clearly because it's part of my

17  nature of my job is overtime is for anything hours worked over

18  40 hours.  Anu in the first place was never hired to work

19  overtime.  The New York State poster, which is a one-pager,

20  talked about the same thing.  It had a minimum wage on it and

21  it also said that if you work for residential or household, I'm

22  not sure of the exact word, it said 44 hours.  Anything you

23  worked over 44 hours would be considered overtime.

24  Q.  And it said that on the New York State poster?

25  A.  That is correct.

C52FUPAH                        N. Sethi - cross

 1    Q.  And if you worked anything over 44 in the home.

 2    A.  If you worked for anything in the home for over 44 hours it

 3    was considered overtime.  But overtime was never an issue

 4    because we never hired Anu to work overtime.  I think she made

 5    it very clear that she worked, she was doing a lot of massages

 6    and all the income she reported from the massages there's no

 7    way she could have been working overtime for us and manage the

 8    massage business as well.

 9              MS. TUMARINO:  Your Honor, I'm going to move to strike

10    the last answer.  It's not responsive.

11              THE COURT:  Granted.

12    Q.  The federal overtime was bigger.  What does that mean

13    bigger?  What size was it?

14    A.  I said the federal poster was bigger, not the overtime.

15    Q.  I'm sorry I misspoke.  The federal poster was bigger.  How

16    big was it?

17    A.  If I remember correctly it was this big by this big.

18    Q.  So about three feet by two feet?

19    A.  Sounds about right.

20    Q.  Three feet wide by two feet high?

21    A.  Yes.  Because I remember folding it and putting it back in

22    a folder.

23    Q.  And the New York State poster you described as a one-pager.

24    Was that in --

25    A.  Yes, standard --

C52FUPAH                          N. Sethi - cross

1   Q.  Eight and a half by eleven piece of paper?

2   A.  Yes.

3   Q.  And you said you don't remember who sent them to you?

4   A.  I don't remember exactly.  They probably came from the

5   State.  Or if I ordered them from a separate place I'm not

6   sure, I don't remember the exact details.  That was a very long

7   time ago.  Over ten years ago.

8   Q.  Did the posters come from the same place?

9   A.  No.

10  Q.  They came separately?

11  A.  They came separately.  They came at separate time because I

12  remember those we had two separate discussions then the posters

13  came.

14  Q.  You stated that you didn't know you had to post it in your

15  home, is that right?

16  A.  That is correct.

17  Q.  You mentioned a minute ago that you had two separate

18  discussions when the posters came.  Can you describe for me

19  when did the first discussion happen?

20  A.  I think the first discussion probably happened, it's

21  probably late 2001 or early 2002.  Both those discussions

22  happened within three months of each other.  And I can go into

23  the discussions if you like.

24  Q.  Just not yet.  And the second discussion, when did that

25  happen?

1    A.  I said within three months.

2            MS. McKENNA:  Asked and answered.

3    Q.  So somewhere in early 2002, is that fair?

4    A.  Yes.

5    Q.  And where were you seated during the first -- where were

6    you during the first --

7    A.  On both places I was sitting on my dining table, because I

8    spread them out on my dining table for her.

9    Q.  And on the first, during the first discussion, you're at

10   the dining table, what time of day?

11   A.  It was in the evening, pretty late in the evening, about 7,

12   7:30 around there, because I would probably get home around

13   that time.

14   Q.  Was this before dinner or after dinner?

15   A.  I don't know.

16   Q.  Was anyone -- who was present during this conversation?

17   A.  It was Anu and me.

18   Q.  And the first discussion, did you translate one of the wage

19   hour notices in the first discussion?

20   A.  Yes, I did.

21   Q.  And which one was that?

22   A.  It was, I believe the federal one.

23   Q.  And you were looking at the notice as you translated it?

24   A.  Yes.

25   Q.  And you translated it into Hindi, is that correct?

1    A.   That is correct.

2    Q.   Did you translate everything on the notice?

3    A.   No.   There were a lot of unrelevant sections in there that

4    I did not translate.   The only thing I translated was what

5    minimum wage she was entitled to and what the overtime

6    conditions were.

7    Q.   And what were the overtime conditions?

8    A.   That if she worked -- on the federal one, if I remember

9    correctly, it is over 40 hours.   If she worked over 40 hours.

10   I remember this very clearly, because I told Anu, in this

11   country, I said -- I can speak in Hindi if you like and I can

12   translate --

13   Q.   I don't understand Hindi.

14   A.   So the gist in English is see what they do in this country,

15   they actually, all employers, businesses have to put a notice

16   up that shows what the minimum wage is.   I said can you ever

17   imagine something like that in India?   Because that's something

18   typically they don't have that in India.   And I remember saying

19   that this was the -- when I explained the federal one, I said

20   this is the central government, because she understands that,

21   or part of the government and she also understands state

22   government because she understands states like Maraj (ph),

23   Garav (ph), so the New York State ones I explained that to her.

24   Q.   Was that part of your second conversation?

25   A.   The state government was the second conversation.   Also in

1    the first conversation when I explained the IRS poster to her I

2    told her this is from the Fed or the central government and the

3    states have different requirements.  And I remember her

4    response also being I don't understand any of this, why are you

5    telling me all of this.

6    Q.  You say you recall on numerous occasions explaining the

7    wage hour laws including minimum wage and overtime to Anu,

8    correct?

9    A.  That is correct.

10   Q.  And other than -- why did you explain it on numerous

11   occasions?

12   A.  Because she brought up her wages on so many occasions.  She

13   would talk to nannies, she'd say so-and-so is making so much,

14   so-and-so is making so much and I also remember having a

15   discussion with her explaining the difference between a live-in

16   rate and a live-out rate.  She's very, very money minded.

17   Q.  You also state that you tried to show her she was making

18   more than the minimum wage before taking any allowances for

19   meal and lodging, correct?

20   A.  That is correct.

21   Q.  So is it fair to say that if you hadn't been, if -- so is

22   it fair to say you were taking meal and lodging allowances?

23          MS. McKENNA:  Objection.

24   A.  Absolutely not.

25   Q.  You were not taking meal and lodging allowances?

1   A.   No.   I was saying those are just benefits on top of that.

2   Q.   Did you also pay for Workers' Compensation while

3   Ms. Upadhyay was employed by you?

4   A.   I don't remember exactly, but I remember paying the

5   unemployment -- I'm not sure if it included Worker's Comp or

6   not, I can't recall.

7   Q.   Did you pay disability insurance for Ms. Upadhyay?

8   A.   I don't know.   I'll have to check with the accountant and

9   see what was all on there.   I don't remember the exact facts.

10  Q.   So your accountant handled this for her?

11  A.   No, he did not handle that for me.   I sent the checks after

12  when I was employed -- when she was employed by us.   I sent the

13  checks, I made the, what do you say, the payments to the

14  State -- yes, my accountant did send me the forms, correct.   I

15  do recall that now.   I still have some of those forms.   Even

16  though the State would send you the booklet, here's the minimum

17  amount you have to do, but my accountant would file my

18  quarterly wage payments I had to pay for Social Security

19  Medicare and unemployment.

20  Q.   When Ms. Upadhyay worked for Shikha Sethi she gave you cash

21  for her taxes, correct?

22  A.   Never.   Anu has never given me a dime till today.   Not even

23  one dime.   And the fact that you say that she paid for my --

24  Q.   There's no question pending right now.   You've answered the

25  question.

1          I'd like you to turn to Defendant's Exhibit 5, please.

2     Do you recognize this document?

3     A.  Yes, I do.

4     Q.  And can you describe for us what it is?

5     A.  It's a document that was created approximately in about

6     March, April of '06.  It was when Anu was complaining about

7     some of the checks that were given by Shikha.  She was

8     complaining that Shikha hadn't paid her all the money, and so

9     she asked me to do a reconciliation that can you show me that

10    all the checks that Shikha has given have been deposited in the

11    account, and so I went and asked my wife to actually go get

12    bank statements from Sovereign Bank, that's where the original

13    account was, and then she also got bank statements from Chase.

14    I remember she having to go and pay five dollars a statement

15    for every statement she had to go get from Sovereign Bank, and

16    basically I showed how her balance built up and I showed it on

17    one page, the idea was on one page I could show her all the

18    checks given to her by Shikha were actually deposited in the

19    account.  I could show her how much interest she had earned and

20    I could also show how much interest she earned when we moved

21    her over to the Chase account.

22    Q.  Anu started working for Shikha Sethi in or about

23    November 2003, correct?

24    A.  That's about right.

25    Q.  Are there any other pages to this document other than the

1    two that are in Defendant's Exhibit 5?

2    A.   That is it.   The only other things that was along with this

3    was actual copies of all the bank statements, because I gave

4    the second page on Exhibit 5 and the bank statements to Anu.

5    She said she wanted them.   I said absolutely, you can have

6    them.

7              MS. TUMARINO:   I'm going to move to strike the last as

8    non-responsive.   The second half of the answer.

9              MS. McKENNA:   Objection, your Honor.   I think he was

10   asked is there any other part of this, he said there are

11   statements that back it up.

12             THE COURT:   I'm going to deny that.

13   Q.   On the first page D000117, do you see there's a little

14   snapshot where it says Anu XLS properties at the upper left,

15   correct?

16   A.   Yes.

17   Q.   And there are two columns there, the bottom column where it

18   says "origin," do you see that?

19   A.   Don't have my glasses with me.

20   Q.   It's hard to read.

21   A.   Yes.   I see that.

22   Q.   It says date last saved, 5/30/2007, 11:56 a.m.   Do you see

23   that?

24   A.   Yes.

25   Q.   And there's a check next to that date last saved box.   Do

1   you see that there?  There's some kind of mark in the box,

2   there are marks on some of the boxes in the far left?

3   A.  I see some marks.  There appear to be marks in a lot of the

4   boxes.

5   Q.  Do you know what those mean?

6   A.  I have no idea.

7   Q.  Next to that it says date created, do you see that?

8   A.  I see that also.

9   Q.  3/25/2006?

10  A.  I believe so.

11  Q.  And that box is not checked?

12  A.  That is correct.

13  Q.  You don't know what that means?

14  A.  No idea.

15  Q.  Now, this summary begins in December of 2004, correct?

16  A.  That is correct.

17  Q.  And you say that you looked at Ms. Upadhyay's Sovereign and

18  Chase Bank statements in creating this statement, correct?

19  A.  That is correct.

20  Q.  You input the information you found on the bank statements

21  and put it into this document?

22  A.  That's correct.

23  Q.  You personally did that?

24  A.  Correct.

25  Q.  The first entry is December 31, 2004, correct?

1   A.  That is correct.

2   Q.  And you reflect a $4,000 deposit.

3   A.  That is correct.

4   Q.  Was this in her Sovereign account or her Chase account?

5   A.  That is the Sovereign account.

6   Q.  Could you please turn to Defendant's Exhibit 3?  And turn

7   to page D000036.

8   A.  36?

9   Q.  Yes.

10  A.  Yes.

11  Q.  And that's the statement for November 2004 to

12  December 2000 -- December 16, 2004, correct?

13  A.  That is correct.  From November 17 to December 16.

14  Q.  Okay.  And there are no deposits in that time, right?

15  A.  Not in that time, but the next month from December 17 to

16  January 17 of '05 there is there is a deposit of 4,000.

17  Q.  And that's reflected in your spreadsheet here in the top

18  row, right, for December 31, 2004?

19  A.  That's right.

20  Q.  There's also some interest she earns in that time period,

21  right?

22  A.  There is some interest, yes.

23  Q.  On December 16 she earned $12.16 and then on January 14 she

24  earned $16.37?

25  A.  That's right.

C52FUPAH                    N. Sethi - cross

1   Q.  The next entry for January '05 reflects $4,000 into her

2   account.  Can you tell me what the source of that information,

3   where the source of that information comes from?

4   A.  Right now I don't remember.  I'll have to go through all

5   the records and see what happened.

6   Q.  Well, this is January 14, 2005, correct?

7   A.  So I think that actually came from a deposit on March 7th,

8   '05.

9           MS. McKENNA:  D000045.

10  Q.  So is it fair to say that's a typographical error in your

11  spreadsheet, that that should correspond to March '05?

12  A.  That is correct.

13  Q.  And the, she earned some interest in February of '05,

14  correct?

15  A.  Yes.

16  Q.  And the interest you have on your spreadsheet is $14.70,

17  correct?

18  A.  Yes.  I was trying to be not exact.  It was 14.86, I put

19  down 14.70, yes.  I was trying to get to the gist of it and not

20  worrying about pennies.  Her concern was about thousands of

21  dollars, six to $7,000 was the original complaint, so I was

22  trying to get to that so I wasn't focused on the pennies.

23  Q.  I understand.  Where did you arrive at the interest numbers

24  here?

25  A.  I used the interest numbers from the bank here.  It says

C52FUPAH                         N. Sethi - cross

1    14.86.  I put down 14.70.  I didn't think there was a

2    difference of 16 cents.

3    Q.  So you rounded down to 14.70?

4    A.  No, they're not rounded numbers.

5    Q.  On March 14 of '05 it says 15.10 is the interest on your

6    spreadsheet, D000118.

7    A.  So I probably made up the difference between February,

8    because if you look at the actual statement in March it says

9    14.47, so I probably covered up for the other ones by being

10   conservative.

11   Q.  And then is it fair to say you did the same thing the

12   following month?  Where the interest is --

13           THE COURT:  I don't think this case is about interest

14   earned, so we need to move this along.

15           MS. TUMARINO:  Certainly.

16   Q.  If you'll turn to January, turn to Defendant's Exhibit 4,

17   the first page, D000075.

18   A.  Yes.

19   Q.  It reflects there on your spreadsheet, it reflects a $3,200

20   deposit, is that right?

21   A.  It does.

22   Q.  And what is the date of that deposit?

23   A.  1/24.

24   Q.  And is that, the 3200 on your spreadsheet, does that belong

25   with January of '06?

C52FUPAH                          N. Sethi - cross

1    A.  What you're referring to as D00075 is not Anu's account.

2    Q.  It's not?

3    A.  I'm not sure.  I can't read the account number on that.  I

4    don't see Anu's name on it.

5    Q.  Well, it's account number 100612826001.  The name on the

6    account is Ronica Sethi.  And the next few pages all pertain to

7    the same account with the same name, Ronica Sethi and the same

8    account number.

9    A.  Because I remember the statement that came in Anu's name

10   used to be on that account.

11            MS. McKENNA:  You have to wait for a question.  We

12   don't have a question yet.

13            THE WITNESS:  Sorry.

14   Q.  So you're saying that the statement that we're looking at,

15   D000075 is not Anu's account?

16   A.  I don't know.  I remember seeing Anu's statement with Anu's

17   name on the account, and I would see Ronica's name on that

18   account as well.

19            THE COURT:  Counsel, can we get a little clarification

20   here?

21            MS. TUMARINO:  This is the joint account that was held

22   between --

23            THE COURT:  Right.  I think it is.

24            MS. TUMARINO:  Doesn't have the same account --

25            THE COURT:  You know what, we'll move faster if

C52FUPAH                    N. Sethi - cross

1    counsel pops up and tells the witness it's the same number.

2                MR. ALLOY:  I direct your attention to page D000084.

3    Does that refresh your recollection that the account number of

4    the joint account with Ronica Sethi and Anu Upadhyay is the

5    same account number as D000075, which is just in Ronica Sethi's

6    name for that month?

7                THE WITNESS:  Yes.  Yes, it does.

8                THE COURT:  Thank you.

9    Q.  You stopped keeping the spreadsheet at the end of May of

10   2007, is that correct?

11   A.  That's correct.  That's the last time I made any changes to

12   it.

13   Q.  When Shaku filed the lawsuit against the Chellarams, did

14   you have a conversation with the Chellarams about it?

15   A.  Me personally, no.

16   Q.  You state that Ms. Upadhyay brought up the lawsuit with you

17   on numerous occasions, is that right?

18   A.  That is correct.

19   Q.  And when did she bring it up with you?

20   A.  She would bring it up when she was giving me a massage.

21   Q.  When she was what?

22   A.  Giving me a massage.

23   Q.  And approximately when was this?

24   A.  I don't remember the exact dates.

25   Q.  Was she working for you at the time?  Was she living and

1  working for you at the time?

2  A.  I don't think so.

3  Q.  And what did you discuss about the lawsuit?

4  A.  Oh, she told me, you know, what Shaku had done was so

5  wrong, that it was a false claim, and she even mentioned that

6  when the claim had settled, Shaku had gotten I think a

7  settlement of about $90,000, I think approximately, she said

8  90,000, (Hindi) is the word she used.  90,000.  And she didn't

9  agree with what Shaku was doing.

10 Q.  What did you agree to pay Ms. Upadhyay when she first came

11 to work for you in December of 1998?

12 A.  We agreed to pay her a thousand dollars.

13 Q.  How often?

14 A.  A month.

15 Q.  The checks you sent to India for Ms. Upadhyay's family that

16 were intended as her wages, did you personally write out those

17 checks?

18 A.  Absolutely.

19 Q.  All of them?

20 A.  All of them.

21 Q.  And to whom were the checks made payable?

22 A.  They were either made to her son Ashok Upadhyay, or her

23 husband, Kashi Prasad Upadhyay.  Because that was the only two

24 names that was on the piece of paper.

25 Q.  And how did you determine to whom the checks would be made

1   payable?

2   A.  She would tell me when to send the checks and to whom to

3   send the checks.

4   Q.  Did you show these checks to Ms. Upadhyay?

5   A.  Absolutely.  I would show her exactly what I was sending as

6   a check and I would show her the corresponding entry in the

7   ledger as well.

8   Q.  Did you give Ms. Upadhyay a copy of the ledger?

9   A.  She had access to the ledger.  She could see it any time

10  she wanted to, and there were many times she asked to see it.

11  Because she wanted to know how much balance she had because

12  that's how she knew how much money she could send to India.

13  Q.  The balance was what she was owed at any given time?

14  A.  Yes, that was what the remaining balance was that she asked

15  us to keep for her.  Because any time you offered to pay her

16  cash she would not accept that.  She said I don't know what to

17  do with it, I don't know where to keep it, I don't have a bank

18  account.

19  Q.  She would not accept cash from you?

20  A.  There were some times when she accepted cash.  I remember

21  very clearly when her salary was raised to 1200 shortly after

22  she started for us, she said her plan was to send every three

23  months or so the money and sometimes she would ask in the

24  middle of the month for the weekend she would say give me some

25  money.  I would say how much do you want.  Sometimes 200,

1   sometimes 300.  Whatever she wanted I would give her.

2   Q.  And then you kept track of how much she was, she had left

3   to be paid in the ledger?

4   A.  Absolutely.  There's a running balance.

5   Q.  You corresponded with Ms. Upadhyay's son by e-mail when it

6   came to transferring money to their accounts, correct?

7   A.  My wife did.

8   Q.  You didn't correspond with him by e-mail?

9   A.  In some cases, the last transfer my wife did.  In some

10  original cases yes, I did.  I remember very clearly because he

11  even sent me his resume.

12  Q.  When was the correspondence that you had with him by

13  e-mail?

14  A.  From 2001, 2002, if I remember correctly.

15  Q.  You were working at Predictive Systems at this time?

16  A.  In 2001 to 2002 I was not working, actually.  I left

17  Predictive Systems in April of 2001.  Rejoined them in May,

18  June of 2002.

19  Q.  So you e-mailed with him in 2001 and 2002, is that what you

20  said?

21  A.  I believe so.

22  Q.  And you were not working at all at this time?

23  A.  In 2001 from March -- April 1, 2001 I did not work, that is

24  correct.  I was only doing some independent consulting.

25  Q.  And it was in these e-mails that he sent to you in 2001 to

1   2002, he asked you to transfer money to his account?

2   A.  I think it was 2001-2002 or could be even later, but

3   definitely he send me bank account information and he asked me

4   to send wires to them because the checks were taking a very

5   long time to clear.

6   Q.  So he requested that you switch to sending wire transfers?

7   A.  That is correct, and I would explain to Anu that the wires

8   would be a lot more expensive, it would cost approximately 25

9   to $50, I don't remember which one, it was either 25 to 50 to

10  send a wire.

11  Q.  And who paid for the costs associated with sending money by

12  wire transfer?

13  A.  I did.

14  Q.  It didn't come out of Ms. Upadhyay's wages?

15  A.  No, it did not.  She did so much for us.  She was taking

16  care of our most precious assets, our children.

17  Q.  In this time of 2001 through 2002 did he also correspond

18  with Ronica by e-mail, do you know?

19  A.  I don't know.

20  Q.  And do you still have the e-mails that Ashok sent you in

21  2001 and 2002 about wire transfers?

22  A.  I think I put it in my affidavit, I do not.  Because those

23  are different e-mail addresses that I don't have access to

24  anymore.

25  Q.  Why don't you have access to them anymore?

1  A.  Because a lot of times the company, either the company I

2  was working for, the company changes, you can't access those or

3  if your cable provider changes, which has happened multiple of

4  time, you lose connectivity, your e-mail address goes and they

5  give you a new one whoever takes it over.  I remember we had a

6  connection RCN which was taken over by Comcast, which we

7  decided to change to FIOS, three different e-mail addresses.

8  At that time I decided to move to an independent e-mail address

9  of Yahoo which I don't have to worry about changing.  Because

10  in New York City we had an e-mail address of Time Warner.  I'm

11  trying to remember correctly, that was Time Warner New York

12  City who was the cable provider.

13  Q.  You testified that when Ashok wrote to you in 2001 to 2002,

14  you weren't working at the time, is that right?

15  A.  I'm sorry, say that again?

16          MS. McKENNA:  We just went through this, your Honor.

17          MS. TUMARINO:  I'm just clarifying.

18  Q.  You testified you weren't working when Ashok e-mailed you

19  in 2001 to 2002?

20  A.  I did not say that.  I said I did not work from April 2001

21  to about May, June of 2002 is what I said.

22  Q.  And it was during that period --

23  A.  I didn't say that.  I said Ashok first sent me an e-mail

24  around 2001, maybe 2002.  I'm not sure exactly when.

25  Q.  Do you know what account he sent it to?

 1   A.  I'm sorry?

 2   Q.  Do you know what account he sent these e-mails to?

 3   A.  I don't know.  So long back.

 4   Q.  You said in your affidavit that when one of Ms. Upadhyay's

 5   sons went to prison she asked for money to be sent to India to

 6   bail him out.  Did she ask you personally?

 7   A.  Yes.

 8   Q.  And did you send money?

 9   A.  Absolutely.

10   Q.  Were those her wages?

11   A.  Absolutely.

12   Q.  Do you recall how much you sent?

13   A.  I don't.

14   Q.  She also told you that her family was rebuilding a house

15   that was damaged and she needed money.  Did she ask you

16   personally to send money?

17   A.  Yes.  Every time I send money to her husband or her son was

18   only upon her request.

19   Q.  And so in that specific instance when her house was damaged

20   she personally asked you to send money?

21   A.  That is correct.

22          THE COURT:  I think there's confusion.  Is it that he

23   is sending her wages her that he is making a personal

24   contribution to the repair of the house?

25   BY MS. TUMARINO:

1  Q.  These are her wages, correct?

2  A.  Only her wages.

3  Q.  But she personally asked you to send the money?

4  A.  That is correct.

5  Q.  Do you remember the amount you sent?

6  A.  So far back, I don't.

7  Q.  Just to be clear, can you turn to Defendant's Exhibit 11?

8  A.  Yes.

9  Q.  This is an e-mail sent first to Ronica and then forwarded

10  to you, correct?

11  A.  That is correct.

12  Q.  And it's from Ashok, the plaintiff's son?

13  A.  That is correct.

14  Q.  Asking that money be wired into an account for plaintiff in

15  India with Citibank?

16  A.  That is correct.

17  Q.  So this is not an e-mail about transferring money to the

18  plaintiff's family, correct?

19  A.  This was the final balance transfer for Anu Upadhyay's

20  account.

21  Q.  You had two titles with Predictive Systems, correct?

22  A.  That is correct.

23  Q.  And from 1995 to 2001 you were the vice president of

24  finance, right?

25  A.  That is correct.

C52FUPAH                         N. Sethi - cross

1  Q.  And what was the size of Predictive Systems at that time?

2  A.  From '95 to 2001.  In 2001 we were probably at our peak.

3  We did about $80 million in revenues.  In 2000 and 2001 we did

4  about $80 million in revenues.

5  Q.  $8 million in revenues?

6  A.  80.  Eight-zero.

7  Q.  And how many employees?

8  A.  We had over 700 employees in over eight offices in the U.S.

9  and three international offices.

10 Q.  And from 2002 to 2003 were there approximately the same

11 number of employees in offices?

12 A.  No.  The number of offices were the same, but the number of

13 employees were being reduced dramatically.

14 Q.  And when you were vice president of finance, you were

15 responsible for overseeing accounting finance and human

16 resources functions of the company, is that right?

17 A.  That is correct.

18 Q.  And how many people worked in the accounting department?

19 A.  About eleven.

20 Q.  And in the finance department?

21 A.  That's the finance and accounting is the same.

22 Q.  Same department.

23 A.  And the human resources department.  We had about two

24 people in human resources and we had about six recruiters which

25 was also part of human resources.

1  Q.  So eight?

2  A.  Yes.

3  Q.  And what were the titles of the, other than the recruiters,

4  the title of the two other people in human resources?

5          MS. McKENNA:  Objection.

6          THE COURT:  Aren't you going a little far afield here?

7  Q.  Is it your testimony, Mr. Sethi, that you were personally

8  responsible for insuring that all of the company's offices had

9  the relevant wage hour posters?

10 A.  That is correct.

11 Q.  And in that capacity you were personally responsible for

12 seeing to it that they were installed somewhere on the walls?

13 A.  That is correct.

14 Q.  And that was your responsibility as vice president of

15 finance and as the chief financial officer of Predictive

16 Systems?

17 A.  That is correct.

18 Q.  Where were the eight offices?

19          MS. McKENNA:  Objection.

20          THE COURT:  Sustained.

21 Q.  Was it an international company, Predictive Systems?

22          MS. McKENNA:  Objection.

23          THE COURT:  Sustained.

24          MS. TUMARINO:  If I could just have a minute, I think

25 I might be done.

 1          (Pause)

 2          MS. TUMARINO:  I have a few additional questions.

 3  Q.  In your affidavit you mention that your wife Ronica and

 4  yourself undertook an extensive review and analysis of Anu's

 5  bank records in June 2007.  Is that right?

 6  A.  We have a time frame wrong.  What we did was '06 we started

 7  it and we ended that analysis in May of '07.

 8  Q.  When in 2006 did you start?

 9  A.  I think it's about March, April time frame.

10  Q.  And why did you do this analysis?

11  A.  Because, I think we just went over this.  Anu asked why, to

12  check to see if all the checks that she had gotten from Shikha

13  were deposited, if she had been paid all the money Shikha owed

14  her on an annual basis were there and I told her all I can do

15  is verify the checks, I can't account for any cash that was

16  given to you or for any wire transfers that Shikha may have

17  made on your behalf.  All I can account for is all the checks.

18  Q.  So she asked you sometime in March or April of 2006 to make

19  an accounting for checks from Shikha?

20  A.  She started complaining, she said I don't think I received

21  all the money from Shikha.  There's some money she felt she was

22  missing, I think it was in the six to $8,000 range and she said

23  can you help me out with this, so I sent my wife to the bank.

24  That's how my wife was involved.  She helped me get all the

25  bank statements, we paid $5 per statement for each Sovereign

C52FUPAH                         N. Sethi - cross

Bank statement we had to get reprinted.  We even got some of

the Chase Bank statements and then I created the spreadsheet we

went through.

         MS. McKENNA:  Your Honor, we went through this

testimony at great length.  At this hour I don't know what

we're doing here.

Q.  When did you first show this spreadsheet to plaintiff?

A.  I showed it to the plaintiff I think in the fall.  I also

showed it --

Q.  In the fall of 2006?

A.  Of '06.  I also gave her a copy with all the bank

statements sometime in '07.  I think this is probably after I

finished the analysis, it was probably June of '07 when I gave

her all the back statements and the spreadsheet, because that

would have been when I completed the analysis.

Q.  You state in your affidavit, paragraph 14, that there's a

time stamp on your analysis that shows you performed the

analysis and reconciliation of payments to Anu on May 30, 2007.

         MS. McKENNA:  We've already questioned the witness

about this date, your Honor.  We went through this.  Why is the

box checked, why is not the box checked.  It is now ten to six,

your Honor.  I don't know what we're accomplishing.

Q.  Do you remember what day of the week it was when you showed

this to Anu?

         MS. McKENNA:  Objection.

1         THE COURT:  Yes.  Sustained.  Come on.

2   Q.  Is the basis of your conclusion that Ms. Upadhyay could add

3   and subtract the fact that she would bring change home from the

4   grocery store?

5   A.  More than that.  She would also count, because there were

6   times she asked for money I gave her money and she counted it.

7   Q.  A child learns to count before they learn to add and

8   subtract, isn't that right?

9   A.  I don't know.

10  Q.  You say for someone who allegedly cannot read and write she

11  was still able to maintain a phone book.

12  A.  That is correct.

13  Q.  Anu can write numbers, correct?

14  A.  She can also write letters.  Also in her testimony earlier

15  today, or yesterday, she spoke a lot of English words in her

16  testimony.  Words like "confused," words like "left" and

17  "right," words like "different," and there were a lot more.

18  And also in that testimony she would answer the questions

19  before the interpreter finished.

20  Q.  You say in your affidavit that over the telephone Shikha

21  provided you with all her employment pay records from the time

22  that Anu worked with them, is that correct?

23  A.  Can you read that for me, please?

24         THE COURT:  Which affidavit are you referring to?  And

25  which paragraph.

1   Q.  The first paragraph 14.  There are two paragraph 14's in

2   the April 16, 2012 affidavit.  The first paragraph 14 towards

3   the bottom of page 6.  "Shikha provided us by phone with their

4   employment rate pay records to Anu, month by month paychecks,

5   transfers, etc., which we then compared to the bank statements

6   showing the deposits of those checks."

7   A.  That is correct.

8   Q.  Did this conversation take place during one of Anu's visits

9   to you?  The phone conversation with Shikha.

10  A.  I don't believe so.  It was during when we were doing the

11  analysis.

12  Q.  And so you got all of the records from Shikha over the

13  phone?

14  A.  Yeah.  I wanted to know what checks.  I just wanted to make

15  sure what checks did she write so I could correspondingly make

16  sure those checks were deposited.

17  Q.  How long was that phone call?

18  A.  I don't remember.

19          MS. McKENNA:  Objection.

20          THE COURT:  Sustained.

21          MS. TUMARINO:  I don't have anything further.  I do

22  have some objections to hearsay argument in the affidavit which

23  I should make now before the witness is excused.

24          THE COURT:  Sure.

25          MS. TUMARINO:  Paragraph 2 is irrelevant.

C52FUPAH                          N. Sethi - cross

1              MS. McKENNA:  Which affidavit?

2              MS. TUMARINO:  I'm using the April 16, 2012 affidavit.

3              MR. ALLOY:  You're saying all of paragraph 2 is

4    irrelevant?

5              MS. TUMARINO:  It's irrelevant to the issue of

6    tolling.

7              THE COURT:  You asked about when she first came to

8    work, so you asked questions about this so I'm not going to

9    strike it.

10             MS. TUMARINO:  The first sentence of paragraph 3 is

11   argument.

12             MS. McKENNA:  Earlier, your Honor, you with respect to

13   the plaintiff when I objected to a similar question said it's

14   the equivalent of in the plaintiff's case, I forget if it was a

15   yes or a no and I think this is an equivalent of a denial of

16   what's being referred to in the plaintiff's affidavit.  Not

17   affidavit.  Plaintiff's statement.

18             THE COURT:  I recognize how it's phrased, but the

19   bottom line is, and we can clarify it and just ask did you get

20   the --

21             MS. McKENNA:  Your Honor, he testified to it, your

22   Honor.

23             THE COURT:  Then that's it.  There's nothing to --

24   this is a waste of time.

25             MS. TUMARINO:  The last sentence of paragraph 3 is

C52FUPAH                    N. Sethi - cross

1   hearsay.

2               MS. McKENNA:  Counsel asked questions about this

3   herself on cross-examination.  She's waived any objection to

4   that.

5               MS. TUMARINO:  Not with respect to Ashok's e-mails to

6   Shikha and Ganesh.

7               MS. McKENNA:  Yes, you did.  Oh, not Ganesh.  He says

8   I know it, so that's not hearsay either, by the by.

9               THE COURT:  Overruled.  Go ahead.

10              MS. TUMARINO:  The last sentence of paragraph 7 is

11  argument.

12              MS. McKENNA:  I don't think that's argument at all,

13  your Honor.  It's an explanation.

14              THE COURT:  It's an argument that anyone can make,

15  whether it's here or not.  So let's just go on.

16              MS. TUMARINO:  Paragraph 17.  We object to the first

17  sentence on the grounds of relevance and opinion.

18              MS. McKENNA:  It's the predicate for what follows,

19  your Honor.

20              MS. TUMARINO:  It's also speculation.  Same thing with

21  the second sentence.

22              MS. McKENNA:  It's an opinion.  Second sentence

23  doesn't say it's speculation.  It states a fact.  The witness's

24  knowledge --

25              MS. TUMARINO:  I'm sorry, the third sentence, "With

C52FUPAH                         N. Sethi - cross

1    the financial crisis of 2008 I believe her massage business may

2    have dried up as well."

3             THE COURT:  Let's just do it this way.  Did Anu

4    explain to you or give you a reason for asking to resume

5    working for you in early 2008?

6             THE WITNESS:  Yes.  She was having a hard time

7    maintaining a job.  She was working for a family in Hillsboro

8    that didn't last more than two months.  She actually came to us

9    and asked us if she could work for us.  I said there's no more

10   work for us, our children are older.  You're welcome to stay

11   with us, but we can't pay you.  We opened our home to her

12   because she was like family.

13            THE COURT:  My question was did she explain to you the

14   reason that she wanted to come back to work for you?

15            THE WITNESS:  She was definitely --

16            THE COURT:  Let me ask you.  Did she tell you about

17   the family in is Hillsboro?

18            THE WITNESS:  I actually picked her up from a common

19   place.  She called me from the family.  I was a reference for

20   that family.  I picked her up from a meeting place between

21   Hillsboro and Princeton because they're very close to each

22   other.

23            THE COURT:  Did she tell you that the job for the

24   family in Hillsboro had ended?

25            THE WITNESS:  No, she didn't say that, but she wasn't

1    comfortable with the job.  And with the Hillsboro job she said

2    her massages were not being as well, too.

3              THE COURT:  Motion denied.

4              MS. TUMARINO:  The last two sentences of paragraph 17

5    are argument.

6              THE COURT:  I understand that to be argument, but I'm

7    not striking it.

8              MS. TUMARINO:  I have nothing further, your Honor.

9              THE COURT:  Okay.

10             MR. ALLOY:  I have just two very quick questions, your

11   Honor, I'll be very quick.

12   REDIRECT EXAMINATION

13   BY MR. ALLOY:

14   Q.  What language do you speak to your children?

15   A.  English.

16   Q.  What language does your wife speak to her children?

17   A.  English.

18             THE COURT:  What language do your children speak to

19   each other?

20             THE WITNESS:  English.

21             MR. ALLOY:  This is Exhibit 25.

22   Q.  Before yesterday, prior to yesterday, had you ever seen --

23   that's a picture of Nahar Alam.

24             MS. TUMARINO:  Your Honor, I'm going to object.  This

25   is beyond the scope of my cross.

C52FUPAH                              N. Sethi - redirect

1               MR. ALLOY:  Well, this is in response to certain

2      direct affidavits that were put in by plaintiff which obviously

3      we didn't have an opportunity to address.

4               THE COURT:  Go ahead, just ask the question.

5      Q.  Prior to yesterday's appearance in court have you ever seen

6      Nahar Alam in your life?

7      A.  Never.

8      Q.  Was she ever in your apartment in New York City?

9      A.  Never.

10              MR. ALLOY:  That's it.  Thank you.

11              THE COURT:  We need to end.  What I would suggest is

12     that counsel confer about a date at which plaintiff's witness

13     can return and Ronica Sethi is available, and if you call in to

14     Andrew and give us some alternatives we'll let you know if they

15     work for us.

16              MS. McKENNA:  Thank you, your Honor.

17              MR. ALLOY:  Thank you, your Honor.

18              THE COURT:  You are excused, and so is the court

19     reporter, who has done yeoman work.  She'll have stories to

20     tell.

21              (Adjourned sine die)

22

23

24

25

1                              INDEX OF EXAMINATION

2     Examination of:                                Page

3     ANU UPADHYAY

4     Cross By Mr. Alloy . . . . . . . . . . . . . 148

5     Direct By Ms. Tumarino . . . . . . . . . . . 183

6     SHIKHA SETHI

7     Direct By Mr. Alloy  . . . . . . . . . . . . 198

8     Cross By Ms. Tumarino  . . . . . . . . . . . 204

9     Redirect By Mr. Alloy  . . . . . . . . . . . 254

10    Recross By Ms. Tumarino  . . . . . . . . . . 263

11    NEERAJ SETHI

12    Direct By Mr. Alloy  . . . . . . . . . . . . 276

13    Cross By Ms. Tumarino  . . . . . . . . . . . 277

14    Redirect By Mr. Alloy  . . . . . . . . . . . 319

15

16

17

18

19

20

21

22

23

24

25