UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ANU UPADHYAY,

                  Plaintiff,

       - against -

NEERAJ SETHI, RONICA SETHI, SHIKHA SETHI,
and GANESH RAJ,

                Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

10 Civ. 8462 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Anu Upadhyay has brought this action against defendants Neeraj Sethi ("Mr. Sethi"), Ronica Sethi ("Ms. Sethi," and, together with Mr. Sethi, the "Sethis"), Dr. Shikha Sethi ("Dr. Sethi"), and Dr. Ganesh Raj, alleging, inter alia, minimum wage and overtime violations of the Fair Labor Standards Act (the "FLSA") and New York, North Carolina, and New Jersey state law. Plaintiff seeks to recover for alleged violations extending as far back as 1998.

    On January 24, 2012, we issued an opinion in which we directed that a hearing be held on plaintiff's contention that the relevant statutes of limitations should be tolled until 2010, when plaintiff allegedly became aware of her cause of action. See Upadhyay v. Sethi, No. 10 Civ. 8462, 2012 U.S. Dist.

LEXIS 11054, at *19-23 (S.D.N.Y. Jan. 25, 2012).[1] That hearing was held over three days, on May 1, May 2, and May 25, 2012.[2] Plaintiff and three of the defendants testified, their direct testimony having been provided by affidavit.[3] In addition, Gulnahar Alam -- the former Executive Director of Andolan, a workers' rights organization focusing on the needs of South Asians in America -- testified on plaintiff's behalf. Together, the parties submitted over fifty exhibits as part of the proceeding, the vast majority of which were introduced by defendants.

Having conducted the hearing, we have encountered no difficulty assessing the equitable tolling issue without

---

[1] In that opinion, we held that, as long as we did not need to decide issues going to the merits that were properly reserved for the jury, we would be acting within our province in resolving the equitable tolling issue. See Upadhyay, 2012 U.S. Dist. LEXIS 11054, at *19-20 (citing, inter alia, Mandarino v. Mandarino, 180 F. App'x 258, 261 (2d Cir. 2006); Pauling v. Sec'y of the Dep't of Interior, 71 F. Supp. 2d 231, 233 (S.D.N.Y. 1999)); cf. Messa v. Goord, 652 F.3d 305, 309-10 (2d Cir. 2011). On April 3, 2012, plaintiff indicated her intent to petition the Second Circuit for a writ of mandamus vacating the order for an evidentiary hearing and requested an order to show cause why the hearing should not be stayed in light of that petition. In a memorandum and order dated April 4, 2012, we declined to issue the order to show cause. See Upadhyay v. Sethi, No. 10 Civ. 8462, 2012 U.S. Dist. LEXIS 50571 (S.D.N.Y. Apr. 5, 2012). Subsequently, on April 11, 2012, plaintiff petitioned the Second Circuit for a writ of mandamus to prevent us from holding a hearing on the tolling issue. On June 5, 2012, after the conclusion of the hearing, the Second Circuit denied plaintiff's petition as moot. (Docket no. 41.)

[2] Accordingly, citations to the transcripts of that hearing are designated "Hr'g Tr. 1," "Hr'g Tr. 2," and "Hr'g Tr. 3," respectively.

[3] Plaintiff relied on two affidavits and a declaration that she submitted at various times in this action (Aff. of Anu Upadhyay, dated July 13, 2011 ("First Upadhyay Aff."); Decl. of Anu Upadhyay, dated Nov. 18, 2011 ("Upadhyay Decl."); Aff. of Anu Upadhyay, dated Apr. 16, 2012 ("Second Upadhyay Aff.")), although, as discussed more fully below, she disavowed the signature on the declaration at the hearing (Hr'g Tr. 1 at 10:10-19).

reaching merits issues. Accordingly, we now rule that equitable tolling is not proper in this case and grant defendants' motion for partial summary judgment.

## DISCUSSION

### I.  Legal Standards

We begin by placing the issue of equitable tolling in its legal context. It is an extraordinary remedy to be used only sparingly. See Lanzetta v. Florio's Enters., Inc., 763 F. Supp. 2d 615, 622 (S.D.N.Y. 2011). Before a statute of limitations may be tolled, a court must determine both that the plaintiff exercised diligence in discovering her claims and that the defendants or some "extraordinary circumstances" prevented the plaintiff from bringing suit until she did.[4] Trans Union LLC v.

---

[4] Although we discuss primarily federal law, plaintiff has also asserted claims under New York, North Carolina, and New Jersey state law. These jurisdictions treat the relevant legal analysis similarly. See, e.g., Doe v. Holy See (State of Vatican City), 793 N.Y.S. 2d 565, 569 (N.Y. App. Div. 3d Dep't 2005) (equitable estoppel requires plaintiff to demonstrate due diligence in bringing the action and "acts by defendants that prevented [plaintiff] from timely commencing suit"); Chao v. Va. Dep't of Transp., 291 F.3d 276, 283 (4th Cir. 2002) ("[E]quitable tolling is appropriate when extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time. Equitable tolling is not appropriate, however, where the claimant failed to exercise due diligence in preserving his legal rights." (internal quotation marks and citation omitted)); Rink & Robinson, PLLC v. Catawba Valley Enters., LLC, 725 S.E.2d 426, 430 (N.C. Ct. App. 2012) ("The doctrine of equitable estoppel may be invoked to prevent a defendant from relying on a statute of limitations if the defendant caused the plaintiff to allow his claim to be barred by the statute of limitations." (internal quotation marks and alteration omitted)); N.C. Fed. Sav. & Loan Ass'n v. Ray, 382 S.E.2d 851, 855 (N.C. Ct. App. 1989) ("When a party is misled through his own lack of diligence and reasonable care, he may not then avail himself of the doctrine of equitable estoppel."); Murdock v. E. Coast Mortg. Corp., No. 10-4717, 2012 U.S. Dist. LEXIS 85428, at *19-21 (D.N.J. June 20, 2012) (refusing to extend equitable tolling to "garden-variety claims of excusable neglect" and holding that a plaintiff must "establish

<u>Lindor</u>, 393 F. App'x 786, 788-89 (2d Cir. 2010) (quoting <u>Walker v. Jastremski</u>, 430 F.3d 560, 564 (2d Cir. 2005)). Plaintiff bears the burden on both questions. <u>See</u> <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418 (2005).

For plaintiff to prevail on the due diligence prong, she must have exercised diligence in pursuing the discovery of her claim during the entirety of the period she seeks to have tolled. <u>See</u> <u>Smith v. McGinnis</u>, 208 F.3d 13, 17 (2d Cir. 2000). Thus, when a party has failed to acquire the knowledge or documents necessary to bring suit because of its own delinquency, equitable tolling is not an appropriate remedy.

For example, in <u>Walker</u>, the Second Circuit found equitable tolling inappropriate because the plaintiff had forgotten information underlying the suit, misplaced relevant documents, and delayed in asking for documents to refresh his recollection and therefore delayed bringing suit. 430 F.3d at 564. Other courts in this district have found, for instance, that an equitably tolled statute of limitations begins to run when the plaintiff "should have acquired [actual knowledge of the facts that comprise her cause of action] through the exercise of

---

that she exercised due diligence in attempting to uncover the relevant facts and preserving her claim" (internal quotation marks omitted)); <u>Bustamante v. Borough of Paramus</u>, 994 A.2d 573, 588 (N.J. Super. Ct. App. Div. 2010) (permitting equitable tolling only if plaintiff could demonstrate that she "had been induced or tricked by [her] adversary's misconduct into allowing the filing deadline to pass" (internal quotation marks and alteration omitted)); <u>Villalobos v. Fava</u>, 775 A.2d 700, 708 (N.J. Super. Ct. App. Div. 2001) (equitable tolling "requires the exercise of reasonable insight and diligence by a person seeking its protection").

reasonable diligence," Gustafson v. Bell Atl. Corp., 171 F. Supp. 2d 311, 323 (S.D.N.Y. 2001), and that a plaintiff who was told that the Human Rights Commission would get back to her about her claim was not reasonably diligent when she did not hear from the Commission and did not follow up for over seven months because she "was not misled into this complacency," Curtis v. RadioShack Corp., 190 F. Supp. 2d 587, 590 (S.D.N.Y. 2002).

The second element, that defendants or some extraordinary circumstance prevented plaintiff from exercising her rights, requires a significant showing. See Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 322 (2d Cir. 2004). An employer's failure to tell a plaintiff of her legal rights is not by itself sufficient to justify equitable tolling, see, e.g., Lanzetta, 763 F. Supp. 2d at 622-23; the employer or some other exceptional circumstance must have actually prevented the exercise of plaintiff's legal rights in some way. See, e.g., Goodman v. Port Auth. of N.Y. & N.J., No. 10 Civ. 8352, 2012 U.S. Dist. LEXIS 26401, at *31-33 (S.D.N.Y. Feb. 29, 2012) (citing, inter alia, Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003); Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). To hold otherwise would be tantamount to holding that the statute of limitations should be tolled in nearly every wage-and-hour case. Accord Jacobsen v.

<u>Stop & Shop Supermarket Co.</u>, No. 02 Civ. 5915 (DLC), 2004 U.S. Dist. LEXIS 17031, at *11-12 (S.D.N.Y. Aug. 30, 2004).

The two elements of equitable tolling are related as it cannot be said that an external cause prevented plaintiff from bringing her claim if her delinquency was due to her own failure to pursue her rights. <u>See</u> <u>Walker</u>, 430 F.3d at 564. Conversely, if no extraordinary circumstances prevented her from bringing her claim, her failure to do so must be due to her own lack of diligence. <u>Cf.</u> <u>Miller v. Int'l Tel. & Tel. Corp.</u>, 755 F.2d 20, 24 (2d Cir. 1985) (noting that an extraordinary circumstance would be one that made it "impossible for a reasonably prudent person to learn" of her cause of action).

## II.  <u>Plaintiff Failed to Act Diligently</u>

Plaintiff endeavors to portray herself as unaware of what she was being paid and of her legal rights, as well as being incapable of learning of those facts. While we reject that self-portrait later in this opinion, <u>see</u> <u>infra</u> Section III.B.2, in this section of our decision we focus on whether plaintiff had and failed to seize the opportunity to learn of these things -- i.e., whether she was diligent.

### A.  **Plaintiff's Diligence in Learning About Her Finances**

Insofar as plaintiff claims that she did not know how much money was being deposited into her bank accounts as wages, she was not being diligent. She has acknowledged that she was aware

she had the bank accounts. (E.g., Hr'g Tr. 1 at 52:21-53:13.)
Nevertheless, she specifically disclaims ever asking the Sethis
about deposit records. (First Upadhyay Aff. ¶ 8; see also Hr'g
Tr. 2 at 274:3-19; Hr'g Tr. 3 at 101:13-17.) Nor did she attempt
to get the records from Drs. Sethi and Raj or from the banks
themselves.[5] Plaintiff has also acknowledged that she saw the
checks representing her wages from Drs. Sethi and Raj.[6] (Hr'g Tr.
1 at 26:1-27:12, 35:7-9, 73:11-23.) She easily could have kept
track of the amounts of these checks or asked for copies of them
but failed to do so.

Similarly, plaintiff acknowledged that she was aware that
the Sethis had tax returns prepared and filed on her behalf
(Hr'g Tr. 1 at 101:5-10) and that she signed them on at least
one occasion (Hr'g Tr. 2 at 187:23-25). Thus, plaintiff could
have asked to see her returns in other years and kept track of
the income reported therein.

---

[5] Plaintiff's argument that she did not know such records existed is not
tenable. It is common sense that a bank must keep track of deposits, and
there has been no suggestion that plaintiff, who went shopping for defendants
on occasion (Aff. of Neeraj Sethi, dated Apr. 16, 2012 ("Mr. Sethi Aff."),
¶ 11), was unfamiliar with the concept of a receipt to document business
transactions. Although not essential to this conclusion, we also, as
discussed further infra, credit defendants' statements that they gave
plaintiff bank statements. (Id. ¶ 14; Hr'g Tr. 2 at 259:24-261:6, 295:25-
296:6, 313:7-15; Hr'g Tr. 3 at 100:11-102:4.)

[6] Although discussed at some length at the hearing, whether or not plaintiff
actually endorsed these checks is irrelevant for the purposes of equitable
tolling. Because she was given the checks, she had knowledge of their
existence; whether they bear her signature or someone else's is immaterial to
that fact, especially because she does not dispute that these checks were
deposited in her account (Hr'g Tr. 1 at 110:3-8).

Furthermore, it is undisputed that, at least on occasion, defendants would send money to plaintiff's family in India on plaintiff's behalf and at her request. To the extent plaintiff claims that she did not know how much of her wages these payments constituted, she was not being diligent. She made no effort to keep records of these transfers. Moreover, she has acknowledged that she was permitted to speak to her family, and she could have asked them about the amounts and frequencies of the transfers but did not. On the one occasion she claims she did ask whether a transfer was made, she did not ask about its amount. (Second Upadhyay Aff. ¶ 2.) Additionally, plaintiff indicated that she traveled to India in September 2007 (Am. Compl. ¶ 56), and she could, and should, have inquired of her family about the transfers then. The fact that plaintiff was aware of delays in depositing checks representing her wages sent to India by Drs. Sethi and Raj (Hr'g Tr. 1 at 59:11-60:7) indicates that she was fully capable of apprising herself of these matters.

In sum, plaintiff's failure to make any effort to utilize the readily available means to track her earnings, particularly in the absence of any claim that any defendant ever refused to respond to a question about her earnings, is simple neglect and can be attributed to nothing more than a lack of diligence.

### B.   Plaintiff's Diligence in Learning About Her Legal Rights

Plaintiff's explanation that she did not bring suit earlier because she was unaware of her legal rights succumbs to the same diligence problem: she had numerous readily available opportunities to learn about those rights. First, she associated with members of Andolan, which specifically educates workers about their wage and hour rights. (Defs.' Ex. 15, Andolan Website ("You have the right to be paid minimum wage . . . and overtime. You have the right to be paid in U.S. dollars every two weeks."); Hr'g Tr. 3 at 6:7-7:1.) In particular, she knew Alam, Andolan's Executive Director, whom it is acknowledged plaintiff saw multiple times throughout her employment, including in 1998 or 1999, again in 1999, and in 2003. (Decl. of Gulnahar Alam ("Alam Decl.") ¶¶ 4, 7, 8; Hr'g Tr. 2 at 156:23-158:2.) Plaintiff also met with members of a workers' rights organization, one of whom was purportedly Alam, and discussed the conditions of her employment at the beginning of her time with the Sethis. (First Upadhyay Aff. ¶ 11; Alam Decl. ¶¶ 2-6.) Second, during her time living with the Sethis, she was friends with Raziah "Shaku" Begum (Hr'g Tr. 1 at 95:16-96:1; <u>see also</u> Hr'g Tr. 2 at 154:8-12), who was a member of Andolan (Hr'g Tr. 2 at 153:25-154:4; Hr'g Tr. 3 at 8:25-9:1). More importantly, however, Begum brought a wage-and-hour case against her

employers in 2004, see Compl., Begum v. Chellaram, No. 04 Civ. 9435 (S.D.N.Y. Dec. 1, 2004) ("Begum Compl."), which plaintiff acknowledges she was aware of (First Upadhyay Aff. ¶ 7). Plaintiff even lived in the same building as Begum in 2008, after she no longer lived with defendants, but prior to bringing suit. (Hr'g Tr. 1 at 130:21-131:9.) Third, she appeared in a workers' rights documentary produced by Brown Girls Productions entitled "Behind Closed Doors" -- which details the situation of domestic workers in New York City, and in particular how some of them are "underpaid and exploited" -- no later than October 2009. (Id. at 137:22-139:12; Defs.' Ex. 25.) It is obvious that plaintiff had unusually rich access to information and that simple questions to any of these people would have revealed her legal rights.

In addition, plaintiff claims she asked the Sethis for money that she asserts was owed to her over a year before seeking legal recourse. (First Upadhyay Aff. ¶ 15.) In this regard as well she was not being diligent in timely bringing a suit even after forming a belief that she was owed wages.

Plaintiff thus had the ready means to learn both the scope of her rights and whether she was being underpaid. We need not resolve any factual disputes to determine -- based on her own testimony -- that she failed to do either. Under these circumstances, no reasonable jury could find that a diligent

10

plaintiff would not have been aware of her rights and claims well before 2010, and neither can we. These grounds alone justify a denial of equitable tolling.[7]

## III. Plaintiff Has Shown No Extraordinary Circumstances

Plaintiff has made very few positive allegations about defendants themselves or about anything that could constitute extraordinary circumstances. Even assuming that plaintiff had acted diligently, the allegations that she has made that are relevant to the second equitable tolling prong are insufficient to warrant the tolling she requests. Regardless, we find her protestations of ignorance of the facts and her rights to be incredible.

### A. Plaintiff's Allegations Do Not Constitute Extraordinary Circumstances

#### 1. Plaintiff's Finances Were Not Hidden from Her

Plaintiff essentially asserts that defendants hid the facts about her wages from her in two ways. First, she contends that, for some period of time, Drs. Sethi and Raj paid her by check made out to either Mr. or Ms. Sethi. (Hr'g Tr. 1 at 26:25-27:9.) Assuming that assertion is true, these checks were still given

---

[7] It is significant as well that plaintiff's failures in these regards have prejudiced defendants insofar as the delay has led to the loss of evidence -- for example, the ledger of payments kept by Mr. Sethi (Mr. Sethi Aff. ¶ 4; Hr'g Tr. 2 at 280:16-284:4) and e-mails with plaintiff's son about transfers of plaintiff's wages to India (Mr. Sethi Aff. ¶ 3; Hr'g Tr. 2 at 306:20-308:3) -- as well as needlessly extending the period for which plaintiff seeks to recover. Cf. Valdez ex rel. Donely v. United States, 518 F.3d 173, 183 (2d Cir. 2008) (noting that a plaintiff otherwise entitled to equitable tolling may forfeit that right if her lack of diligence prejudiced the defendant).

to plaintiff and she understood that they represented her wages
(id. at 35:7-9), and the documentary evidence demonstrates that
deposits were made in her account (Defs.' Ex. 3), so she was not
prevented in any way from knowing how much she was being paid.
Second, she alleges that the Sethis misled her over the course
of a year beginning in April 2008 about how much money she was
still owed and when it would be paid to her. (First Upadhyay
Aff. ¶¶ 14-16.) Accepting this description of events as true, it
could at most warrant equitable tolling beginning in April 2008
of the statutes of limitations pertaining to the claims against
the Sethis. However, to the extent those periods had elapsed
prior to that point, this conduct cannot justify reopening them.[8]
See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 108 (2d
Cir. 2005) ("A tolling period cannot delay the expiration of a
deadline when that deadline has already expired.").

Moreover, the suggestion that defendants kept the details
of plaintiff's finances from her to an extent sufficient to
warrant tolling is belied by the written record in this case.
Among other things, defendants created a contemporaneously dated
spreadsheet tracking all of plaintiff's wages (Defs.' Ex. 5),
collected all of the bank records reflecting accounts held for
plaintiff or jointly with plaintiff (Defs.' Ex. 4), and filed

---

[8] In this context, it should be recalled that plaintiff's primary period of
employment with the Sethis ended in the fall of 2003. (Am. Compl. ¶ 7.)

both state and federal tax returns on plaintiff's behalf from 2002 through 2008 (Defs.' Ex. 18). While, given the issue before us, we do not find that these documents evidence actual payments made to plaintiff by defendants, they are at a minimum indicative of the fact that defendants were not attempting to hide from plaintiff any information about her wages. Creation of a paper trail simply is not conducive to concealment.

Likewise, the Sethis assisted plaintiff in obtaining her social security card, green card, and other documentation. These voluntary acts are hardly consistent with off-the-books employment. Moreover, these acts empowered plaintiff to readily find a new job if she was dissatisfied with defendants' treatment of her. Additionally, the Sethis assisted plaintiff in obtaining a certificate of good standing from JPMorgan Chase Bank, where the joint account was held, so that she would be able to open a bank account of her own elsewhere. Again, this action is inconsistent with any suggestion that defendants were hiding financial information from plaintiff.

2.   <u>Plaintiff's Legal Rights Were Not Hidden from Her</u>

Plaintiff also asserts two ways by which defendants prevented her from learning of her legal rights. First, she states that the Sethis interrupted a meeting she was having with representatives from a workers' rights organization in 1999 or 2000 and that Ms. Sethi subsequently discouraged her from

13

speaking to them. (First Upadhyay Aff. ¶ 11.) Putting aside for the moment the inherent tension in plaintiff's statements that Ms. Sethi invited the representatives to speak to plaintiff but then ended the meeting early and told plaintiff not to speak to them (id.), this conduct simply does not rise to a level that would justify invoking the "extraordinary measure" of equitable tolling. Veltri, 393 F.3d at 322. The bottom line is that, accepting plaintiff's version of events,[9] Ms. Sethi invited members of a workers' rights organization to the Sethis' home to speak with plaintiff and permitted them to speak in private for some period of time. Regardless of what else plaintiff alleges about this interaction, she has alleged that the Sethis affirmatively provided her the opportunity to learn about her rights.[10] This scenario cannot be the basis for equitable

_____

[9] The Sethis have offered a competing description of the meeting. While plaintiff claims that Ms. Sethi invited the workers to speak to plaintiff about obtaining a green card (First Upadhyay Aff. ¶ 11), Mr. Sethi indicated that they did not embark on the process of obtaining plaintiff a green card until they learned of the passage of an amnesty law for foreign domestic workers in 2001 (Mr. Sethi Aff. ¶ 10; Hr'g Tr. 2 at 278:11-20). Ms. Sethi testified that two visitors for plaintiff simply arrived at their apartment building without prior notice and asked to speak privately with plaintiff, which they did for approximately 45 to 60 minutes. (Aff. of Ronica Sethi, dated Apr. 16, 2012 ("Ms. Sethi Aff."), ¶ 13; Hr'g Tr. 3 at 86:5-12, 91:11-14.) Although not necessary to our conclusion in this section of this order, we find the Sethis' recital of the events far more plausible than plaintiff's.

[10] Similarly, plaintiff alleges that she learned about Begum's lawsuit from Ms. Sethi. (First Upadhyay Aff. ¶ 7.) Had defendants truly been trying to conceal plaintiff's legal rights from her, they never would have made her aware of the possibility of bringing a wage-and-hour suit against one's employers.

tolling. Indeed, it is actually inconsistent with the invocation of that "extraordinary measure."

We note also that plaintiff had significant freedom to leave her employers' households. Plaintiff, for instance, has acknowledged that she would typically leave the Sethis' household every evening around 7:30 p.m. in order to attend to her massage clients (Hr'g Tr. 1 at 66:24-67:7) and that she was free to socialize with other nannies in playgrounds and parks (First Upadhyay Aff. ¶ 12). The Sethis even left plaintiff in New York for six weeks when they traveled to India. (Mr. Sethi Aff. ¶ 12.) It is clear that defendants did not supervise whom plaintiff socialized with and that plaintiff was in no way prevented from speaking to whom she wished.

Second, plaintiff has contended that defendants' alleged failure to post or otherwise provide to her the federal and state notices regarding wage-and-hour laws may justify equitable tolling. As we have written before, see Upadhyay, 2012 U.S. Dist. LEXIS 11054, at *15-17, a failure to post these notices is not by itself a sufficient basis on which to predicate equitable tolling if plaintiff was otherwise aware of her rights.[11] See,

---

[11] Some courts have also found that a failure to post the required notices simply does not qualify as an "extraordinary circumstance," even if the plaintiff was otherwise unaware of her rights, without any "allegation that defendants engaged in anything more, e.g., some sort of deception." Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 319 (S.D.N.Y. 2011) (quoting Cao v. Wu Liang Ye Lexington Rest., Inc., No. 08 Civ. 3725,

e.g., Maldonado v. La Nueva Rampa, Inc., No. 10 Civ. 8195, 2012 U.S. Dist. LEXIS 67058, at *11-13 (S.D.N.Y. May 14, 2012); Lanzetta, 763 F. Supp. 2d at 622-23; Saunders v. City of New York, 594 F. Supp. 2d 346, 363-64 (S.D.N.Y. 2008). Assuming arguendo that defendants did not advise plaintiff of her rights, plaintiff must at minimum make some affirmative showing as to her ignorance of those rights before she can rely on a failure to post to justify equitable tolling. As discussed below, we do not believe her representations about her lack of knowledge.

**B.  Plaintiff Simply Is Not Credible**

The preceding discussion -- despite our notations of skepticism about plaintiff's story throughout -- did not depend on an assessment of plaintiff's credibility. Rather, based on plaintiff's own admissions and accepting her version of the visit from a workers' rights organization, plaintiff has failed to meet her burden to establish the two prongs of the equitable estoppel test. Put simply, our opinion could -- purely as a matter of legal logic -- stop here. However, because plaintiff's version of events is so riddled with facially incredible statements and discrepancies that have not been satisfactorily explained, we feel compelled to address her credibility.[12]

---

2010 U.S. Dist. LEXIS 109373, at *4 (S.D.N.Y. Sept. 30, 2010)). As already discussed, plaintiff has not made this showing.

[12] The credibility of Alam, the only other witness to testify on plaintiff's behalf, also demands discussion. Alam testified that she was one of the women

       1.   Plaintiff Called into Question the Testimony in
           Her Own Affidavits

In the course of plaintiff's testimony, she explicitly disavowed and otherwise undermined much of the affidavit presentation drafted by her counsel. Specifically, on the first day of the hearing, plaintiff disavowed the signature on a declaration that had been submitted on her behalf in connection with the briefing on the motion that gave rise to the hearing.[13] (Hr'g Tr. 1 at 10:10-19.) Later that day, after having affirmed that the First Upadhyay Affidavit bore her signature, she

_____

from a workers' rights organization who met with plaintiff in the Sethis' home near the beginning of her employment. (Alam Decl. ¶ 4; Hr'g Tr. 3 at 23:6-8.) She further indicated that she met plaintiff on several other occasions in the years prior to the initiation of this lawsuit. (Alam Decl. ¶¶ 7-9; Hr'g Tr. 3 at 25:13-15, 33:24-35:8.) Plaintiff also acknowledged that she knew Alam (Hr'g Tr. 1 at 89:18-21) and met with her just prior to bringing suit (Second Upadhyay Aff. ¶ 13). Yet plaintiff's affidavits and declaration do not name either of the women who visited the Sethis' home. Plaintiff was unable to provide any coherent explanation for why, if she knew who Alam was at the time she submitted her affidavits and declaration, and if Alam actually came to the apartment, she did not identify Alam as one of the visitors. (Hr'g Tr. 2 at 157:24-160:19.) We therefore have doubts that Alam was, in fact, one of the women who came to speak to plaintiff at the Sethis' apartment.

    Moreover, even if Alam was present for the meeting, she acknowledged at the hearing that she did not speak the same language as plaintiff at the time of the meeting. (Hr'g Tr. 3 at 23:2-5, 26:5-24.) Nevertheless, her declaration does not indicate that fact and, indeed, is written as if Alam herself had the relevant conversation with plaintiff. (Alam Decl. ¶ 5.) Given the misleading nature of this recital, Alam's credibility is severely compromised.

[13] This was not the only time plaintiff's signature posed difficulties at the hearing. On the second day of the hearing, plaintiff steadfastly maintained that her signature contains a single "n" and that the signatures on her application for alien employment certification (Defs.' Ex. 26), employment authorization card with photo identification (Defs.' Ex. 27), social security card (Defs.' Ex. 28), and passport (Defs.' Ex. 9) were not hers (Hr'g Tr. 2 at 168:12-169:21, 173:15-175:24, 176:17-178:13). While these denials are consistent with her prior representation that she did not endorse Drs. Sethi and Raj's checks made out to her (Hr'g Tr. 1 at 106:11-107:15), they are entirely untenable.

disavowed one of the representations made in that affidavit. (Id. at 124:7-126:24.)

Subsequently, plaintiff seemed to indicate that she would agree to any proposition that was read to her (id. at 132:16-133:7), calling into question the accuracy of both of her affidavits and her declaration (whatever force the latter document still retained after its disavowal). Furthermore, plaintiff represented at the hearing that she has no memory of dates (id. at 46:12-48:8), including dates essential to the merits of this case and alleged in the amended complaint (e.g., Am. Compl. ¶¶ 6-8, 10, 14-16, 22, 25, 26, 30-32, 35, 36, 42, 43, 46, 47, 54).[14] These aspects of plaintiff's hearing testimony seriously damage her affidavit testimony, thereby undermining her testimony as a whole.

We now move from general to more specific examples, beyond those mentioned above, of plaintiff's lack of credibility. The discussion that follows is intended to be only illustrative.

---

[14] The amended complaint suffers from other defects as well. For instance, its North Carolina state claims are based on the allegation that Dr. Sethi was a resident of, and that plaintiff worked in, North Carolina in 2003 and 2004 (Am. Compl. ¶ 8), even though Dr. Sethi was attending a residency program at the University of Virginia in Charlottesville, Virginia at the time (Aff. of Shikha Sethi, dated July 29, 2011 ("Dr. Sethi Aff.") ¶ 3). Although plaintiff may have initially been confused regarding her state of employment, we have no doubt that Dr. Sethi did live in Virginia and are baffled as to why plaintiff and her counsel still maintain otherwise.

2.   Plaintiff's Proffered Self-Portrait Did Not
     Withstand Scrutiny

We focus first on those lies pertaining to plaintiff's self-description. Obviously, in seeking the benefits of equitable estoppel, it was to plaintiff's advantage to portray herself as incapable and vulnerable. That portrait, however, did not withstand trial scrutiny.

Plaintiff has claimed that she "cannot read or write in any language." (First Upadhyay Aff. ¶ 2.) The extent to which this claim is embellished is immediately apparent upon examination of plaintiff's diaries, in which writing that appears to be hers is found throughout and frequently seems to correspond to dates that are denoted by name rather than number (e.g., "Thursday, June 19," rather than "6/19"). (Defs.' Exs. 23, 24.)[15] Further, in trying to support this depiction of herself, plaintiff made the preposterous claim that, in connection with her massage business, she finds her way around the city largely through the assistance of strangers because she cannot read directions or street signs. In particular, she claimed that she gets someone to write down the address of where she is going, navigates public transportation, and then, after arriving at the

---

[15] Plaintiff -- after first stating that she wrote names, numbers, and addresses in her diaries (Hr'g Tr. 1 at 73:24-74:18, 75:17-76:2) -- later refused to admit that she wrote any "words" in them, though she did acknowledge that she had "written the phone numbers and the marks." (Id. at 77:2-23.)

destination stop, shows the address to someone every block until she arrives at the correct location. (Hr'g Tr. 1 at 80:19-81:19.)

Plaintiff has also asserted that she "do[es] not speak or understand English, except for words like 'hello' and 'goodbye.'" (First Upadhyay Aff. ¶ 2.) However, not only did plaintiff acknowledge at the hearing that her vocabulary is not so limited as implied by the statement in her affidavit (e.g., Hr'g Tr. 1 at 81:23-25),[16] she also utilized certain English words in her responses when convenient, further belying her assertion about her knowledge of English. Moreover, she occasionally answered questions before the interpreter had finished translating them and could tell when the interpreter was not translating her words correctly. (E.g., id. at 71:1-7, 85:2-10, 29:23-30:16.)[17]

Nor has plaintiff simply mischaracterized her language skills; she has also dramatically undersold her facility with numbers. She has stated that she never "learned how to

---

[16] When plaintiff indicated that she in fact understands other English words, including the words "left" and "right," her attorney was quick to point out that the statement in plaintiff's affidavit is not actually false because plaintiff stated that she understands words "like" "hello" and "goodbye," not "only" those words. (Hr'g Tr. 1 at 81:23-82:13.) Language-parsing aside, we find plaintiff's affidavit misleading.

[17] Presumably to bolster her claim of lack of facility with the English language, plaintiff indicated that the Sethis' children spoke only Hindi in their home, unless speaking to their mother. (Hr'g Tr. 1 at 93:15-25.) When challenged, she altered her response but maintained that the Sethis' children spoke Hindi to her and other children, despite speaking English to each other and their parents and attending an English-speaking school (id. at 94:1-95:13; Hr'g Tr. 2 at 319:14-20; Hr'g Tr. 3 at 112:24-113:13).

add/subtract[] or multiply numbers" and that she therefore required Ms. Sethi's assistance "to count the cash income I had earned from my massage work . . . because I could not add the dollar bills together," as well as that she cannot even count months as they go by. (First Upadhyay Aff. ¶¶ 2, 5; Hr'g Tr. 1 at 57:6-7.) These representations are wholly inconsistent with the ease with which she is able to discuss the amounts of money she has received at various times, as well as her abilities to run errands and go shopping (e.g., Hr'g Tr. 2 at 179:1-25), negotiate her wages (Hr'g Tr. 1 at 35:10-36:9), operate a business, and send money to her family (id. at 32:17-33:9, 71:19-72:23, 121:10-122:6). In trying to bolster this image of her limited skills, she made the wholly incredible claim that she would verify neither how much her massage clients paid her (Hr'g Tr. 2 at 166:16-167:7) -- despite acknowledging that she charged different amounts to different clients (id. at 166:8-15; Hr'g Tr. 1 at 66:13-19) -- nor how much money she sent to her family through Western Union (Hr'g Tr. 2 at 164:24-165:5).[18]

---

[18] In tension with the impression intended to be conveyed by these representations, plaintiff also contended that, before she moved to Virginia to work for Drs. Sethi and Raj in October 2003, she negotiated how much she would be paid after the doctors moved to New York in July 2004. (Hr'g Tr. 2 at 192:10-15.) This is a facially dubious proposition, but it is particularly incredible in light of the fact that the doctors' move was not confirmed until June 2004 and not even contemplated in the fall of 2003. (Id. at 240:8-241:18.) Regardless, by making this representation, plaintiff suggests that she has greater skill with numbers and money than she would like to admit.

Plaintiff also averred that, in April 2008, in plaintiff's presence, Ms. Sethi withdrew $10,000 from plaintiff's account but gave plaintiff only $5000. (Defs.' Ex. 4; First Upadhyay Aff. ¶ 14.) Ms. Sethi does not strike us

3.   Plaintiff Lied About Matters Central to the
      Equitable Tolling Issue

We have already found that plaintiff actually had the opportunity to learn about her rights and financial situation and therefore is not entitled to the benefit of equitable estoppel. Here we go a step further and find that she lied about both what opportunities were available to her -- in an effort to distance herself from the obvious potential sources of information -- and the knowledge she acquired from them.

We simply cannot credit plaintiff's assertion that she never discussed her rights or wages with other nannies (First Upadhyay Aff. ¶ 12; see also Hr'g Tr. 1 at 29:2-4), even though she acknowledged that she is friends with other nannies and saw them with some frequency (First Upadhyay Aff. ¶ 12). Even less plausible is plaintiff's claim that the Sethis never showed her the analysis of her wages and bank balance prepared in 2007 or any supporting records. (Id. at ¶ 8.) That spreadsheet is date-stamped as having last been modified in 2007 (Defs.' Ex. 5), so it was not prepared in anticipation of litigation, and there is no explanation for its existence other than to educate plaintiff on her finances. We therefore believe that plaintiff was fully

---

as either dishonest or stupid, but the conduct plaintiff attributes to her is both. Moreover, plaintiff even made claims that are flatly contradicted by the documentary evidence, such as that the Sethis never wired money to her family in India. (Compare Hr'g Tr. 1 at 62:2-8, with Defs.' Exs. 7, 17.) Again, we do not believe plaintiff's accounts of these matters, but they indicate that she was cognizant of financial affairs.

22

aware of her financial situation, both objectively and in relation to other similar workers.

We also are unable to credit plaintiff's statements about her ignorance of the wage-and-hour laws. Initially, we do not believe that a workers' rights organization whose mission includes education on wage-and-hour issues would visit a domestic worker and neither mention her legal rights during that meeting nor follow up about those rights later. Plaintiff's contention that she did not learn of her legal rights from this organization (First Upadhyay Aff. ¶ 11) is not credible.

Plaintiff has further claimed that she did not know the substance of Begum's lawsuit (First Upadhyay Aff. ¶ 7) because she never had the time to speak to Begum about it, other than on a single occasion (Hr'g Tr. 1 at 127:24-128:8). She even claimed that, other than that one meeting, she did not see Begum again after that suit was filed in 2004 (id. at 129:5-10), though she later backtracked and acknowledged that they saw each other when living in the same building (id. at 130:21-131:22). It is beyond dispute that Begum's lawsuit asserts claims under some of the same wage-and-hour provisions that are at issue here. See Begum Compl. ¶¶ 106-114 (asserting minimum wage claims under the FLSA and New York Labor Law and overtime claims under the New York Labor Law). Plaintiff has reluctantly acknowledged that she and Begum are friends (Hr'g Tr. 1 at 95:16-23), that they have spent

23

time together since Begum filed her lawsuit (id. at 130:21-131:22; Hr'g Tr. 2 at 154:8-12; see also id. at 259:12-23), and that she appeared in a documentary about workers' rights with Begum (Hr'g Tr. 1 at 136:10-139:12). It is beyond our powers of credulity to believe that, under these circumstances, plaintiff and Begum never spoke of the substance of Begum's lawsuit.[19] (Cf. Hr'g Tr. 2 at 154:8-156:7.) We therefore find that plaintiff was aware of her legal rights long before she brought suit.

In sum, when viewed as a whole, it is clear that plaintiff purposefully constructed her web of falsehoods in an effort to achieve the most favorable litigation outcome possible. Thus, we believe -- and no reasonable jury could find otherwise -- that plaintiff has been aware of any possible causes of action for years yet failed to bring them in anything resembling a timely fashion, warranting a denial of equitable tolling irrespective of any action or inaction of defendants proffered by plaintiff.

### 4.   Plaintiff's Lies Are Pervasive

We note further that plaintiff has not limited the subjects about which she will lie to those that are central to the resolution of the equitable tolling issue. Indeed, she has lied

---

[19] Likewise, plaintiff's claim that she was advised to seek assistance from an attorney after she developed the belief that defendants owed her money by a random, unnamed client of her massage business (Second Upadhyay Aff. ¶ 13) simply does not ring true. It is too much to believe that a friend of plaintiff's who lived in the same building as she did, was involved in a workers' rights organization, and had herself brought a wage-and-hour suit against her employers did not provide such advice but a disinterested stranger did.

about matters with no bearing on that topic, or on the case as a whole.

For instance, plaintiff claimed that the only reason she saw a doctor who was located in Queens about her rheumatoid arthritis was that Dr. Sethi had found that doctor for her. (Id. at 151:17-151:25, 153:5-9.) At the time, however, plaintiff was living in Manhattan with Drs. Sethi and Raj, who were themselves affiliated with a medical center in Manhattan. (Id. at 152:1-2.) Plaintiff's explanation that Dr. Sethi chose that doctor because she wanted plaintiff to be seen by someone of Indian descent is highly unlikely -- in particular because the doctor chosen was not Indian. (Id. at 152:6-21.) The far more likely explanation for why plaintiff's doctor was located in Queens is that plaintiff listed her address on her application for Medicaid as being in Queens. (Id. at 261:7-262:23.)

Indeed, plaintiff's Medicaid application is, in itself, a further reason to doubt her trustworthiness. She filled out the application when working for Drs. Sethi and Raj in New York, and she indicated on it that her income was $100 per week (id. at 153:10-15, 261:7-262:9), despite having income both from her employment as a nanny and the massage business she ran on the side.[20]

---

[20] Plaintiff was also evasive as to whether she reported the income she made from the massage business on her income tax returns. (Hr'g Tr. 1 at 101:5-21.)

###### C.   Defendants Are Credible

Because plaintiff bears the burden in proving the propriety of equitable tolling and she has failed to do that, our crediting of defendants' testimony is not essential to our decision. Nevertheless, given the sometimes-scandalous claims made by plaintiff, we believe it warranted to note that we found defendants eminently trustworthy in both word and deed,[21] and their version of events makes it clear that plaintiff had significant knowledge of her rights and finances for years before bringing suit.[22]

---

[21] Defendants consistently conducted themselves in ways that suggest they were honest, fair employers who provided plaintiff with access to all of the information she needed. In addition to what we have described above, we note that the Sethis enrolled plaintiff in English classes and Ms. Sethi herself attempted to teach plaintiff English (Ms. Sethi Aff. ¶ 3; Hr'g Tr. 1 at 91:8-18; Hr'g Tr. 3 at 91:17-93:21), the Sethis permitted plaintiff to have a joint account with them so that she could obtain a higher interest rate than would otherwise have been available to her (Ms. Sethi Aff. ¶ 22; Hr'g Tr. 3 at 81:17-82:5), the bank records of plaintiff's joint account with the Sethis show no unwarranted withdrawals (Hr'g Tr. 2 at 254:20-259:3, 270:1-8; Hr'g Tr. 3 at 99:3-9), and all checks made out to plaintiff and entrusted to the Sethis were duly deposited in plaintiff's account (Hr'g Tr. 1 at 110:3-8). These facts simply are not consistent with the suggestion that defendants were attempting to hide anything from plaintiff.

Plaintiff's and plaintiff's family's treatment of defendants casts further doubt on the notion that defendants are anything other than trustworthy. Plaintiff purchased a gold necklace and earrings for Ms. Sethi as a gift after plaintiff received her green card, and plaintiff's granddaughter was named after Ms. Sethi. (Ms. Sethi Aff. ¶ 16; Hr'g Tr. 1 at 45:14-46:1.) Moreover, e-mails between the Sethis and plaintiff's son are friendly in tone (Defs.' Exs. 7, 11), suggesting that plaintiff's family did not believe that plaintiff was being shortchanged in any way. Additionally, plaintiff herself has acknowledged that, on at least one occasion, she gave a significant amount of money from her massage business in cash to defendants to transfer to India for her. (Hr'g Tr. 1 at 117:15-23.) These actions suggest that plaintiff was nothing if not well-treated by defendants and that defendants had earned plaintiff's trust.

[22] We reiterate that we are not making any findings about what wages plaintiff was entitled to receive or the amount of wages she did receive, in this section of the opinion or any other.

In particular, we fully credit defendants' statements that plaintiff discussed her pay with defendants on numerous occasions and knew how much she was supposed to be paid (Mr. Sethi Aff. ¶ 2; Dr. Sethi Aff. ¶¶ 6(a), (c), 7(c), (d), 9(c); Hr'g Tr. 2 at 236:11-240:7, 249:15-252:22, 293:6-16, 304:8-18; Hr'g Tr. 3 at 101:24-102:4); as a result of plaintiff's inquiries, the Sethis prepared an accounting of all payments to plaintiff, which they discussed with her in 2006 or 2007 (Mr. Sethi Aff. ¶ 14; Ms. Sethi Aff. ¶ 20; Hr'g Tr. 2 at 295:1-21, 312:3-313:15; Hr'g Tr. 3 at 99:11-101:6); and defendants gave plaintiff her bank statements on at least several occasions, and in particular after the 2007 accounting (Mr. Sethi Aff. ¶ 14; Hr'g Tr. 2 at 259:24-261:6, 295:25-296:6, 313:7-15; Hr'g Tr. 3 at 100:11-102:4). As a result, there is no doubt that plaintiff was fully apprised of her financial situation on an on-going basis.

Moreover, we find that defendants had made plaintiff equally aware of her legal rights. Mr. Sethi translated wage-and-hour posters for plaintiff in 2001 or 2002, and Dr. Sethi did the same in 2006. (Mr. Sethi Aff. ¶ 8; Dr. Sethi Aff. ¶ 9(c); Hr'g Tr. 2 at 287:6-293:5, 225:20-226:21, 230:21-233:1.) Defendants discussed labor rights and wages in general with plaintiff on at least several occasions. (Mr. Sethi Aff. ¶¶ 6, 9; Ms. Sethi Aff. ¶ 17; Hr'g Tr. 2 at 226:22-227:16, 230:13-20,

293:6-16; Hr'g Tr. 3 at 90:5-91:10.) Wage-and-hour posters were posted in Drs. Sethi and Raj's New York apartment buildings from 2004 to 2007. (Dr. Sethi Aff. ¶ 9(b); Hr'g Tr. 2 at 223:24-225:8.) Moreover, plaintiff was aware of the details of Begum's lawsuit and discussed the suit with defendants on numerous occasions. (Mr. Sethi Aff. ¶ 13; Ms. Sethi Aff. ¶ 12; Dr. Sethi Aff. ¶ 9(e); Hr'g Tr. 2 at 222:18-223:12, 241:19-242:9, 302:13-303:9; Hr'g Tr. 3 at 85:10-12, 86:13-87:4, 110:2-111:9.)

Given these facts, it is clear that defendants did not hide from plaintiff how much she was earning, had been paid, or had in her bank accounts, even going out of their way to create a detailed accounting of payments for her. Moreover, defendants did not prevent plaintiff from learning of her rights, and in fact tried to facilitate her understanding of the law.

<u>CONCLUSION</u>

The Court's equitable power permits us to find, see <u>Heyman v. Kline</u>, 456 F.2d 123, 130 (2d Cir. 1972), and we do so find, without reaching any merits issues, that plaintiff has not demonstrated that the statutes of limitations in this case should be tolled. Nevertheless, we note that, independent of that power, the Second Circuit has held that when a plaintiff's testimony is "largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the

28

suspension of disbelief necessary to credit the allegations made in [her] complaint," summary judgment is appropriate because there can be no genuine issue of material fact regarding her claims. Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005) (internal quotation marks omitted). This case is one of "the rare circumstance[s] where the plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete," id. at 554, where an assessment of plaintiff's credibility would be permissible on summary judgment. Even drawing all reasonable inferences in the light most favorable to plaintiff, no reasonable juror could believe plaintiff's testimony, which was rife with inconsistencies and contradictions, unexplained lacunae, and simple implausibility.

Plaintiff has thus failed on multiple fronts to demonstrate why she should be entitled to equitable tolling. For the foregoing reasons, defendants' motion for partial summary judgment is granted, and most of her claims are untimely. In particular, the following are barred: all FLSA claims against Drs. Sethi and Raj; all FLSA claims against the Sethis prior to November 9, 2008, unless willfulness is demonstrated; all New Jersey state law claims prior to November 9, 2008; all New York state claims against Drs. Sethi and Raj prior to November 9,

2004; all New York state claims against the Sethis; all North Carolina state law claims; and all breach of contract claims.[23]

Dated:     New York, New York
           July 30, 2012

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiff**
Amelia K. Tuminaro
Gladstein Reif & Meginniss, LLP
817 Broadway, 6th Floor
New York, NY 10003

**Attorneys for Defendants**
Kathleen M. McKenna
Joshua F. Alloy
Proskauer Rose LLP
11 Times Square
New York, NY 10036

---

[23] See 29 U.S.C. § 255(a) (two-year statute of limitations, or three years if the defendant's violation is willful, for wage-and-hour claims); N.J. Stat. Ann. § 34:11-56a25.1 (two-year statute of limitations for wage-and-hour claims); N.Y. Lab. Law §§ 198(3), 663(3) (six-year statute of limitations for wage-and-hour claims); N.C. Gen. Stat. § 95-25.22(f) (two-year statute of limitations for wage-and-hour claims); N.Y. C.P.L.R. § 213(2) (six-year statute of limitations for breach of contract); Va. Code Ann. § 8.01-246(4) (three-year statute of limitations for breach of oral contract).